**PECKAR & ABRAMSON, P.C.**
70 Grand Avenue
River Edge, NJ 07661
Telephone: (201) 343-3434
Kevin J. O'Connor, Esq. KOConnor@pecklaw.com
Kevin M. Foltmer KFoltmer@pecklaw.com
Attorneys for Defendants

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW JERSEY**

| | |
|---|---|
| EARLE REFINING, LLC, <br><br> Plaintiff, <br><br> vs. <br><br> NEW VACUUM TECHNOLOGIES LLC and NORTH JERSEY PETROLEUM OPERATIONS, LLC, <br><br> Defendants. | Case No. 3:22-cv-04469-GC <br><br> ECF CASE – Electronically Filed <br><br> **DECLARATION OF JOSEPH M. LAURA IN SUPPORT OF MOTION TO DISMISS** |

I, **JOSEPH M. LAURA,** certify under penalty of perjury, pursuant to 28 U.S.C. § 1746, that the following is true and correct to the best of my knowledge and belief:

1. I am a member of New Vacuum Technologies, LLC ("NVT") and North Jersey Petroleum Operations, LLC ("NJPO" and, with NVT, collectively "Defendants") in the above-referenced action commenced by Plaintiff, Earle Refining, LLC ("Plaintiff" or "Earle").

**PRELIMINARY STATEMENT**

2. Earle has sued Defendants alleging patent infringement concerning U.S. Patent No. 10,053,635 (the "'635 Patent"). Because the purported assignment by which Earle claims to have taken ownership of the '635 Patent as well as the associated exclusive license rights (the "'635 Patent License") are the subject of a pending

American Arbitration Association ("AAA") arbitration (the "Pending Arbitration") of which I am a party along with Pristec America, Inc. ("PAI-NV") of which I am the President, the Court should dismiss this action without prejudice until such time as the Pending Arbitration has fully concluded.

A. **Earle's First Lawsuit Before This Court Concerning the Patent and License Rights.**

3. We were before the Court one time previously in connection with these same patent and license rights, when Earle filed a June 16, 2017 complaint in the matter styled *Pristec Refining Technologies USA, LLC et al v. Pristec AG et al.*, 3:17-cv-04437-PGS-LHG (the "First Federal Action"). A true and correct copy of the Complaint in the First Federal Action is attached hereto as **Exhibit A**.

4. The First Federal Action, just like the claims in the Pending Arbitration, concern a joint venture between Earle and PAI-NV to pursue valuable petroleum processing in refineries in the U.S. through the licensing of the '635 Patent by PAI-NV to a joint venture of which Earle was and remains a minority member, Pristec Refining Technologies USA, LLC ("PRT"). (*See* Ex. A, ¶ 1).

5. In October, 2017, the Court dismissed the First Federal Action on jurisdictional grounds.

B. **The Monmouth County Actions and the ICDR Arbitration.**

6. PAI-NV sued Earle in Delaware, and Earle filed a competing action on December 1, 2017 in the Monmouth County, New Jersey Chancery Division. Ultimately the Delaware case was discontinued in early 2018 and the parties continued with Earle's action in Monmouth County, where Earle asserted essentially the same claims it had asserted in the First Federal Action.

LAW OFFICES
Peckar &
Abramson
A Professional Corporation

#4779843v1

2

7.  In February 2018, a few months after Earle had sued it in the aforementioned Chancery Action, Pristec AG ("PAG"), the assignor of the '635 Patent, sued myself and another officer and board member of PAI-NV (Anthony Sichenzio), in a separate, Monmouth County Chancery Division action. PAG claimed, among other things, that it had the legal right to terminate the '635 Patent License granted to PAI-NV in October 2013, allegedly due to "misconduct" on the part of Sichenzio and I.

8.  Sichenzio and I immediately moved the Chancery Court to compel PAG to arbitrate its new lawsuit. That arbitration was heard in 2019 before the International Centre for Dispute Resolution (the "ICDR Arbitration"), which is an affiliate of the AAA dedicated to resolving international disputes.

C.  **The PAG/Earle Conspiracy Concerning the '635 Patent Is Revealed.**

9.  It was through facts revealed by Earle in the lead up to the filing of the First Federal Action that Sichenzio and I obtained concrete evidence that Earle had been conspiring with PAG to engineer a phony "disassociation" of PAI-NV and the termination of the '635 Patent License to the petroleum processing technology.

10. The First Federal Action complaint laid out in detail in paragraphs 169 through 186 that Earle and PAG had, during early 2017, secretly negotiated a purported "Letter of Intent" for an entity they called "Newco," with the intention of granting to Newco the very patent license rights that flowed to PRT (of which Earle had served as Manager) through my company, PAI-NV. (Ex. A, ¶¶ 172-173)(describing the agreement for "Newco").

11. By the time we moved to compel arbitration of the new PAG case against us in early 2018, we had learned even more of this deception and fraud on the

LAW OFFICES
Peckar & Abramson
A Professional Corporation

#4779843v1

3

part of Earle and PAG in connection with the affairs of PRT. Prior to suing us, PAG, who by then had realized that it had made a grave mistake in colluding with Earle, gave us documentary evidence that it had worked in secret with Earle in the latter part of 2016 and into early 2017, to intentionally terminate the '635 Patent License. They did so with the intention of pursuing "Newco" and freezing out all of the American investors who had funded the development of the '635 Patent.

12. In the ensuing ICDR arbitration which was held in early 2019 over the course of six days, Earle appeared on behalf of PAG, along with lead counsel in this action, Robert Schiappacasse, who admitted to this scheme under oath. Mr. Sichenzio and I presented the ICDR arbitrator with clear and convincing evidence of a fraudulent conspiracy between Earle and PAG, which was materially assisted by Schiappacasse. Earle and its attorneys were shown to have schemed behind the back of Earle's co-member in PRT (PAI-NV) to cause PAG to terminate the '635 Patent License so that Earle and PAG could form "Newco."

13. The evidence showed that Earle intended to divert the patent and license rights to Newco, thereby cutting out the rights of myself, Sichenzio, and all of the American investors in PAI-NV. The evidence also showed that Sills Cummis, who purported to be simultaneously representing the interests of both Earle and PRT, ghost wrote the very license termination notice that PAG used to kick off the cascading effects intended by Earle and PAG to lead to the demise of Sills' own client, PRT.

14. The evidence also showed that the old adage "there is no honor among thieves," was alive and well as between Earle and PAG. After Schiappacase secretly drafted the '635 Patent license termination notice and induced PAG to send it to PAI-

NV, Schiappacase caused a wholly illegal "disassociation letter" he drafted to be sent, purportedly on behalf of PRT, to PAI-NV. Through this "disassociation letter," Earle and Sills Cummis now claimed that Earle owned all of PRT, along with the '635 Patent License.

15. The ICDR Arbitrator decisively ruled in our favor, finding that we had proven this "PAG/Earle conspiracy" by clear and convincing evidence. The Arbitrator specifically found that Earle had engaged in a fraudulent conspiracy with PAG to cancel the '635 Patent License:

> 225. As set out in the factual recitals above, Respondent and the Earle Parties were clearly conspiring to freeze Claimants out of the U.S. Pristec Companies and transfer rights to the Pristec Technology to companies controlled by Earle in the weeks leading up to the execution of the SAA. The quick-fire series of events underlying this conspiracy – *from* the January 1, 2017 License Performance Guaranty *to* the January 19, 2017 letter accusing PAI-NV of committing material breaches of the PRT Operating Agreement and the PRT License *to* Earle's January 20, 2017 ghost-writing of the draft Cease and Desist Letter *to* Nuerk sending the Cease and Desist Letter to Laura on January 21, 2017 *to* the February 7, 2017 letter from Earle to Laura claiming that PAI-NV had been "disassociate[ed] from PRT" because of the Cease and Desist letter – is clear and convincing evidence in my opinion. Moreover, this was all done at a time when Laura was Chairman of Respondent's Supervisory Board, yet Laura was left out of the dealings between Respondent and the Earle Companies.
>
> 226. Based on this evidence, I conclude that Respondent's private dealings with Earle constituted material information that should have been disclosed to Claimants. I also conclude that had Claimants been informed about this by Respondent, they would have refused to enter into the SAA with Nuerk or, at minimum, would have demanded additional or different terms protecting their rights.
>
> 228. Respondent's explanations for why this activity was not fraudulent are also not persuasive, in my opinion. First, the fact the Parties had long been discussing a potential consolidation of the U.S. Pristec Companies with PAG does not justify the concealment of the PAG/Earle conspiracy from Claimants. If anything, this fact would have only made it easier to persuade Claimants to enter into the SAA.

(See Award, a true and correct copy of which is attached hereto as **Exhibit B**, at ¶¶ 225-28).

16. The ICDR Award was confirmed by the Southern District of New York. A true and correct copy of the Opinion and Order confirming the ICDR Award is attached hereto as **Exhibit C**.

17. The ICDR Arbitrator sought Earle's promise, under oath, that it intended to honor a preliminary injunction that he had already issued when Earle testified, prohibiting Earle and PAG from consummating their "Newco" deal. (*See* Award, Ex. B, at xxx n.9 ("Consistent with that injunction, both Nuerk and Earle confirmed during their testimony that they did not proceed to implement the settlement.")).

18. As reflected in the Award, the "Settlement" that was enjoined was a plan by Earle and PAG to divert the patent and license rights to "Newco," which the Arbitrator permanently enjoined.

19. Unbeknownst to all, Earle, through its owner Thomas J. Earle ("TJ Earle") had already set out to break that promise well before he stated under oath that Earle would honor the injunction. Just days after the ICDR Arbitrator issued a substantial financial award to Sichenzio and I as well as a permanent injunction prohibiting PAG from directly or indirectly doing anything further to alienate the U.S. affiliates' license rights to the '635 Patent, Earle purports to have entered into a transaction that fell squarely within the scope of the permanent injunction. (*See* Assignment, Complaint Ex. 2).

20. By this transaction, which Earle claims gives it the legal right to sue now before this Court, Earle claims to have purchased the '635 Patent—which it and PAG had secretly valued at over $520,000,000—for a fraction of that price, $500,000.

6

Earle also claims to have assigned the '635 Patent License that was the subject of the permanent injunction, to Earle. (*Compare id.*, *with* ICDR Award, Ex. B, at xliv-xlv).

21. If you place side by side the secret Earle valuation (a true copy of which is attached hereto as **Exhibit D)** that we learned that Earle had completed during the time that an injunction was already in place prohibiting it from launching "Newco" (which was formed as Pristec USA, LLC) and the Patent Assignment (Complaint, Ex. 2), you can see that Earle claims to have gained ownership of the '635 Patent and '635 Patent License for a price ($500,000) that is but a small fraction of what Earle believed it was worth. (**Ex. D**, Valuation, at 3)(indicating a FMV of '635 Patent rights alone at $520,000,000).

22. Earle engaged in this transaction despite the ICDR Permanent Injunction, as follows:

> "The October 1, 2013 "Patent, Technology and Know-How License Agreement" entered into by and between Respondent and PAI-NV (the "PAG-PAI License") remains in full force and effect notwithstanding the rescission of the SAA ***and, further, Respondent (whether directly or through its officers, employees or agents) is enjoined from terminating the PAG-PAI License without the internal approvals required by Austrian law, including the approval of PAG's Supervisory Board.***
>
> Respondent, whether directly or through its officers, employees or agents, is permanently restrained and enjoined from: (a) taking any actions to implement or consummate the terms of the purported settlement agreement in the litigation pending in the Chancery Division in Monmouth County, captioned *Pristec Refining Technologies et al. v. Pristec AG*, et al. (No. MON-C-175-17) (the "First Monmouth Action"), including causing or permitting ICT, PAI-NV or PAI-NJ to implement or consummate the terms of that settlement agreement; (b) ***compromising the claims or potential claims of ICT, PAI-NV or PAI-NJ in the Monmouth Action or otherwise; and (c) taking any other actions (including causing ICT, PAI-NV or PAI-NJ to take any actions) to enter into, implement or consummate the terms of any other settlement agreements or transactions of any kind that would***

7

> *impact the operations, ownership or rights of ICT, PAI-NV and PAI-NJ, including rights in the cold cracking Pristec Technology or any other technology."* (ICDR Award, Ex. B, at xliv-xlv)(emphasis added).

23. On or about July 31, 2019, Earle caused a letter to be sent to me in which it claimed to have purchased the '635 Patent and to have assumed the role of "Licensor" under the '635 Patent License. A true and correct copy of Earle's letter is attached hereto as **Exhibit E**.

24. The impact of this illegal transaction is at least threefold. One, Earle, who had already been shown to be a fraudster intent on terminating PAI-NV's license, would not only gain control of the patent but would become the "Licensor." This would set the stage for what came next (discussed below), which included Earle launching its own business with the technology in blatant violation of the '635 Patent License.

25. Two, at the time of the transaction in question, and as reflected in the ICDR Award, ICT owned 35,000 shares of PAG. (Award, Ex. B, at xliii ("ICT is hereby the lawful owner of 35,000 shares of PAG"). This is approximately twenty (20%) of PAG's outstanding shares. Thus, by virtue of this illegal transaction, if upheld, Earle would deprive ICT of roughly one third of PAG's profits from the '635 Patent, and, likewise, render PAG insolvent by selling off its largest asset for 1/1000 of its value.

26. Three, ICT owned an upstream oil processing patent that was largely dependent on the '635 Patent.

27. In September 2019, shortly after the ICDR Award was rendered, Sichenzio and I traveled to Austria to meet with PAG. During this trip, PAG

representatives reluctantly provided us with a copy of the purported "United States Patent Assignment" contained within Exhibit 2 to the Complaint which Earle claims gives it the legal right to commence this action. They only cooperated with us since we had such a large judgment, we could push them into involuntary bankruptcy. Their representative, Ruediger Nuerk, admitted that the transaction that he had entered into with Earle was improper and offered to work with us to invalidate it.

28.    In the Monmouth County Action, PAI-NV, Sichenzio and I thereafter moved swiftly to sue Earle to set aside the PAG/Earle patent/license transaction. In a counterclaim asserted in the litigation, a true and correct copy of which is attached hereto as **Exhibit F**, the Court was asked to rule that the transaction was illegal; improper; and to invalidate the transaction, which would result in the reversion of the '635 Patent rights to the inventors. (*See* Ex. F, ¶¶ 154-172).

29.    We secured an expert in Austrian law, Dr. Michael Praeger, who has concluded that the Earle transaction is illegal and void. A true and correct copy of the Prager expert report exchanged in the Monmouth Action, is attached hereto as **Exhibit G**.

30.    Earle never challenged the authority of the Monmouth County Chancery Division to decide the validity of the "United States Patent Assignment" contained within Exhibit 2 to the Complaint in this action or the validity of the purported assignment of the exclusive license to Earle. Indeed, Earle has secured its own expert witness to opine that its actions in purchasing the patent rights were legal.

31.    Among other testimony we secured in the Monmouth County action was the admission by Earle's counsel, Robert Schiappacase, Esq. (lead counsel in this

LAW OFFICES
Peckar & Abramson
A Professional Corporation

#4779843v1

9

action) that he caused Earle to take unilateral action in declaring itself the sole owner of PRT and of the '635 Patent License, with no payment at all being made to PAI-NV in direct violation of the PRT Operating Agreement. (A true and correct copy of excerpts of the deposition of Robert Schiappacase are attached hereto as **Exhibit H**, and the Court is directed to pp. 60:1-65:2).

32. Yet, despite the obvious fact that its client, Earle, never truly owned PRT, Sills Cummis[1] filed the First Federal Action on behalf of PRT claiming that Earle owned all of the company, and it did so again in Monmouth County. This unlawful action by Earle has effectively scuttled the PRT joint venture and any hopes of continuing with commercialization of the Pristec Technology until the Pending Arbitration is resolved.

33. Instead of challenging the authority of the Court to adjudicate such claims, Earle actively participated in discovery for years, and ultimately moved for summary judgment on its fraud claim, which was denied on August 11, 2020. A true and correct copy of the Court's Order dated August 11, 2020 is attached hereto as **Exhibit I**.

34. The Court then set the case down for a trial date.

35. With a trial date of the Monmouth County Action imminent, Earle and the other parties to that action agreed to arbitrate all disputes before the AAA, including the question of whether Earle owns the '635 Patent and License, and whether it owes damages to its partners in the joint venture for its abject fraud in entering into

---

[1] Sills Cummis & Gross, P.C. ("Sills") was sued for its actions. Those claims are tolled while the parties pursue the Pending Arbitration. (*See* Ex. J, at 1 (noting that the claims against Sills "have, on agreement of the parties asserting/defending such claims, been severed and tolled.").

10

the transaction in the first place. Attached hereto as **Exhibit J** is a true and correct copy of the parties' Arbitration Agreement.

36. The Arbitration Agreement was amended to allow for one additional claim to be made by Walter Gil Derubio against me. A true and correct copy of the Amended Arbitration Agreement is attached hereto as **Exhibit K**.

37. If, as we believe will occur, the arbitrator rules that Earle has never validly owned the '635 Patent and '635 Patent License, this lawsuit will be wholly unnecessary.

38. If the arbitrator rules that Earle does in fact own the '635 Patent and '635 Patent License, then PAI-NV has the right to intervene in this action and will assert claims in this action stemming from Earle's blatant violation of the exclusive license, as is mentioned below.

39. Since 2021, Earle has sought to stall the AAA arbitration in several ways, including a December, 2021 letter to the Court in Monmouth County asking the Court to relist the matter for trial, and refusing to proceed before the AAA. When that failed, and with the Honorable Judge Anthony Parrillo, J.S.C. (Retired) appointed and ready to schedule an arbitration, Earle most recently made a last ditch effort to bring these very same patent infringement claims within the scope of the Pending Arbitration.

40. In the context of making its effort to bring patent infringement claims within the Pending Arbitration, Earle provided Judge Parrillo (and therefore me) with a copy of a "Cooperation Agreement" dated October 7, 2021 between Earle and the

purported administrator of PAG's bankruptcy estate, RedMax GmbH & Co. KG ("Redmax"), a true and correct copy of which is attached hereto as **Exhibit L**.

41. This Cooperation Agreement contains the following statement, which is signed by Earle, admitting to the cooperation between PAG's alleged successor and Earle:

> "***The parties are aware that New Vacuum Technologies, LLC (Delaware) applied for patents or property rights in various countries based on the Know-How in the fields of application of the Base Patents.*** …The parties will coordinate efforts to achieve a transfer of the registered and existing patents or patent application by New Vacuum Technologies, LLC und (sic) the Innovative Crude Technologies, Inc. to the parties.  It is agreed that in case of a successful transfer, RedMax shall have all patents and patent applications worldwide (except U.S.) and Earle shall have all U.S. patents and patent applications." (Cooperation Agreement, Ex. L, at 6/22-7/22)(emphasis added).

42. In the Cooperation Agreement, Earle and Redmax stated their view that NVT's patent application claims are allegedly overlapping with the patent claims in the '635 Patent.

43. The "Cooperation Agreement" even mentions jointly pursuing claims against Miguel Delgado Castillo, a PAI-NV Board Member who is actively involved in the Pending Arbitration:

> "With respect to relevant Know-How which Jose Miguel Delgado ("Delgado") has, the parties agree to coordinate their efforts to obtain same. The sharing of any costs of any legal actions by the parties shall be subject to a separate agreement…." (*Id.*, at 6/22). (emphasis added).

44. Not only does the Cooperation Agreement <u>not</u> support the notion that Earle owns any legal rights, but Earle once again handed us a document in which it admitted to doing that which the '635 Patent License prohibits.

45. Earle admits therein that it has built machinery using the very PAG patents and license rights that are the subject of the Pending Arbitration, and which the ICDR arbitrator has protected through the ICDR's permanent injunction. (*See id.*, at 2/22).

46. This same document also contains a critical admission for this Court's consideration, and likewise betrays a further breach of Earle's fiduciary duty as manager of PRT. In the Cooperation Agreement, Earle agreed with PAG's alleged successor (who is undoubtedly bound by the permanent injunction) to "***provide all information and all necessary cooperation as may be required to contest or procure the termination of the*** ['635 Patent License]." (*Id.* at 9/22).

47. In other words, the Manager of PRT (Earle) conceded in this agreement that the '635 Patent License has never been validly terminated, and has once again been caught signing a document committing to an action intended to destroy PRT.

48. The referenced "license agreement" in this "Cooperation Agreement" is the very same license agreement the ICDR arbitrator found that Earle had conspired with PAG to unlawfully terminate in the first place (the '635 Patent License). The arbitrator permanently enjoined them from terminating it again without due process of law and following the agreement.

49. Earle is once again shown for an incredible lack of candor to this Court, when it alleged in paragraph 25 of the Complaint in this new action that PAI-NV is "a prior exclusive licensee of the '635 Patent in the United States." (Complaint, ¶ 25).

50. The issues of whether Earle is the legitimate licensor, and whether the exclusive license continues to exist in favor of PAI-NV, are two issues that go to the heart of Earle's standing. The '635 Patent License is attached hereto as **Exhibit M**.

51. Section 4.B grants the Licensor the legal right to bring a patent infringement claim. (*Id.*, § 5.A). Section 5.C obligated Earle to "consult and cooperate" with PAI-NV on any such claim, which Earle has never done in this case.

52. The '635 Patent License prohibits anyone in the position of "Licensor" (which Earle claims to be) from doing the things it admitted to doing in its "Cooperation Agreement" with Redmax. For instance, in Section 7.H, Licensor agreed that it "shall not retain any copies of any of the Licensed Technology other than for copies of patents that my (sic) issue therefrom." (*Id.*, § 5.A).

53. This is because PAI-NV is granted

"the exclusive right and license to use the Licensed Technology to make, use, import and sell Licensed Products and to practice Licensed Processes and provide Licensed Services in the Primary Territory during the term of this Agreement unless sooner terminated as provided in this Agreement." (*Id.*, § 2.A).

54. As the Court can see from the Cooperation Agreement, where Earle manifested an intention to work with Redmax to try to terminate the license, Earle confirmed for Redmax that "it has full knowledge of the arbitral award issued against [PAG] on 10 June 2019 in the arbitration proceeding administered by the [ICDR] under case No. 01-18-0001-9729." (Cooperation Agreement, ¶ 3.6, at 7/22).

55. In further demonstration of the lawlessness of Earle and PAG's successor, Redmax, the Preamble to the Cooperation Agreement contains multiple references to Earle's blatant violation of the '635 Patent License, including this:

> D. Earle has access to a facility in the U.S. (State of Louisiana) to utilize the technology that is based on the U.S. Patents and has meanwhile developed its own know-how with respect to the use of the technology. RedMax has acquired the technical documentation of Pristec AG as provided by the insolvency administrator. Earle is prepared to grant RedMax access to the facility and its equipment for the purpose of testing the technology based on the Base Patents.
>
> E. The parties intend to cooperate, under the terms of this Agreement in light of a potential further development of the technology based on the Base Patents, by exchanging existing and future know-how in order to render the technology marketable.

(Cooperation Agreement, Ex. L, at Preamble D & E; *see also id.*, §§ 1.1-1.9 (where Earle and Redmax agree to all manner of activities that are flatly prohibited by the License Agreement).

56. In sum, since it is abundantly clear that Earle cannot show that it has standing to pursue the patent infringement claims it has brought in this action until it has won the Pending Arbitration, and since it is clear that the disputes in the Pending Arbitration overlap certain of the claims made by Earle which go to standing, the Court should dismiss the action without prejudice, so as not to interfere with the Pending Arbitration and to avoid the unnecessary expense and inconvenience on the part of the Court and the parties in litigating claims for which Earle currently lacks standing.

Dated: August 4, 2022

_____
Joseph Laura

LAW OFFICES
Peckar & Abramson
A Professional Corporation

#4779843v1

15