# EXHIBIT A

**AMERICAN ARBITRATION ASSOCIATION**

**COMMERCIAL ARBITRATION TRIBUNAL**

**CASE NO. 01-22-0000-7497**

PRISTEC REFINING TECHNOLOGIES,
USA, LLC, EARLE REFINING, LLC,
EARLE OIL INVESTMENTS, LLC
and EARLE INVESTMENTS, LLC,

Claimants, Counterclaim-Respondents
and Third Party Respondents,

v.

PRISTEC AG, PRISTEC AMERICA, INC.,
(NEVADA), PRISTEC AMERICA, INC.
(NEW JERSEY), INNOVATIVE CRUDE
TECHNOLOGIES, INC., ANTHONY
SICHENZIO and JOSEPH LAURA,

Respondents/Counterclaimants.

---

PRISTEC AMERICA, INC. (NEVADA),
suing both individually and derivatively
on behalf of Pristec Refining Technologies
USA, LLC,

Counterclaimants,

v.

WALTER GIL DE RUBIO, THOMAS J.
EARLE, JR., WALTER D. EARLE AND
MICHAEL EARLE,

Counterclaim-Defendants.

---

**REASONED AWARD OF ARBITRATOR**

I, THE UNDERSIGNED ARBITRATOR, having been designated in

accordance with the Arbitration Agreement dated September 23,

2021 entered into among Claimants, Counterclaim-Respondents and Third Party Respondents, represented by Thomas A. Della Croce, Esq., William R. Tellado, Esq. and Lauren C. Watson, Esq. of Sill Cummis & Gross, P.C.; and Respondents/Counterclaimants, represented by Kevin J. O'Connor, Esq. and Kevin M. Foltmer, Esq. of Peckar & Abramson, P.C.; and Counterclaim-Defendant Walter Gil de Rubio, represented by Elias Abilheira, Esq.; and having been duly sworn, and having heard the proofs and allegations of the parties during a six-day evidentiary hearing and for reasons that follow and having previously rendered an Interim Award on January 12, 2023, do hereby rule and Award as follows:

## I

## INTRODUCTION

This case arises from two failed joint ventures to commercialize in the United States a "revolutionary" oil refining technology developed by a non-party Austrian Company Pristec A.G. ("PAG").  This technology ("Pristec Technology"), which uses pressure and frequency waves to break down the molecules of heavy crude oil resulting in more easily refinable and therefore more marketable light crude, was licensed to Respondent Pristec America, Inc. (Nevada) ("PAI" or "PAI-NV"), who in turn sublicensed the technology to Pristec Refining Technologies USA, LLC ("PRT").

Claimants'[1] original claims, encompassed in an October 24,
2017 lawsuit filed in the Chancery Division of Superior Court,
Monmouth County, involved alleged breaches by Respondents[2] of
various agreements between the parties establishing the two
joint ventures – Pristec Northeast LLC ("PNE") and Pristec
Refining Technologies USA, LLC ("PRT") – and obligating
Respondents to provide these new entities with the promised
technology and technical support.  Subsequently, Claimants
withdrew some of their claims in the 2017 action and – following
a final award issued in an International Center for Dispute
Resolution ("ICDR") arbitration between Laura, Sichenzio and
Pristec AG, and subsequent to that, Earle's purported July 3,
2019 purchase of the patent from Pristec AG – filed a second
action on July 31, 2019, asserting claims against Respondents
for breach of contract, fraudulent inducement, breach of the
implied covenant of good faith and fair dealing, and conversion.

Respondents filed counterclaims against Claimants and
third-party claims against Thomas J. Earle ("T.J. Earle");
Walter R. Earle; Michael Earle and Walter Gil de Rubio

---

[1] Earle Refining, LLC ("Earle Refining"); Earle Oil Investments,
LLC ("Earle Oil"); Earle Investments, LLC (collectively, the
"Earle entities" or "Earle") and PRT (collectively,
"Claimants").
[2] Pristec America, Inc. (Nevada) (PAI-NV); Pristec America, Inc.
(New Jersey) ("PAI-NJ"); Innovative Crude Technologies, Inc.,
("ICT"); Joseph Laura ("Laura"); and Anthony Sichenzio
("Sichenzio"), (collectively, "Respondents").

essentially alleging that Claimants and Third-Party Defendants conspired in bad faith to divest Laura, Sichenzio and PAI of their interests in the joint venture and to fraudulently appropriate the Pristec Technology for their own exclusive benefit.  Among other relief sought, Respondents requested a declaratory ruling that the July 3, 2019 Patent Purchase Agreement between PAG and Earle Refining is invalid and unenforceable.

These two Superior Court actions were eventually consolidated.  The original Case Management Order set a deadline for document discovery of January 30, 2020, and an Amended Case Management Order of July 2, 2020 extended discovery to November 5, 2020.  On October 26, 2020, Claimants moved to compel the production of requested documents and that motion was pending when the parties executed an Arbitration Agreement on June 30, 2021, following denial of their dueling summary judgment motions in the Superior Court actions, which were then poised for trial. Basically the Arbitration Agreement waived proceeding in court; required arbitration before the American Arbitration Association (AAA) of the dispute between the parties in the First and Second Superior Court actions; barred new claims from being brought; and strictly limited any further discovery.[3]

---

[3] Accordingly, a Consent Order was entered on August 6, 2021, acknowledging the parties "have reached an agreement to

By way of background, the Pristec Technology was originally developed as early as 2006 by four inventors – Ruediger Nuerk, Miguel Delgado Castillo, Fedor Chernikov and Veneciano Rivera – the rights and patents to which were eventually acquired in October 2015 by PAG, an Austrian joint stock corporation formed in 2006, and whose CEO was Nuerk, one of the original inventors. As noted, the Pristec Technology, also known as "cold cracking" technology, was designed to reduce the viscosity or thickness of crude oil for easier transportation and to separate out impurities from the hydrocarbon liquids, thereby upgrading the quality and value of the resulting oil.   The cold cracking technology purported to use a wheel spinning at a certain speed inside a unit called an "activator" to generate a pressure wave that separated ("cracked") the electrons in the hydrocarbon chain in the oil.   The cold-cracking technology supposedly utilized various combinations of three different activators – a hydrogen activator, a carbon activator and a sulfur activator – to crack different elements in the oil, depending on the circumstances.

---

arbitrate the disputes between them that are in issue in the First and Second Action[s] in accordance with the Agreement to Arbitrate . . .."   The Consent Order also dismissed the two Superior Court actions without prejudice, the court having retained "jurisdiction over all matters arising from or related to the First and the Second Action, including but not limited to, the parties' Agreement to Arbitrate . . .."

These activators are housed in a larger piece of machinery called a module or "skid." The components are connected together via piping, pumps and other equipment to increase the pressure and temperature of the crude oil that is fed into the system. Supposedly, the Pristec Technology accomplishes the separation efficiently and at a much lower cost than traditional methods.

Of course, implementation of this technology is an expensive proposition. It has been estimated that it would cost approximately $1.5 million to build one cold-cracking unit with one hydrogen and one carbon activator. One combination module, with two hydrogen activators and two carbon activators, cost $4.5 million in 2017.

In 2008, Nuerk met Laura, who expressed an interest in the Pristec Technology. From 2010 to 2013, Laura and his partner Sichenzio, after loaning PAG $1.5 million in exchange for 35,000 shares of the Austrian corporation, formed the U.S. Pristec Companies (ICT, PAI-NJ and PAI-NJ), whose purpose was to raise money from U.S.-based investors to fund further development of the Pristec Technology with the goal of commercializing the technology in North America. Laura and Sichenzio worked together, on behalf of the U.S. Pristec Companies, to secure investors. In return for their efforts, on October 13, 2013, PAG licensed to PAI-NV the exclusive right to use the Pristec

Technology for certain commercial purposes in the United States,
Canada, Mexico and Columbia.

Despite raising over $10 million from more than 100 U.S.
investors, Laura's and PAG's efforts over the years to
commercialize the Pristec Technology had repeatedly failed to
deliver success on multiple projects in Egypt, Estonia,
Venezuela and other locations.  They faced numerous
technological, financial and geopolitical hurdles in trying to
commercialize novel technology in a highly regulated industry,
as year after year went by without a single commercial contract.
These hurdles involved unexpected safety concerns with remote
activation, foreign country uprising (Arab Spring), delays of
six months (Tallinn) to 2.5 years (Egypt) in conducting the
pilot tests that were a necessary precursor to any commercial
contract, and difficulties raising money just to keep the
companies afloat and out of bankruptcy.  Compounding the matter,
in July 2015, the Securities and Exchange Commission (SEC)
served Laura and Sichenzio with subpoenas in connection with an
investigation of Laura and Sichenzio for defrauding Pristec
America's investors.

By the time Laura met T.J. Earle in May 2015, Laura and PAG
had yet to develop and design a commercially ready activator or
perform certain necessary testing of the Pristec Technology that
was required before sales efforts could proceed.  This was

critical because in order for a commercial contract to be executed, the cold cracking technology would have to be tested, certified and proven.  Nevertheless, T.J. Earle, who had experience in the petroleum industry, expressed an interest in commercially exploiting the Pristec Technology licensed to PAI-NV.  Eventually T.J. Earle, through his companies Earle Oil and later Earle Refining, agreed with Laura to invest in the Pristec Technology through the formation of two joint ventures (PNE and PRT), whose purpose was to sell the technology to oil terminals and oil refineries.  Through these joint ventures, T.J. Earle and his entities made direct monetary investments of approximately $3 million, including (i) an $850,000 license fee paid on January 15, 2016; (ii) a $150,000 deposit paid in January 2016; (iii) a $100,000 loan made on March 15, 2016; (iv) a $1,500,000 license fee paid on September 14, 2016.

The joint ventures between Earle and Laura fared no better. Suffice it to say after nearly 17 years in existence, no commercially viable product has been created.  To date, no oil processing revenues were ever generated or paid to investors. In fact, no revenue whatsoever, other than Earle's license fees, have ever been earned.  PAG has presently been declared bankrupt and dissolved, all of its assets sold for € 270,000 (Euros). And as recently as September 2020, after Earle Refining purportedly acquired the U.S. Patent for the Pristec Technology,

obtained detailed drawings from PAG for the activators, and completed construction of the module and activators, testing repeatedly failed to demonstrate any significant level of conversion to make the technology marketable.

Nevertheless, all agree the Pristec Technology is valuable. Its success depended on the licensee PAI-NV's ability to manufacture and deliver the system, equipment and other technical material to PRT to enable PRT to make sales to customers. However, within only a few months of forming their second joint venture (PRT) in September 2016, the parties' relationship and partnership irretrievably fractured amid dueling claims of contract breaches, bad faith, unfair dealing, schemes to steal the technology, conspiracies to cut the other out of the deal, misappropriation of funds, mismanagement, poor record keeping, disloyalty and mistrust. These conflicting claims lie at the core of the instant controversy. Yet despite the intensity of the dispute, many of the facts adduced at the 6-day evidentiary hearing, as well as the earlier ICDR Arbitration, remain uncontested. The following is a chronology of events, uncontradicted and taken from both forums, that provide background and context to the present matter:

## II

### TIMELINE OF UNDISPUTED EVENTS

1.  2006 – PAG founded.

2.  2008 – Laura is first introduced to Nuerk, PAG's CEO.

3.  February 3, 2010 – Laura incorporated PAI.

4.  October 7, 2010 – PAI changed its name to Innovative Crude Technologies, Inc. d/b/a "Pristec America, Inc."  Laura and Sichenzio each came to hold a 50% ownership interest in ICT.

5.  2010 – ICT and PAG enter into an agreement whereby Laura's and Sichenzio's $1.5 million loan is to be converted into 35,000 shares of PAG.  The Agreement provided:  "ICT and [PAG] intend a long-term partnership and cooperation in marketing and operating Pristec heavy oil technology in the North America region."

6.  September 1, 2011 – PAI-NJ was incorporated in New Jersey, with ICT and PAG each holding a 50% shareholding interest in the company.

7.  September 4, 2013 – PAI-NV was incorporated in the State of Nevada, with ICT and PAG each holding a 50% shareholding interest in the company.  ICT controlled the Board of Directors with 3 seats and PAG had 2 seats.  Laura served as CEO and Managing Director of the U.S. Pristec Companies.

8.  September 19, 2013 – Laura and Sichenzio are appointed members of PAG's Supervisory Board.

9.  October 13, 2013 – PAG entered into a "Patent, Technology and Know-How License Agreement" with PAI-NV (the "PAG-PAI License").  Under the PAG-PAI License, PAI-NV was licensed the exclusive right to use the Pristec Technology for certain commercial purposes in the United States, Canada, Mexico and Columbia.  Under the License Agreement, PAI-NV was required to make certain royalty payments to PAG (33% of revenue generated).

10. October 2015 – PAG acquired patents from the original inventors, including Nuerk.

11.   2015 – Laura was first introduced to T.J. Earle.

12.   July 2, 2015 – Letter of Intent (LOI) executed between
      Earle Investments and PAI re:  oil terminals joint venture
      (PNE).

13.   September 30, 2015 – Amended and Restated LOI executed.

14.   December 2015 – The SEC interviewed Laura with respect to
      an inquiry or investigation into potentially improper
      investment activities at the U.S. Pristec Companies (the
      "SEC Investigation").  An email from Nuerk to Laura and
      Sichenzio dated February 16, 2016 indicates that Nuerk was
      aware of the SEC Investigation as of that date.  In this
      February 16, 2016 email, Nuerk asked Laura for "Documents
      already presented to the SEC a while ago."

15.   January 15, 2016 – A joint venture was formed, Pristec
      Northeast, LLC ("PNE"), between Earle Oil Investments, LLC,
      Walter Gil de Rubio, Steven Hays and PAI-NV.  On that
      same date, PNE entered into an Intellectual Property License
      with PAI pursuant to which PNE was granted a license to
      sell certain oil-refining technology.  The business purpose
      of PNE was "to open and operate one or more terminals in
      the northeastern United States for the purpose of importing
      oil, using the Technology to 'crack' that oil in Territory,
      and to sell barrels of the refined oil in the market . .
      .."

16.   March 15, 2016 – Letter Agreement executed between Earle
      Oil and PAI evidencing a $100,000 loan from Earle to PAI to
      fund the Vienna demonstration.  In connection with this
      loan, Earle signed a revenue sharing agreement.

17.   June 2016 – T.J. Earle initiated discussions with Laura
      about utilizing the Pristec Technology in refinery
      operations.

18.   September 14, 2016 – A new joint venture, Pristec Refining
      Technologies, USA LLC ("PRT"), was formed between Earle
      Refining LLC, Walter Gil de Rubio, Steven Hays, and PAI.
      On that same date, PRT entered into an Equipment Sales
      Agreement and Exclusive Intellectual Property License with
      PAI.  In turn, PAI agreed to, among other things, sell
      equipment and provide certain technical and material
      support and information to PRT and PRT was granted a
      license to use the Pristec Technology, including the right

to sublicense the technology in accordance with processing of petroleum products at refineries located within the United States.  The business purpose of PRT was to, "provide the systems . . ., Technology . . ., and related services to all petroleum refineries in the United States only . . ., on an exclusive basis . . .."

19. September 14, 2016 – According to the PRT Operating Agreement, Earle Refining acquired a 21% interest and PAI a 75% interest in PRT.  PRT paid PAI a non-refundable $1.5 million license fee for an exclusive sublicense for the Pristec Technology in refineries throughout the United States, funded by a capital contribution of $1.5 million by Earle Refining to PRT.  PAI, in turn, remitted $250,000 of the $1.5 million amount to PRT as a "capital contribution."

20. October 12, 2016 – PRT's first Board meeting wherein a budget and business plan was approved, setting customer and installation targets beginning in 2017, and fixing dates from September to December 2016 for design, testing, building and installation events.  Alpha testing in the United States was to take place from January to March 2017.

21. January 14, 2017 – Nuerk, on behalf of PAG, executed a "License Performance Guaranty" for the benefit of PRT (the "License Performance Guaranty").  Section 1 of the License Performance Guaranty provided:  "If [PAI-NV] does not or cannot perform its obligations under the PRT License, for any reason or no reason, including without limitation, because the [PAG-PAI License] has been terminated by either party, then [PAG] agrees to perform all of [PAI-NV's] obligations under the PRT License immediately upon demand by PRT."

22. January 19, 2017 – Earle Refining, through its attorney, sent a letter to Laura advising that PAI-NV was in material breach of PRT's Operating Agreement and the PRT License, alleging months of PAI-NV's repeated failures to deliver equipment, designs and other technical materials and support, and demanding PAI-NV cure these asserted beaches.

23. January 20, 2017 – T.J. Earle sent Nuerk a draft letter written by Earle's attorney for Nuerk to send to Laura terminating the PAG-PAI License and demanding that PAI-NV "cease and desist" from all activities related to the Pristec Technology.

24.  January 21, 2017 – Nuerk signed the "cease and desist" letter drafted by Earle and sent it to Laura, purporting to terminate the PAG-PAI License (the "Cease and Desist Letter"), and claiming that PAI did not pay PAG its fair share of revenue and used the License Agreement to commit fraud.

25.  January 21, 2017 – Laura responds to the "Cease and Desist Letter."

26.  January 26, 2017 – Letter and email from Laura to Earle responding to Earle's January 19, 2017 letter claiming PAI's material breach.

27.  January 26, 2017 – de Rubio sent Nuerk a copy of a subpoena he received in the SEC investigation.

28.  January 26, 2017 – Nuerk held an "extraordinary shareholders' meeting" in Vienna to nominate two additional members of PAG's Supervisory Board.  According to PAG, "The purpose of the meeting was to ensure that the Supervisory Board was independent and functional, with five members instead of three, so that the Management Board could take the necessary corporate actions and not be blocked by individual Supervisory Board members, such as [Laura and Sichenzio] who were motivated by personal interests."

29.  January 27, 2017 – Nuerk sent a copy of the Cease and Desist letter to various "stakeholders" in the U.S. Pristec Companies, including Laura and Sichenzio and a number of potential investors, stating that the PAG-PAI License had been terminated "with immediate effect."

30.  January 27, 2017 – Earle's attorney advised PAI-NV that the termination of its license by PAG was another material breach of its contractual obligations and constituted a "disassociation" event under PRTs Operating Agreement, Section 13(a)(iv).  As a result, "PAI is no longer a Member of PRT."

31.  February 7, 2017 – Earle emailed Laura, among others, claiming that PAI-NV had been "disassociate[ed] from PRT," losing all of its membership interests in PRT.  Earle based this allegation, in part, on the Cease and Desist letter, stating:  "PRT has no value given that [PAI-NV] has lost its right to license the technology to PRT."  Earle further

stated:  "PRT hereby redeems [PAI-NV's] membership for $0 effective as of this date."

32.  February 8, 2017 – Nuerk, on behalf of PAG, sent a letter to Laura notifying him that the Cease and Desist Letter was "null and void" and, accordingly, that the PAG-PAI License "remains in full force and effect."  Nuerk explained that the Cease and Desist Letter had never been legally effective:  "As you are aware, the foregoing letter did not receive the required internal approvals within Pristec AG, and thus had not constituted a duly formal act by Pristec AG.  As such, the foregoing letter was per say (sic) invalid under Austrian Law."  The next day, February 9, 2017, PAG and PAI entered into a Second Amendment of the PAG-PAI License, ratifying the terms of the License Agreement.

33.  February 8, 2017 – On the same day that the January 21, 2017 Cease and Desist Order was revoked, ICT and PAG entered into a Share Acquisition Agreement ("SAA") in Vienna.  Nuerk executed the SAA on behalf of PAG, and Laura executed the SAA on behalf of ICT.  Laura and Sichenzio also executed the SAA on their own behalf.  The preamble to the SAA confirmed, *inter alia*, the following facts:

- ICT was wholly owned in equal parts by Laura and Sichenzio;
- ICT owned 35,000 shares in PAG; and
- ICT owned 50% of the shares in PAI-NV.

The SAA provided for the transfer of the shares held by Laura and Sichenzio in ICT to PAG.  As consideration for these shares in ICT, Section II(3) of the SAA obligated PAG to transfer the 35,000 shares of PAG held by ICT back to Laura and Sichenzio individually.  PAG further agreed, in that same section, to transfer these 35,000 PAG shares to Laura and Sichenzio "simultaneously with PAG's issuance of 25,000 of PAG shares, to be deposited with a trustee for the purpose of converting the existing shareholders in the U.S. Pristec Companies to shareholders in PAG."

The SAA further provided that "Laura and Sichenzio agree to attempt to convert 100% of the current revenue/investor/convertible loan holders.  [Laura and Sichenzio] agree at a minimum to have 80% of the current revenue/investor/convertible loan holders convert.  The

amount to be converted not including loans shall not exceed 14 million USD as of the date of this agreement."

Pristec AG, Pristec America and ICT agree to use TaxAnd Global Network as the accountant for all Pristec entities beginning January 1, 2017.  Additionally, "it is agreed that TaxAnd shall be nominated as CFO for all Pristec entities (Pristec AG, Pristec America, ICT).  As part of the CFO duties Pristec AG, Pristec America and ICT shall authorize TaxAnd to assume responsibility for all shareholder books related to Pristec entities."

34. February 10, 2017 – Nuerk initiates a conference call with T.J. Earle, de Rubio and Hays wherein, according to Earle's minutes of the call, Nuerk advised:  "Pristec AG had reinstated the [PAG-PAI License] license and structured a plan to immediately take over ownership of PAI and ICT while converting its investors to PAG and ultimately shutting both PAI and ICT down as soon as the newly instated accountant from TaxAnd as CFO could prepare the books for a proper closure."

35. March 23, 2017 – Nuerk (on behalf of PAG) and T.J. Earle (on behalf of the Earle Companies) executed a Letter of Intent, under which they agreed to establish a joint venture "NewCo" that would have "exclusive rights to the Pristec Technology for Refineries in the U.S. and Canada and their affiliated terminals" (the "NewCo Letter of Intent").

36. April 21, 2017 – PAG's counsel informed Laura that the Board of Directors of PAI-NJ, PAI-NV and ICT had purportedly removed him from his positions in these companies.  The letter stated:  "please be advised that you no longer have the authority to bind any of the Pristec Companies to any agreements, promises or contracts.  Please refrain from engaging in this conduct in the future.  If, however you are in the process of discussing potential investments, we would encourage those conversations to continue as long as the final decision is presented to the appropriate Board for consideration."

37. June 16, 2017 – PRT, Earle, Earle Refining and Earl Oil (collectively, the "Earle Parties") commenced an action in the United States District Court for the District of New Jersey.  In the Federal Action, the Earle Parties alleged

that PAI-NV had breached the PRT Operating Agreement and the PRT License. The Earle Parties also alleged that PAG had breached the License Performance Guaranty and NewCo Letter of Intent.

38. August 31, 2017 – PAI-NV and Laura commenced an action against PRT, Earle, Earle Refining, Hays and de Rubio in the Court of Chancery of the State of Delaware, (the "Delaware Action"). In the Delaware Action, PAI-NV and Laura alleged, *inter alia*, that Earle had breached the PRT Operating Agreement. By way of relief, PAI-NV and Laura sought declaration that PAI-NV remains a member of PRT, as well as compensatory damages.

39. October 23, 2017 – the Federal Action was dismissed for lack of subject matter jurisdiction.

40. October 24, 2017 – The Earle Parties commenced an action against PAG, PAI-NV and Laura in the Superior Court of New Jersey, Chancery Division, Monmouth County ("First Monmouth Action"). The claims asserted by the Earle Parties in the First Monmouth Action are substantially identical to the claims that were dismissed for lack of subject matter jurisdiction in the Federal Action; however, the Earle Parties also added new claims against Laura.

41. January 29, 2018 – PAG's counsel sent a letter to Laura demanding in part, as follows: "As you know, as of April 21, 2017, 'you no longer ha[d]the authority to bind [any Pristec entity] to any agreements, promises or contracts,' and you were expressly instructed to 'refrain from engaging in' any such conduct going forward. <u>By this letter, we formally demand that you immediately cease and desist from any unauthorized conduct.</u> You are not permitted to negotiate, enter, or execute agreements or purchase orders on Pristec's behalf; you may not make any promises or undertakings on Pristec's behalf; you may not raise money or try to raise money for Pristec; and you may not take any other action while claiming to act on behalf of Pristec or any Pristec entity or affiliate."

42. February 10, 2018 – Laura sent a letter to investors and shareholders in the U.S. Pristec Companies, alleging a contractual right to raise monies on behalf of the companies.

43. February 16, 2018 – A meeting of PAG shareholders took place in Vienna, wherein Laura and Sichenzio were not allowed to participate.  During the meeting, a majority of PAG's shareholders voted to remove Laura and Sichenzio from PAG's Supervisory Board.

44. February 26, 2018 – Nuerk, purporting to act on behalf of PAI-NV, PAI-NJ and ICT, filed an action against Laura and Sichenzio in the Superior Court of New Jersey, Chancery Division, Monmouth County, (Docket No MON-C-24-18), seeking injunctive relief against Laura and Sichenzio. In their counterclaim, Laura and Sichenzio sought rescission of the SAA.  The matter was eventually referred to arbitration. (See ¶s 47, 50).

45. March 28, 2018 – PAG, purporting to act on behalf of PAI-NV, caused the Delaware Action, and the claims asserted against Earle therein, to be voluntarily dismissed and the defenses raised in the First Monmouth Action to be withdrawn.

46. June 15, 2018 – New Jersey Chancery Division stayed the lawsuit filed by Nuerk on behalf of PAG, on February 26, 2018 (Docket No, MON-C-24-18), ordering that the parties' disputes be submitted to arbitration (the "ICDR Arbitration").

47. September 2018 - SEC files a civil complaint against Laura, Sichenzio and de Rubio in the Eastern District of New York, alleging that Laura and Sichenzio had defrauded investors, misappropriated over $6 million of the approximately $12 million raised from investors, and engaged in securities fraud.  The SEC Action remains ongoing at this time.

48. September 27, 2018 – PAG and The Earle Parties entered into a settlement agreement that purported to settle the claims brought by the Earle Parties against both PAG and PAI-NV in the First Monmouth Action.  In connection with this settlement, a Delaware company named Pristec U.S.A. LLC ("Pristec USA") was formed.  Pristec USA is the "NewCo" contemplated in the March 23, 2017 Letter of Intent and was purportedly granted exclusive rights to the Pristec Technology in the United States.

49. May 16, 2018 – Re:  the lawsuit filed on February 26, 2018 between PAG and PAI – Laura and Sichenzio, individually and derivatively on behalf of ICT, PAI-NJ and PAI-NV, filed a

Demand for Arbitration with the AAA.  PAG filed an
answering statement.  Because PAG is a foreign entity, the
AAA's international division, the ICDR, accepted
administrative responsibility for the arbitration.  In
their Demand, Laura and Sichenzio sought to rescind the
SAA, alleging that PAG had fraudulently induced them to
enter into the SAA through various misrepresentations and
concealments in order to "take unlawful control of valuable
petroleum refining technology developed by [Laura and
Sichenzio] and to loot [the U.S. Pristec Companies] of
their assets."

50. November 12, 2018 - The ICDR Arbitrator issued a temporary
    restraining order:

> "Pending the issuance of my decision on
> Claimants' preliminary injunction
> application, PAG is hereby enjoined from
> taking any actions to implement or
> consummate the terms of the settlement
> agreement in the Monmouth Action, including
> causing or permitting PAI and/or ICT to
> implement or consummate the terms of the
> settlement agreement."

51. November 13, 2018 - T.J. Earle signed bill of sale as
    manager of Pristec USA for the purchase of a sulfur
    activator from PAG.

52. December 1, 2018 - Earle engages Corporate Valuation
    Advisors, Inc. (CVA) to conduct a "Valuation of Business
    Enterprise and Technology" for Pristec USA.  The valuation,
    created on January 24, 2019, estimated a value of $520
    million for the U.S. Patent rights to the Pristec
    Technology.  The asserted aim of the valuation was "to
    establish a basis for some sort of projection."  It was
    contemplated that based thereon, Earle would seek financing
    for Pristec USA.

53. January 3, 2019 - ICDR Arbitrator issued a preliminary
    injunction:

> "Pending and until the issuance of the final
> signed Award in this arbitration, [PAG]
> whether directly or indirectly through its
> officers and/or employees or agents, is
> restrained and enjoined from:  (a) taking

any actions to implement or consummate the
terms of the purported settlement agreement
in the litigation pending in the Chancery
Division in Monmouth County, captioned
Pristec Refining Technologies et al. v.
Pristec AG, et al. (MON-C-175-17) (the
[First] 'Monmouth Action'), including
causing or permitting Pristec America, Inc.
('PAI') and/or Innovative Crude
Technologies, Inc. ('ICT') to implement or
consummate the terms of that settlement
agreement; (b) compromising the claims or
potential claims of PAI and/or ICT in the
[First] Monmouth Action or otherwise; and
(c) taking any other actions (including
causing ICT and/or PAI to take any actions)
to enter into, implement or consummate the
terms of any other settlement agreements or
transactions of any kind that would impact
the operations, ownership or rights of PAI
and ICT, including rights in the cold
cracking technology or any other
technology."

54. January 10, 2019 – Earle, on behalf of Pristec USA,
    executed a bill of sale for the purchase of a hydrogen
    activator from PAG.

55. January 24, 2019 – The Commercial Court of Vienna issued a
    decision reversing the actions taken by PAG's shareholders
    at the extraordinary general meeting on February 16, 2018,
    including removing Laura and Sichenzio as members of PAG's
    Supervisory Board, and ordered that the constitution of the
    PAG board be returned to its pre-February 16, 2018 form.

56. February 20, 2019 – Email acknowledging that on January 31,
    2019, Earle paid $49,442.50 to PAG's forensic accounting
    expert at the ICDR arbitration, and agreed to purchase
    PAG's Japanese patent for € 500,000, which never occurred.

57. February 25 – March 5, 2019 – Six-day evidentiary hearing
    in the ICDR arbitration.

58.   June 10, 2019 – ICDR arbitrator issued a Final Award in
      favor of Laura and Sichenzio.  The arbitrator found that
      the SAA lacked consideration; that the preconditions of the
      SAA were never fulfilled by PAG; and that Laura and
      Sichenzio had "met their burden of proof that they were
      fraudulently induced to enter into the SAA," and that they
      "would have refused to enter into the SAA" had PAG
      disclosed its private dealings with a third-party to
      "freeze [them] out of the U.S. Pristec Companies and
      transfer rights . . . to companies controlled by [the
      third-party]."  The arbitrator then determined that the SAA
      was "void and unenforceable," declared the SAA "rescinded,"
      and concluded that the parties were "returned to *status quo
      ante* positions they occupied the day before the SAA was
      executed.  The arbitrator ordered PAG to pay the following
      amounts:   (1) $26,586 to Laura and Sichenzio for costs
      incurred in defending a suit initiated by PAG in New Jersey
      state court, which "directly flow[ed] from the fraud
      perpetrated by [PAG] that is the subject of [the]
      arbitration," with interest accruing at the rate of 9% from
      February 26, 2018 by [PAG]"; (2) $154,835.98 in
      administrative expenses and arbitrators' fees incurred by
      Laura and Sichenzio during the instant arbitration, with
      interest accruing at a rate of 9% from the date of the
      Award through "the date the sum is paid in full by [PAG]";
      and (3) $331,614.99 in legal fees and expenses incurred by
      Laura and Sichenzio during the instant arbitration, with
      interest accruing at a rate of 9% from the date of the
      Award through "the date the sum is paid in full by [PAG]".

59.   July 3, 2019 – Earl Refining and PAG entered into a Patent
      Purchase Agreement wherein Earle Refining purported to
      purchase from PAG the U.S. Patent for the Pristec
      Technology – specifically U.S. Patent No. 10,053,635
      entitled "Method for the treatment of a liquid, in
      particular a mineral oil, " ("the 635 Patent") – for
      $500,000.  In that agreement, PAG purported to assign to
      Earle Refining its rights and obligations as the licensor
      under the Pristec America (PAI-NV) license in the United
      States only.

60. July 31, 2019 – Earle's attorney writes to PAI-NV asserting that Earle Refining had purchased PAG's U.S. Patents and associated license rights and thereby has assumed the role of "licensor" of the PAI-NV license.  (J-191).

61. September 10, 2019 – Laura received from Earle's attorney correspondence making demand for an accounting of PAI's use of the Pristec Technology under the PAG-PAI License, including a list of any and all sub-licensees and an accounting of all revenue and royalties paid under the PAG-PAI License.

62. July 31, 2019 – The Earle Entities ("Claimants") filed a second action against the Pristec America Companies, Laura and Sichenzio ("Respondents") in Monmouth County Superior Court (MON-C-98-19) (the Second Monmouth Action), asserting claims for breaching contract, fraudulent inducement and conversion.  In the Second Monmouth Action, the Earle entities abandoned their "disassociation" claim asserted in the 2017 action.

63. September 4, 2019 – Claimants' First Amended Complaint in the Second Monmouth Action.

64. October 28, 2019 – Respondents' Answer and Counterclaim in the Second Monmouth Action.

65. December 13, 2019 – Claimants' Reply to Counterclaim in the Second Monmouth Action.

66. January 7, 2020 – Respondents' Revised First Amended Answer, Counterclaims and Third-Party Complaint in the First Monmouth Action.

67. January 24, 2020 – Respondents' Third Party Complaint in the Second Monmouth Action.

68. February 10, 2020 – Claimants' Answer to Counterclaim and Third-Party Complaint in the First Monmouth Action.

69. August 19, 2020 – Claimants' Answer to Third-Party Complaint in the Second Monmouth Action.

70.  June 30, 2021 – The two Superior Court Monmouth Actions
     were eventually consolidated and the parties executed an
     Arbitration Agreement following denial of their summary
     judgment motions.

71.  August 6, 2021 – A Consent Order was entered acknowledging
     the parties, "have reached an agreement to arbitrate the
     disputes between them that are in issue in the First and
     Second Action[s] in accordance with the Agreement to
     Arbitrate . . .."

72.  October 9, 2020 – Certain of PAG's creditors commenced an
     involuntary bankruptcy proceeding against PAG in Austria
     Commercial Court, Vienna.

73.  July 26, 2021 – The Austrian bankruptcy administrator
     auctioned off all of PAG's assets, including all its
     intellectual property, fixed assets, and legal claims.  All
     of PAG's assets were sold for € 270,000 (Euros).  The bid
     of an affiliate of RedMax GmbH & Co KG, an Austrian
     corporation, was accepted at the auction.  RedMax and the
     Austrian bankruptcy administrator entered into a notarized
     purchase agreement pursuant to which RedMax acquired all of
     PAG's assets including its legal claims.  PAG was
     dissolved.

74.  October 15, 2021 – RedMax informed Laura and PAI of
     RedMax's purchase of PAG's assets.

75.  October 7, 2021 – Following RedMax's purchase of PAG's
     assets, rights and claims, RedMax and Earle Refining
     entered into a Cooperation Agreement pursuant to which
     RedMax, among other things, waived all rights to challenge
     the Earle-PAG patent sale, and confirmed that Earle has
     "{the exclusive rights in the technology in the US and
     RedMax shall have exclusive rights worldwide (except in the
     US) . . ."  RedMax also agreed that Earle owned the '635
     Patent and assigned all rights or claims it obtained from
     the PAG bankrupt estate in such patent to Earle.

76.  February 2022 – Claimants filed their Demand for
     Arbitration in the instant matter.

III

### THE ESSENCE OF THE PARTIES' DISPUTE
### AND THE ESSENTIAL FACTUAL DISPUTES

The PRT joint venture was built on the premise and mutual expectation that the Earle entities would bring experience and capital to commercialize the Pristec Technology in the United States, and the Pristec American companies would provide access to the technology itself, including the equipment and technical know-how and support.  As plain and clear as those goals might be, the reasons why they were never realized are far less so, with the parties offering widely divergent views on, and explanations for, the seemingly irremediable breakdown of their business relationship.

Indeed, at the core of this arbitral dispute are the parties' conflicting claims over who is to be held accountable for PRT's failure and the alleged resultant loss of hundreds of millions of dollars in projected revenues from the commercialization of the Pristec Technology, as well as over who ultimately has rights to that novel, albeit unrealized and unproven, cold cracking methodology.  This is an especially critical point of contention considering the relationship's breakdown started to occur a mere few months after PRT was formed and after the parties, with benefit of counsel, carefully negotiated and crafted the terms and conditions of their

business partnership, as memorialized not only in PRT's Operating Agreement but as well in the Equipment Sales and License Agreement, both executed on September 9, 2016.

Specifically, Claimants' essential claim is that they were fraudulently induced to enter into the joint venture both by Laura's misrepresentations as to the commercial readiness of the Pristec Technology and by material omissions as to the SEC's inquiry; and were further damaged by PAI's later breaches of contract in failing to provide PRT with engineered drawings and designs for the activators and modules needed to construct the system and bring the Pristec Technology to market.

Respondents, on the other hand, see it very differently, essentially counter-claiming that the Earles, as minority partners, abused their position of influence and power within PRT for their own gain and to conspire with Nuerk and PAG to steal the Pristec Technology and deprive Laura and Sichenzio of their property rights in ICT, PAI and the PAG-PAI License.  They cite as evidence of such motive Earle's attempt to form Pristec USA, which would hold an exclusive royalty-free license to exploit the Pristec Technology and Earle's later attempt to purchase the U.S. Patent and license rights from PAG.

Neither version, however, explains the rather sudden deterioration of their business relationship over so short a period of time – approximately late December 2016 to early

January 2017 – after which a rapid-fire series of events –
including Earle's notice of "material breach"; Nuerk's "cease
and desist" letter terminating PAI's license; and Earle's letter
of "disassociation" – all culminated in a barrage of litigation
leading up to the instant matter.  Although the chronology of
these events leaves little room for dispute, there is much
disagreement over their origin, cause and effect.

Illustrative is the SAA, executed the same day – February
8, 2017 – that PAG revoked its cease and desist directive
against PAI.  According to Respondents, this was part of
Claimants' greater plot to wrest control of the Pristec American
companies from Laura and Sichenzio.  They allege that they were
fraudulently induced to enter into the SAA and they would have
never agreed to execute the SAA had PAG informed them about:
(1) Nuerk's "backroom" dealings with Earle; (ii) the License
Performance Guaranty; (iii) the fact that Earle's attorney had
been the one to actually write the Cease and Desist Letter; and
(iv) the fact that Nuerk and Earle had, before the SAA was
signed, already agreed upon the general parameters of "NewCo",
which effectively required PAI to no longer exist in order to
grant the valuable license rights to NewCo and Earle in not just
the U.S., but also Canada.

In stark contrast, Earle, whom the ICDR Arbitrator found
was not even aware of the SAA at time of its execution,

essentially adopts the position of Nuerk that the SAA was the
culmination of a longstanding plan to "consolidate" the U.S.
Pristec Companies with PAG, and that PAG and Respondents had
been considering and negotiating the terms of the SAA for more
than two years before it was eventually signed in February 2017.
Nuerk also contended during the ICDR arbitration that the SAA
was necessary "to take control of a situation where
[Respondents] were engaging in misconduct and fraud with
impunity."  Nuerk later admitted that the reason behind PAG's
license termination letter to PAI was to pressure Laura and
Sichenzio to agree to the restructuring of the Pristec America
companies and to execute the SAA, merging ICT into PAG.

During this same period of time – late December 2016 to
early January 2017 – the documentary proofs reveal a flurry of
correspondence and calls among Nuerk, de Rubio and T.J. Earle
regarding growing concerns over the management of PAI, the
impending SEC inquiry and possible misconduct on the part of
Laura.  While the emails speak for themselves, the parties are
again at odds over their import, origin and true motivation.

According to Earle, beginning in late December 2016, Nuerk
repeatedly contacted him (many times through de Rubio) and
advised that Laura had engaged in fraud while operating PAI and
that Nuerk had documentary support to prove his claim.
Supposedly, Nuerk enlisted Earle's support to resolve these

issues and further advised of his intention to terminate PAI's license based on this evidence.  Earle, for his part, found Nuerk's allegations credible as by this time he was aware of the SEC's investigation as well as PAI's lack of recordkeeping and failure to pay taxes.

Laura, on the other hand, opines that Earle's so-called growing concern over the SEC inquiry was really a subterfuge, disguising his actual plan to oust Laura, Sichenzio and PAI from PRT.  According to Laura, it was de Rubio and T.J. Earle who, in December 2016, initiated contact with Nuerk, informing that Laura had engaged in fraudulent conduct with respect to PRT, and insisting PAG disengage with Laura and deal separately with T.J. Earle.

Regardless of who initiated contact, what caused it to occur, or its role in the stream of events that followed, the undeniable fact is that there was an ongoing SEC investigation into the affairs of Laura, Sichenzio, de Rubio and PAI at all relevant times - one that eventuated in the filing of a civil complaint by the SEC in the Eastern District of New York in 2018.  And here again, the parties greatly differ as to who knew what and when.

To bolster their theory that Earle conveniently used the SEC inquiry as part of his "takeover" plan, Laura and Sichenzio assert they informed T.J. Earle of this fact in August 2016,

months before the parties formed their PRT joint venture, and
was never cited as a concern until the filing of the Second
Monmouth Action in 2019.  In contradiction, T.J. Earle insists
that the first time he learned of the SEC inquiry was September
15, 2016 – one day after the PRT Agreements were executed – in
an email from de Rubio attaching the subpoena he had received
from the SEC back in the summer.  And even then, he was assured
by Laura that the SEC inquiry was a normal, routine matter.  To
be sure, even though the SEC investigation may have come to him
later, T.J. Earle knew well before the formation of PRT about
issues concerning PAI's faulty bookkeeping and failure to file
taxes.

The above factual disputes are by no means exhaustive and
are simply illustrative of the core controversies in this case,
resolution of which follows an explication of the governing law.

**IV**

### GENERALLY, THE LAW GOVERNING BREACH OF CONTRACT, OF THE IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING, AND THE FIDUCIARY DUTY OF CARE AND LOYALTY

It is axiomatic that the plain meaning of a contract
governs and must be enforced as written.  *Manti Holdings, LLC v.
Authentix Acquisition Co., Inc.*, 261 A.3d 1199, 1208 (Del.
2021); *Levison v. Weintraub*, 215 N.J. Super. 273, 276 (App. Div.

1987.[4]  That said, because the goal is always to enforce the
parties' reasonable expectations and mutual purpose, the
presence of so-called "plain language" in the contract itself,
otherwise controlling, should not be viewed in isolation so as
to defeat those expectations. *See 5 Corbin on Contracts*,
Section 24.7 (Perillo and Bender rev. ed. 1998).  "Before the
meaning of words in a contract can be plain and clear, at least
some of the surrounding circumstances may make plain . . . a
meaning that was not apparent . . . in the absence of such proof
. . .." *Ibid.*  To be sure, the reasonable expectations of the
parties are a factor used by a court in interpretation so long
as the expectations are not contrary to the language of the
contract. *Gibson v. Callaghan*, 158 N.J. 662, 670 (1999).

Indeed, the court's task is to ascertain the intent of the
parties as manifested by the language used in the written
agreement in its entirety. *Borough of Princeton v. Bd. Of
Chosen Freeholders*, 333 N.J. Super. 310, 325 (App. Div.), *aff'd*
167 N.J. 135 (2000).  The polestar of construction is the
intention of the parties to the contract. *Conway v. 287
Corporate Ctr. Associates*, 187 N.J. 259, 268-69 (2006).  Maximum
effect is given to their intention. *Brick Township Municipal*

---

[4] PRT's Operating Agreement is governed by Delaware law and its
Equipment and Sales Agreement and License are governed by New
Jersey law.

*Utilities Auth. v. Diversified R.B.&T. Constr. Co.*, 171 N.J.
Super. 397 (App. Div. 1979); *Keppler v. Terhune,* 88 N.J. Super.
455, 462 (App. Div. 1964).  And in the quest for this intention,
a court considers the situation of the parties, their course of
dealing, attendant circumstances, and the objects they were
striving to attain.  *Conway,* 187 N.J. at 268-69; *Cruz-Mendez v.
ISU/Insurance Servs.*, 156 N.J. 556, 570-71 (1999).

    In order to demonstrate a breach of contract, a Claimant is
required to prove by a preponderance of the evidence that:  (1)
the parties entered into a valid contract; (2) Claimant did what
the contract required him to do; (3) Respondent did not do what
the contract required him to do; and (4) Respondent's failure to
perform his obligations under the contract caused an
ascertainable loss to Claimant.  *H-M Wexford LLC v. Encorp,
Inc.*, 832 A.2d 129, 140 (Del. Ch. 2003); *Globe Motor Co. v.
Igdalev*, 225 N.J. 469, 481 (2016) (Citing and quoting Model Jury
Charge (Civil), § 4.10A "The Contract Claim Generally: (May
1998)).  A party bringing a claim for breach of contract has the
burden to establish **all** elements of its cause of action
including damages suffered as a proximate result of another's
breach.  *Improvement Authority v. GSP Recycling Co., Inc.*, 358
N.J. Super. 484, 503 (App. Div. 2003); *Lone v. Brown*, 199 N.J.
Super. 420, 425 (App. Div. 1986).  Of course, the failure to
perform by one party may be excused by the other party's prior

breaches of the contract.  *See e.g. Magnet Resources, Inc. v. Summit MRI, Inc.*, 318 N.J. Super. 275, 285 (App. Div. 1998) ("It is black letter contract law that a material breach by either party to a bilateral contract excuses the other party from rendering any further contractual performance.").  *See also Nolan v. Lee Ho*, 120 N.J. 465, 472 (1990) ("When there is a breach of material term of an agreement, the non-breaching party is relieved of its obligations under the agreement.").  *Level 4 Yoga, LLC v. Core Power Yoga, LLC*, 2022 WL601862 (Del. Ch. Mar. 1, 2022).

Furthermore, New Jersey and Delaware both recognize that an implied covenant of good faith and fair dealing exists in every contract.  *Sons of Thunder v. Borden, Inc.*, 148 N.J. 396, 420 (1997); *Anderson v. Wachovia Mortgage Corp.*, 497 F. Supp. 2d 572, 581 (D. Del. 2007).  "[I]n every contract there is an implied covenant that neither party shall do anything which will have the effect of destroying or injuring the right of the other party to receive fruits of the contract."  *Sons of Thunder*, 148 N.J. at 420.

The term "good faith" means "faithfulness to the scope, purpose, and terms of the parties' contract."  *Allen v. El Paso Pipeline GP Co., LLC*, 113 A.3d 167, 183 (Del. Ch. 2014).  "The covenant is best understood as a way of implying terms of the agreement, whether employed to analyze unanticipated

developments or to fill gaps in the contract's provisions."
*Dunlap v. State Farm Fire & Cas. Co.*, 878 A.2d 434, 441-42 (Del.
2005).

> Stated in its most general terms, the
> implied covenant requires "a party in a
> contractual relationship to refrain from
> arbitrary or unreasonable conduct which has
> the effect of preventing the other party to
> the contract from receiving the fruits" of
> the bargain.  Thus, parties are liable for
> breaching the covenant when their conduct
> frustrates the "overarching purpose" of the
> contract by taking advantage of their
> position to control implementation of the
> agreement's terms.  *Id.* at 441.

That said, implying contract terms "should be [a] rare and
fact-intensive exercise, governed solely by 'issues of
compelling fairness.'"  *Dunlap*, 878 A.2d at 442; *see also Kuroda
v. SPJS Holdings, LLC*, 971 A.2d 872, 886 (Del. Ch. 2009).  So
for instance, the implied covenant of good faith could not be
used to contradict the express agreement of the parties, or to
result in a better deal for one such party than it had struck
for itself.  *Dave Greytak Enters., Inc. v. Mazda Motors of Am.,
Inc.*, 622 A.2d 14, 22-23 (Del. Ch.), *aff'd*, No. 64, 1992 Del.
LEXIS 121 (Del. 3/16/92).  Instead, the good faith covenant
comes into play when it is clear from what the parties otherwise
"expressly agreed" that "they would have proscribed the
challenged conduct as a breach of the implied covenant of good

faith had they thought to negotiate with respect to the matter."
*Ibid.*

Moreover, general allegations of "bad faith" conduct are
not sufficient.  Rather, "the plaintiff must allege a specific
implied contractual obligation and allege how the violation of
that obligation denied the plaintiff the fruits of the
contract."  *Kuroda,* 971 A.2d at 886; *Anderson,* 497 F. Supp. at
581-82.

These same principles apply to the governance of a limited
liability company.  Thus, *N.J.S.A.* 42:2C-39(d) provides that a
manager "shall discharge the duties under this act or under the
operating agreement and exercise any rights consistently with
the contractual obligation of good faith and fair dealing."  *See
also, CSH Theatres, LLC v. Nederlander of San Francisco Assocs.,*
2015 WL 1839684 at 11 (Del. Ch. Apr. 21, 2015), *aff'd sub nom.
In re Shorenstein Hays-Nederlander Theatres, LLC Appeals,* 213
A.3d 39 (Del. 2019).

These same principles equally apply to parties in a joint
venture, which is "an enterprise undertaken by several parties
to carry out a single business purpose for their mutual profit
in which they combine their property, skill, knowledge and
money."  *Resource Ventures, Inc. v. Resources Mgmt. Int'l, Inc.,*
42 F. Supp. 2d 423, 440 (D. Del. 1999).  *See also Presten
v.Sailer,* 225 N.J. Super. 178, 191 (App. Div. 1988).  Joint

venturers owe each other a fiduciary duty of utmost good faith, fairness and honesty with respect to their relationship to each other and to the enterprise.  *In re Arthur Treacher's Fish & Chips, Inc.*, 386 A.2d 1162, 1166 (Del. Ch. 1978).

A claim for breach of fiduciary duty lies in contract rather than tort.  Such a claim requires a claimant to establish:  (1) the existence of a fiduciary relationship giving rise to fiduciary duties; and (2) a breach of such fiduciary duties.  *Beyers v. Bd. Of Educ.*, 2011 Del. Super. LEXIS 1678 at 16–17 (Del. Sup. Ct. May 6, 2011).

The fiduciary duties a partner (or manager of an LLC) owes to the partnership and to the other partners (or LLC members) are the duty of care and loyalty.  Yet even these may be restricted or eliminated by the partnership's operating agreement (or LLC agreement).  *See* 6 Del. C. § 18-1101(c); *Zimmerman v. Crothall*, 62 A.3d 676, 703 (Del. Ch. 2013) (finding that parties exercised prerogative under 6 Del. C. § 18-1101(c) to restrict fiduciary duties); *N.J.S.A.* 42:2C-39(c) (A partner's duty of care is limited "to refrain[ing] from engaging in grossly negligent or reckless conduct, intentional misconduct, or a knowing violation of law."); *In re Walt Disney Co. Derivative Litigation*, 907 A.2d 693, 749 (Del. Ch. 2005).

Such is the case here where the parties elected to restrict and specifically delineate the fiduciary duties that they owed

to each other and the Refinery Joint Venture.   Section 5(g) of
the PRT Operating Agreement provides that each manager and
director "owes to the Company and its Members the fiduciary
duties of care and loyalty set forth in this Section . . .."
(§ 5(g)).   The duty of care requires each manager and director,
in conducting and winding up PRT's business, "to perform his or
her duties in good faith, in a manner he or she reasonably
believes to be in the best interest of [PRT] and with such care
as an ordinary prudent person in a like position would use under
the circumstances."   (§ 5(g)(i)).

The duty of loyalty imposed by the Agreement requires PRT's
manager and directors "(1) to account to the Company and hold as
trustee for it any property, profit or benefit derived by the
Manager or Director (i) in the conduct and winding up of the
Company's activities; (ii) from a use of the Company's property;
and (iii) from an appropriation of a Company opportunity" and
"(2) to refrain from dealing with the Company . . . as or on
behalf of a person or entity having an interest adverse to the
company [subject to certain exceptions]; and (3) to refrain from
competing with the Company . . .."   (§ 5(g)(ii)).   However, a
partner does not violate such a duty or obligation merely
because the partner's conduct furthers his own interests.
*N.J.S.A.* 42:2C-39(e).

What remains then is the application of the facts, as determined to be credible and proven, to the law, as just explained, to resolve the contract-related claims and counter claims of Claimants and Respondents respectively.

## V.

### CLAIMANTS' CONTRACT-RELATED CLAIMS

Claimants' contract-related claims fall generally into two broad categories, namely fraudulent inducement and breach. As to the former, Claimants allege that Respondents knowingly made material misrepresentations and wrongly concealed critical facts from them, including that PAG and PAI had the ability to bring the Pristec Technology to market, had sufficient funding to do so, and that the technology was commercially ready. Moreover, Laura and Sichenzio wrongfully concealed from the Earles during negotiations of the PRT agreements the existence of an SEC investigation into their activities regarding PAI. According to Claimants, they reasonably relied on these fraudulent representations and material omissions in entering into the PRT agreements, and suffered damages as a result.

As to their breach of contract claim, Claimants allege Respondents failed to provide PRT with commercially ready equipment, test results, drawings and other technical information and support in order to do business and market the Pristec Technology. Specifically, PAI failed to provide PRT

with activators or their engineered designs/specifications to allow Polaris – the engineering firm engaged by PRT to design the module to U.S. standards – to assemble a system and construct a demonstration unit to show the Pristec Technology to potential customers and to further prove the technology out.   In support of their claim, Claimants cite to Section 7(f) of the Operating Agreement which contemplates "Earle's receipt and approval of the specifications necessary to construct the first system required under the business plan . . .."

### A.   <u>FRAUDULENT INDUCEMENT</u>

To establish their fraudulent inducement claim, Claimants must prove by a preponderance of the credible evidence the misrepresentation of a material fact; knowledge or belief by Respondents of its falsity; intent that Claimants rely on the misrepresentation; reasonable reliance by Claimants thereon; and resulting damages.   *Nolan v. Lee Ho*, 120 N.J. at 472.

A claim of fraudulent inducement cannot be predicated upon representations that involve things to be done in the future. *Anderson v. Modica*, 4 N.J. 383 (1950).   Statements as to future or contingent events, expectations or probabilities, or as to what will or will not be done in the future, do not constitute actionable misrepresentations for purposes of a fraudulent inducement claim, even though they may turn out to be wrong. *Alexander v. CIGNA Corp.*, 991 F. Supp. 427, 435 (D. N.J.),

*aff'd*, 172 F.3d 859 (3d Cir. 1998).  Moreover, to establish such a claim, a "defendant must have **no** intention at the time he makes the statement of fulfilling the promise." *Notch View Assocs. v. Smith*, 260 N.J. Super. 190, 203 (Law Div. 1992). "Mere non-performance is insufficient to show that the promisor had no intention of performing." *Ibid.*  And most pertinent, for present purposes, a party cannot establish "reasonable reliance" – a required element of fraud in the inducement – on extrinsic promises where there are clearly expressed "non-reliance" and "integration" provisions in the contract at issue.  *Blanos v. Penn Mutual Life Ins. Co.*, Civ. No. 09-5174, 2010 WL 143670 at 6 (D. N.J. January 12, 2010); *Chazanow v. Sussex Bank*, No. Civ. A. 11-1094 CCC, 2013 WL 4069530 at 4 (D. N.J. August 9, 2013).

Based on the totality of the evidence, objectively considered, this claim fails for want of any reasonable reliance by the Claimants on any or all of Respondents' misrepresentations and omissions.

In the first place, PRT's Operating Agreement, negotiated, drafted and executed by sophisticated businessmen with experienced counsel, contains a broadly stated merger/integration clause reciting that the agreement "replaces and supersedes all prior written and oral agreements understandings and negotiations with respect to the business" of PRT.  Section 24(d).

Secondly, that same Agreement also makes clear that each party had the advice of counsel and other consultants, as well as the full opportunity to conduct a proper due diligence investigation before forming PRT (*see* Section 25), which the Earles admittedly performed from May 2015 through January 2016. Any such reasonably competent inquiry would have uncovered the fact that PAG had been trying to commercialize the Pristec Technology since 2006 without success and that by the time Earle had entered into the picture, PAG and PAI had not secured a single commercial contract.

Indeed, T.J. Earle knew well before the creation of PRT, and at the very latest through his involvement with PNE, that PAI did not have a commercially ready product.  He was acutely aware that more comprehensive testing of the technology was needed to answer certain critical questions raised by potential customers, such as what happens to the metals in the oil and to the sulfur generated in the process and whether any harmful products were created as a result thereof. In fact, the May 9, 2016 Vienna demonstration did nothing to answer these questions. T.J. Earle was equally cognizant of issues with the Series 1 activator, which needed to be redesigned and upgraded to meet U.S. safety standards.  Accordingly, any reliance T.J. Earle may have placed on contrary representations by Laura was clearly and objectively unreasonable.

Moreover, by the time he entered into the Operating Agreement for PRT, T.J. Earle had claimed PAI had previously breached the PNE Operating Agreement by not honoring its contractual obligations concerning the "Hays Method" for refineries.  T.J. Earle also suspected, as early as July 2016, that Laura had been colluding with Earle's employee, Ronald Tabery, to misappropriate PNE's confidential and proprietary information related to refineries.  Yet despite these earlier misgivings, T.J. Earle forged ahead with Laura in forming PRT.

Even more significant, T.J. Earle knew of serious issues of mismanagement concerning the operation of PAI, separate and apart from the SEC's investigation, which Earle testified he was not aware of until the day after PRT's Operating Agreement was executed.  Well before then, however, perhaps as early as Summer 2016, T.J. Earle was made aware of PAI's faulty bookkeeping, failure to pay taxes giving rise to a potential $1.5 million tax liability, and loans taken by Laura from PAI – all issues the SEC wound up investigating. In fact, the situation was so alarming that de Rubio, who was in constant contact with Earle at the time (J-266, J-268), wrote to Joseph Sciarrino, an accountant, on August 18, 2016, expressing his growing concerns:

> I had a long meeting with Joe regarding the
> exposure he has created for himself and
> continues to by not getting Pristec's house
> clean and keeping the books in the manner he
> has.  It is a disaster waiting to happen

> whether there has been any misappropriation
> of funds or not, an SEC investigation will
> interpret the slightest innocent and
> unintentional transaction inconsistent with
> SEC guidelines as FRAUD.  The furthest Joe
> stays away from the account the safer he
> will be.  He has agreed to allow me to run
> the books and put everything in order in
> addition to certain financial controls,
> maintaining a mandatory revolving bank
> balance, monthly financial reporting; but,
> most importantly prepare everything for you
> so to have credible financials available for
> prospective investors and so forth.

                    [J-267]

And again, on August 30, 2016, de Rubio confronted Laura
directly, writing:

> As I already expressed to you, many of my
> investors are calling for updates and
> becoming somewhat apprehensive as I hear it
> in their voices and line of questioning
> consistent with every one of them.  How much
> longer do you think investors are going to
> continue listening to the same story month
> after month and year after year before they
> lose patience altogether?
>
> I question how serious you take this matter
> as you still have not contacted the Sofos
> who have been voicing concerns for some time
> now.  Moreover, I am hearing more and more
> of the same thing from different investors
> who maintain they are growing tired of
> hearing about deals that never close.

                    [J-269]

Given his serious concerns, de Rubio warned T.J. Earle to

perform "extra due diligence."

As if this were not enough to have raised serious warning signals over any continued partnership with Laura, much less forming a new joint venture, in late Summer 2016, and well before Earle's funding of PRT's license fee, Laura asked T.J. Earle to personally loan him the $1.5 million license fee so he could pay back the money Laura admitted he had taken out of PAI. In return, Laura offered to have PAI give the license to PRT without charge.  On another occasion in 2016, Laura and Sichenzio asked T.J. Earle to loan them funds to pay back taxes to the IRS.  Laura also admitted to T.J. Earle that Laura had used a portion of the PNE license fee to settle a preexisting lawsuit totally unrelated to the Pristec Technology and the parties' joint ventures.

Even assuming Laura's misrepresentations and omissions were material and intentional, Claimants' reliance thereon was simply not objectively reasonable given the wealth of information available to Earle and of which he was actually made aware well in advance of PRT's formation.  The warning signs of PAI's fiscal health, operational mismanagement and financial irregularities, as well as the rather nascent stage of Pristec Technology's development despite many years in existence, were loud and clear and should have put Claimants on notice that Respondents possessed neither a commercially ready product nor the ability to produce one in the near future.  Suffice it to

say, Earle went into the PRT joint venture with "eyes wide open," and accordingly Claimants' claim of fraudulent inducement in Count VI is **DENIED**.

### B.   BREACH OF CONTRACT

In a January 19, 2017 letter to Laura notifying him of PAI's material breach of PRT's Operating and License Agreements, Claimants' counsel cited specifically to "PAI's inability to provide the design work for the [Series II carbon and hydrogen] activator" as constituting "a material breach of Section 7(f) of the [PRT] Agreement and Section 1 of the License Agreement." Section 7(f) of the PRT Agreement provides that "upon Earle's receipt and approval of the specifications necessary to construct the first system required under the Business Plan, Earle shall make loans to the company as and when needed . . .." Under Section 1 of the License Agreement, PAI agreed to sell the "System" to PRT with delivery and installation within six months of PRT's order; and under Section 2, PRT had the right to purchase the equipment developed by PAI at 150% of cost.  To that end, PRT had engaged Polaris Engineering to construct the engineered design for the System according to the standards of the refinery market in the United States; however the System could not be finalized without the design work for the activators that, according to Claimants, PAI was to supply but failed to do so.

Respondents, on the other hand, represent that PAI remained
at all times ready to deliver the equipment **as specified** in the
Operating and License Agreements.  However, PAI was not yet able
to supply the Series II activators required by modifications to
the System demanded by Hays and T.J. Earle.  In his January 25,
2017 letter response to Claimants' January 17, 2017 notice of
material breach, Laura explained that Bilfinger, the Austrian
company retained by PAG to manufacture the System, after having
received the design plan and pricing for a skid design from
Polaris, was working on "retooling" and consummating the
engineering drawings for the Series II activators as well as the
new skid design (collectively, the "System Design") to meet the
specifications required by Earle's modifications and the U.S.
API.  Acknowledging that the "system Design" process "has not
progressed as fast as the parties initially expected[,]" Laura
nevertheless pledged "to avoid any further delays" by taking
"the extraordinary formal measure of calling a Supervisory Board
meeting for [PAG]" at the earliest possible time.  In
conclusion, Laura assured T.J. Earle that "PAI remains ardently
determined to take all steps necessary to conclude the design
and manufacturing steps needed to bring the said project to a
successful completion."  (J-77).

As noted, to establish a breach of contract, Claimants must
prove by a preponderance of the evidence that:  (1) the parties

entered into a valid contract; (2) Respondents failed to perform their obligations under the contract; and (3) Claimants were damaged as a result. *H-M Wexford LLC v. Encorp, Inc.*, 832 A.2d at 140. *Murphy v. Implicito*, 392 N.J. Super. 245, 265 (App. Div. 2007). Based on the credible proofs adduced, Claimants have failed to meet their burden and accordingly this cause of action is **DENIED**.

The gravamen of Claimants' complaint is that Respondents failed to give them the engineering for the module and Series II activators as well as the technical know-how to operate the system. However, neither the PNE nor PRT Operating Agreements obligated PAI to deliver any Series II equipment. In fact in Section II.4 of the PRT License Agreement of September 14, 2016, PAI warrants only that the equipment would operate within the framework of the specifications identified in Section I.4, which set maximal pressure and temperature limitations.

However, to achieve a higher percentage conversion/performance rate and maximize profits, Earle insisted on a new "Series II" activator design that pushed the Pristec Technology beyond the stated limits in the PRT agreements. Not only did those agreements not include any reference to this new design, they also did not obligate either PAI or PRT to fund testing for future development of, and design work for, the Pristec Technology. On the contrary, Section 7 of PRT's

Operating Agreement provides that in addition to the payment of
the license fee, Earle Refining was required to loan additional
funds to PRT up to the amount of $1,250,000 to build the first
module.  According to PAI, PRT's Operating Agreement only
obligated PAI to furnish "specifications" for the equipment
described in detail in that agreement, and those were only to be
furnished as a precondition to Earle funding the first unit.

Regardless of whether Respondents were contractually bound
to supply PRT with engineering drawings for the Series II carbon
and hydrogen activators, there is nothing in any of the relevant
Agreements obligating them to do so within a specified period of
time.  In fact, none of the Agreements at issue contain a "time
of the essence" clause.  Accordingly, the fact that the
engineering for the Series II activators was not completed by
January 25, 2017 – the date arbitrarily set in Claimants' notice
of material breach – is not evidential, much less dispositive of
Claimants' breach of contract claim.

To be sure, the Business and Budget plan formally adopted
at PRT's October 12, 2016 Board meeting (J-47) set a deadline of
November 10, 2016 for delivery of the Series II activators.
However, by all accounts, this schedule was aggressive and
ambitious, more aspirational than realistic, especially given
the actual state of the technology at the time, and the work and
funds still needed to be invested to make the Pristec Technology

commercially ready.  In any event, the goals set forth in the
Business and Budget Plan were never incorporated in either the
PRT Operating or License Agreements, which together constitute
the entire Agreement among the parties.

Actually, the evidence demonstrates that PAI gave Earle
access to detailed engineering plans for the "skids" that were
given to Polaris to come up with a competing bid.  In fact,
these were the same engineering drawings that Earle referenced
in a February 14, 2017 email to Nuerk (J374), proudly asserting
that all design work for the first fully automated module
meeting all American Petroleum Institute ("API") standards was
on schedule, and deep analysis testing had been performed.

Of course, even with the engineered drawings provided,
Claimants were unable to bring the Pristec Technology to market
without the technical know-how to operate or calibrate the
system – the so-called "operating parameters" (i.e. temperature,
pressure and RPMs) – which they claim Respondents wrongfully
withheld from them.  Yet, nothing in the Agreements themselves
explicitly obligates PAI to furnish PRT with information PAG or
PAI deems highly confidential and proprietary, such as the
actual "calibration process" or the engineered drawings for the
mechanical components (i.e. wheel) inside the Series II
activators, which Earle began requesting in December 2016.
While Claimants cite Section 7(f) of PRT's Operating Agreement

and Section 1 of the License Agreement in support of their demand, nothing in those provisions, as already noted, obligates PAI to disclose such information,  Indeed, subsection (f) falls under Section 7 of the Operating Agreement, which is generally captioned "Capital Contributions . . .", and more specifically, "Loans by Members for Working Capital", which has nothing to do with Respondents' disclosure obligations.

Obviously, when the terms of a contract are clear, a court should enforce it as written according to its plain meaning. *Manti Holdings, LLC v. Authentix Acquisition Co., Inc.*, 261 A.3d 1199, 1208 (Del. 2021); *CSFB 2001-CP-4 Princeton Park Corporate Ctr., LLC v. SB Rental I, LLC,* 410 N.J. Super. 114, 120 (App. Div. 2009).  However, where there is any ambiguity, the parties' true intent must be ascertained.  *Celanese Ltd. v. Essex Cty. Imp. Auth.*, 404 N.J. Super. 514 (App. Div. 2009).  Such intention is revealed by the language used, **taken in its entirety**, *Borough of Princeton v. Bd. Of Chosen Freeholders of Mercer, 333* N.J. Super. at 325, as well as the parties' situation, their course of dealing, the attendant circumstances and the objects they were striving to attain.  *Conway v. 287 Corporate Ctr. Assocs.*, 187 N.J. at 268-69.

As to the former, the document must be read as a whole, "in accord with justice and common sense," *Krosnowski v. Krosnowski*, 22 N.J. 376, 387 (1956), to give effect to every word or phrase

as far as practicable. *Borough of Princeton,* 333 N.J. Super. at
325.   Courts cannot ignore portions of a contract in order to
avoid a finding of ambiguity, *ibid.,* nor should artificial
emphasis be placed on one provision, with a consequent disregard
for others.   *Ibid.*  And as to the latter, because the goal is
always to enforce the parties' reasonable expectations and
mutual purpose, "at least some of the surrounding circumstances
may make plain . . . a meaning that was not apparent . . . in
the absence of such proof . . . ."  *See* 5 *Corbin on Contracts,* §
24.7.

     To that end, PRT's Operating Agreement must be read in
conjunction with the Equipment Sales and Intellectual Property
License Agreement (J-39), executed the same day as the Operating
Agreement and referenced therein.  The E&L Agreement clearly
recognizes a distinction between technical and business
information that is "proprietary" and that which is not (Section
I(1) and (5), and plainly contemplates that disclosure of the
former to a sublicensee (PRT) is at the discretion of the
sublicensor (PAI).  Thus, the second "Whereas" clause declares
that PAI "has agreed to sell the Equipment . . . to PRT subject
to [PAI's] retention of rights in certain intellectual property
related to the design, manufacture and operation of the
equipment . . . ."  *See also* Section II(2).  In fact, PRT
breaches the Agreement if it fails to maintain in confidence

"any Confidential Information and Know-How **that [PAI] may from time to time disclose to PRT . . ..**" Section 6.2 (emphasis supplied). And upon termination of the Agreement, PRT is obligated to "promptly return to [PAI] all non-public documents PRT has received from [PAI] constituting . . . the Licensed Technology . . .." Section 7.

Plainly, when read together with the Equipment Sales and License Agreement, PRT's Operating Agreement does not contractually obligate PAI to disclose the so-called "secret sauce" to PRT as either the purchaser of the Equipment or sublicensee of the Pristec Technology.

In sum, Claimant has not proven by a preponderance of the credible evidence that PAI has breached any express provision of the Agreements in issue, or that its failure to satisfy the timelines set forth in either PRT's Business Plan or counsel's January 17, 2017 notice of material breach to Laura is otherwise actionable.

There is yet another reason why Claimants' claim of breach of contract must fail. As noted, to establish such a claim, one must prove damages suffered as a result of another's breach. *Nelson v. Elizabeth Bd. Of Ed.*, 466 N.J. Super. 325, 342 (App. Div. 2021). Here, even assuming Respondents' breach, Claimants have failed to prove to a reasonable certainty any ascertainable loss proximately caused thereby. *Lone v. Brown*, 199 N.J. Super.

at 425.   While Earle claims to have invested close to $4 million
in the Pristec Technology, including almost $3 million in
license fees, Earle also claims to be the owner of the U.S.
Patent, an asset acquired for $500,000 yet valued, according to
Earle's own appraiser, at $520 million.   (J-459).   Even assuming
that valuation to be grossly inflated, Earle is nevertheless
estopped from "blowing hot and cold," namely asserting,
simultaneously in the same litigation, a claim for damages where
that claim is totally inconsistent with its claim of ownership
of the U.S. rights to a novel cold cracking technology worth, by
its own account, multiple times the value of its expenditures
and whatever lost profits its expert has opined.   *See Newburgh
v. Arrigo*, 88 N.J. 529, 535 (1982); *Kazin v. Kazin*, 81 N.J. 85,
89 (1979).

For all these reasons, Claimants' causes of action in
Counts I and VI fail.

### C.   <u>BREACH OF IMPLIED COVENANTS</u>

By parity of reasoning, Claimants' claim of breach of the
implied covenants of good faith and fair dealing (Count IV)
fails as well.

To state such a claim, Claimants must allege a specific
implied contractual obligation, a breach of that obligation by
Respondents, and resulting damage to Claimants.   *Anderson*, 497
F. Supp. at 581-82.   However, such implied contractual duty

cannot be used to contradict the express agreement of the parties, countermand the parties' intent, create wholesale a new legal duty or result in a better deal for one such party than it had struck for itself. *Dave Greytak Enters., Inc. v. Mazda Motors of Am., Inc.*, 622 A.2d at 22-23. Its purpose is narrow, its use "rarely invoked successfully"; and general allegations of bad faith conduct are not sufficient. *Kuroda*, 971 A.2d at 886. It also does not apply if the conduct complained of is authorized by the contract terms. *Dunlap v. State Farm Fire and Cas. Co.*, 878 A.2d at 441-42.

While the credible evidence suggests Laura and Sichenzio withheld from Earle information about the true nature of the SEC's investigation prior to closing the PRT deal, there were, nevertheless, ample avenues of inquiry available for Earle to pursue that would have, and should have, raised cause for concern. Same is true regarding Laura's inflated representations about the state of development of the Pristec Technology, with information presumably in the public domain strongly suggesting otherwise. Under these circumstances, it cannot be said that Laura's omissions and representations somehow frustrated the reasonable expectations of Claimants.

As for PAI's challenged conduct in failing to deliver a marketable System on schedule, not only did it not constitute a breach of the express terms of the letter of the parties'

Agreement for reasons already mentioned, neither did it violate the so-called "spirit" of the bargain originally intended and struck by the parties. Lacking is any credible evidence of a bad faith refusal to perform or intentional interference with Claimants' performance. Rather, the evidence suggests that unanticipated developments – such as Claimants' modifications to the System and lack of funding – as well as unresolved questions as to the ultimate responsibility for funding the testing and further development of the technology, better explain any frustration of the Agreements' goals.

For these reasons, Claimants' claim of breach of the implied covenant of good faith and fair dealing is **DENIED**.

### D. <u>BEACH OF FIDUCIARY DUTY</u>

As parties to the joint venture partnerships PNE and PRT, Claimants and Respondents each owed fiduciary duties to the other, as defined, delineated and delimited in their Operating Agreements, and as previously described herein. In Count VII of their Complaint, Claimants alleged Respondents breached their fiduciary duties to them by (i) diverting and misappropriating monies that Claimants had invested in the companies; (ii) working with others such as Ronald Tabery to misappropriate Claimants' confidential information and cut Claimants out of the ventures; and (iii) refusing to provide Claimants with test

results, designs, and demonstration equipment that were
necessary for either joint venture to conduct their businesses.

Suffice it to say, Claimants have not satisfied their
burden of proving any of these claimed breaches by a
preponderance of the credible evidence, or for that matter, any
damages suffered by them as a result of any such breach, even if
proven.  Accordingly, Count VII fails as a cognizable claim and
is **DENIED**.

### E.    CONVERSION/THEFT

To establish a claim for conversion under New Jersey law, a
plaintiff must prove it was entitled to possession of the
property at issue and that the defendant willfully deprived
plaintiff of its right to possession by exercising unlawful
dominion over the property.  *Royal Store Fixture Co. v. N.J.
Butter Co.*, 114 N.J. Super. 263, 268-69 (App. Div. 1971).  *See
also Kuroda*, 971 A.2d at 890.  In Count V of their Complaint,
Claimants allege that Respondents used a portion of the $850,000
Terminal Joint Venture (PNE) license fee (over $300,000) to
settle the "Glenwood" lawsuit, which was totally unrelated to
the business of the joint venture, rather than to fund the
further development of the Pristec Technology.  Claimants'
theory of liability then is that the license fee monies were
somehow earmarked for PNE's exclusive use and should have been

expended on PNE's business rather than "converted" for Laura's own personal purposes.

This claim lacks merit. As a licensee of the Pristec Technology, PAI-NV sublicensed the right to use the technology to PNE in exchange for which the licensor received a license fee. Those monies were the property of PAI-NV who had no independent legal duty to Earle, apart from that imposed by the License Agreement. If Laura misspent any of those funds, the only entity with standing to complain was PAG as a 50% shareholder of PAI-NV, and not Earle, who had no financial interest or stake in that company. Interestingly enough, when PAG did assert that very claim in the ICDR arbitration, it was deemed without merit. Accordingly, Count V of Claimants' Complaint is **DENIED**.

VI

RESPONDENTS' COUNTER AND THIRD PARTY CLAIMS

Broadly stated, Respondents' counter and third party claims of fraud and breaches of fiduciary duty focus on T.J. Earle's role as managing director of PRT and on the Earle entities' status as partners and joint venturers with PAI in PRT. Respondents generally allege that Claimants, in collusion with PAG and Nuerk, engaged in a secretive scheme to force Laura and Sichenzio from PAI with the ultimate goal of taking control of

valuable Pristec Technology through creation of a "NewCo," which
would give Respondents a bigger "slice of the pie" and strip PAI
of its license rights.  According to Respondents, the principal
vehicle by which Claimants and PAG sought to remove Laura and
Sichenzio from the parties' joint venture was through the SAA,
which would have replaced Laura's and Sichenzio's interest in
the Pristec America companies with interests in PAG.

In support of their claims, Respondents chiefly rely on a
finding by the ICDR Arbitrator that PAG had fraudulently induced
Laura and Sichenzio to execute the SAA by, among other things,
concealing from them Nuerk's contemporaneous discussions with
T.J. Earle about a potential new venture that would develop and
market the Pristec Technology.  Specifically, Respondents cite
the following passage from the Arbitrator's decision cataloguing
a series of events as evidential of this so-called "conspiracy":

> The January 1, 2017 License Performance
> Guaranty to the January 19, 2017 letter
> accusing PAI-NV of committing material
> breaches of the PRT Operating Agreement and
> the PRT License to Earle's January 20, 2017
> ghost-writing of the draft Cease and Desist
> Letter to Nuerk sending the Cease and Desist
> Letter to Laura on January 21, 2017 to the
> February 7, 2017 letter from Earle to Laura
> claiming that PAI-NV had been
> "disassociate[ed] from PRT" because of the
> Cease and Desist letter.

There are several problems with Respondents' theory of
liability in this regard.  First, T.J. Earle was not a party to

the negotiations of the SAA and in fact, as the ICDR Arbitrator
found, was not even aware of the SAA until after it was
executed.  Moreover, Claimants were not a party to the ICDR
arbitration.  Indeed, the narrow issue before the Arbitrator
only concerned the validity and enforceability of the SAA, a
document negotiated between and executed by, PAG (Nuerk) and PAI
(Laura and Sichenzio).  And while the Arbitrator found that
Laura and Sichenzio "would have refused to enter into the SAA"
had they known about Nuerk's misrepresentations – including, by
the way, having ready access to a $100 million credit line from
Credit Suisse – the Arbitrator ultimately rescinded the SAA for
a myriad of other reasons as well, including lack of
consideration from PAG and failure of PAG to satisfy conditions
precedent.

Under the circumstances, any finding by the ICDR Arbitrator
implicating T.J. Earle in a "conspiracy" with Nuerk to freeze
Laura and Sichenzio out of the Pristec American companies is
simply dicta, not binding on, or dispositive of, the instant
litigation.[5]  Furthermore, for as nefarious a picture painted by
Respondents, there is an equally benign, legitimate explanation
underlying the SAA.  As Nuerk informed T.J. Earle upon

---

[5]As Presiding Judge Gummer of Monmouth County's Chancery Division
ruled in her March 12, 2020 decision rejecting Respondents'
motion to disqualify Sills Cummis, "The ICDR Arbitrator made no
finding that Earle or his counsel engaged in fraud."

reinstating PAI's license, the SAA was Nuerk's attempt at implementing a longstanding corporate plan of consolidation and restructuring, accomplished through acquisition of the outstanding shares of PAI-NV and ICT owned by Laura and Sichenzio, thereby rendering those companies wholly-owned subsidiaries of parent PAG.   (J82; J178(b) at 4:18 to 5:1; J250; J489 at 180:16 to 181:7).

To be sure, Nuerk admittedly used the "termination of license" letter to pressure Laura and Sichenzio into agreeing to the SAA.[6]  And a certain consequence of its execution would have been the eventual distancing of Laura and Sichenzio from positions of influence and control over the joint venture. However, it is also clear that prior to executing the SAA, Laura and Sichenzio negotiated for ownership rights in PAG in exchange for PAG's receipt of ICT shares, and specifically conditioned the consolidation on Laura's continued role as PAI's CEO.   In

_____

[6]Not only is the record devoid of any evidence of Earle's complicity in the execution of the SAA, it is also highly questionable whether Laura actually relied on Nuerk's maneuvering.  After all, Laura was well aware of Nuerk's longstanding plan to consolidate and knew that PAI's License Agreement with PAG did not allow for termination.  Indeed, PAI's license on its face is non-cancellable and this feature was included in the License Agreement to protect U.S. investors who had provided over $13 million in funds to PAG to develop the Pristec Technology.  Moreover, as early as February 13, 2017, after its license had been "reinstated" a mere 18 days after PAG "terminated" it, PAI was on record disputing its so-called "dissociation from PRT that had been based on PAG's earlier wrongful act of revocation.  (J88).

fact, Laura and Sichenzio retained prominent executive level
roles in the Pristec companies while PAG pursued consolidation,
and acted as PAG's agent, touting the SAA as a positive step
forward for the Pristec enterprise.  (J125; J514 ¶146).  Well
after the SAA was executed, there were weekly conference calls
among PRT, PAI and PAG from early February 2017 through April
11, 2017 concerning the status of equipment delivery and related
matters.  (J84; J95 to 97; J99 to 104; J106 to 111; J360).  Even
thereafter, Laura was involved in the Earles' negotiations with
PAG to form a new joint venture, Pristec USA, and in early June
2017, tried to mediate a resolution of a dispute between PAG and
Earle over the LOI.  (J174).

Regardless of how the SAA is viewed, the events leading up
to and in the wake of its execution, challenged by Respondents
as secretive and conspiratorial, are neither and, and in any
event, find ample justification in the totality of the
circumstances then confronting the joint venturers.

It is clear that beginning in December 2016, there was a
heightened consciousness of, and growing concern over, both
Laura's management of PAI's business and the SEC's continuing
investigation into Laura's role therein.  de Rubio had alerted
T.J. Earle that PAI's "house was not in order," specifically
referring to the company's sloppy accounting methods, failure to
pay taxes, and lack of documentation supporting Laura's personal

loans from PAI.  At the same time, Nuerk was initiating contact with T.J. Earle, through de Rubio.  In a series of so-called "secret" conference calls commenced by Nuerk and involving de Rubio, Delgado and T.J. Earle, as well as in a stream of emails to them, Nuerk advised that he had obtained evidence of possible misconduct by Laura, specifically that Laura had misappropriated investor monies, embezzled funds from PAI and forged signatures on certain investor revenue share contracts.  In fact, Nuerk admitted that he told SEC investigators that there was money owed PAG from PAI that was never received.

Contemporaneous therewith, Nuerk also became aware of the Austrian regulatory authorities' interest in, and scrutiny of the Pristec American companies.  (J64; J514, ¶125).  Nuerk had been contacted by officials from the Austrian Financial Market Authority ("AFMA") who, in turn, had been advised by the SEC of its investigation into "possible offering fraud at the U.S. Pristec Companies."  In its letter of August 15, 2016, the SEC, noting that "Laura and Sichenzio claim to be members of [PAG's] Board and have held various officer positions at [PAG]," requested AFMA's assistance in obtaining related records from PAG, including "any file that AFMA may have already compiled concerning PAG, Rudy Nuerk or Jose Miguel Delgado Castillo."  On December 21, 2016, Nuerk reached out to de Rubio and told him

the Austrian authorities had alleged that Laura had misappropriated $12 million from PAI investors.

So concerned was Nuerk that he instituted certain actions intended to minimize Laura's and Sichenzio's influence and role in the business. First and foremost, as previously mentioned, the SAA was a plan devised in part to convert Laura's and Sichenzio's interests in the Pristec America companies into stock in PAG, the parent company, distancing them from the operation while retaining value for them. In furtherance of this goal, Nuerk called a special meeting of PAG's shareholders wherein Laura and Sichenzio were removed from PAG's Supervisory Board. Subsequently, Nuerk, in the name of PAI-NV, instituted a lawsuit against Laura and Sichenzio seeking to enjoin them from conducting any business on behalf of the Pristec Companies.

These were all actions initiated by Nuerk, not T.J. Earle, and occasioned by escalating concerns over Laura's mismanagement of PAI as well as the SEC's investigation of his possible fraud and theft of funds in the operation of Pristec business. As it turns out, Nuerk's and Earle's concerns were more than justified, as demonstrated in the civil enforcement action brought by the SEC in 2018, wherein the agency's formal complaint contained numerous allegations of misuse and misappropriation of investor funds by Laura and Sichenzio.

While certainly not evidential, the SEC's investigation – which Laura has repeatedly downplayed – as well as its formal complaint – which remains outstanding – are nevertheless informative of the actions and responses taken by Nuerk and T.J. Earle in their aftermath.[7]  Undeniably, their existence at the very least frustrated the reasonable expectations of the joint enterprise, and at worse, rendered it toxic, adversely affecting its ability to raise funds and, ultimately, its continuing viability.  Perhaps the best evidence of this is the testimony of Castillo Delgado – Laura's current partner – who asserted that one of the reasons he resigned from PAG on October 13, 2018 was the fact that Laura and Sichenzio "had problems with the SEC" and "were not the right people to run the company."  And Alex Herrera, a former PAI consultant, further commented that Laura was "unfundable."

This then was the situation confronting Claimants when they entered into the License Performance Guaranty with PAG; gave notice to PAI of its material breaches and subsequently its resultant disassociation from PRT; materially assisted PAG in

---

[7]Although Respondents repeatedly decry the unfairness of any reference to the SEC action, they actually "opened the door" by continually downplaying its significance, asserting as late as their most recent post-hearing submission that the SEC simply "has been focused on loans that were taken over the years by Laura from the Pristec Companies."  Of course, the SEC's civil enforcement complaint filed on September 7, 2018 speaks for itself.

its letter of license termination; and negotiated the LOI and later Settlement Agreement with PAG to form the "NewCo". While these events have been characterized as a "conspiracy" and "aiding and abetting" Nuerk's fraudulent scheme to wrest control of the Pristec Technology from Laura and Sichenzio, the preponderance of the credible evidence suggests just the opposite, namely as necessary measures designed with the best interests of PRT in mind, and to avert a very real risk of danger to the reputation, character and future of the Pristec business.[8]

As manager and a director of PRT, T.J. Earle[9] was required, in the conduct of PRT's business, "to perform his duties in good faith, in a manner he reasonably believes to be in the best

---

[8] Respondents never really explain why discussions and correspondence among de Rubio, Nuerk, T.J. Earle and Delgado about concerns over Laura's alleged mishandling of investor contracts or misappropriation of investor funds are actionable. Concern that a key officer of the U.S. Pristec companies was under investigation by U.S. and Austrian regulatory authorities is entirely legitimate. Indeed, Delgado, Laura's trusted associate and ally to this very day, acknowledges that he was a party to these so-called "secretive" communications.
[9] As PAI's sole manager, T.J. Earle has the power and authority to exclusively manage the partnership's business and conduct, direct and exercise full control over all of PAI's activities, including the power "to take any action on behalf of the company or exercise any rights and powers … granted to the company under this agreement" except for "situations in which the approval of either the members or the Board is specifically required by the express terms of this agreement." Operating Agreement Section 5(f). *See also* 6 Del. C. § 18-402; *Great Lakes Chemical Corporation v. Monsanto*, 96 F. Supp. 2d 376, 383 (D. Del. 2000).

interests of [PRT] and with such care as an ordinarily prudent person in a like position would use under the circumstances." *See* Operating Agreement § 5(g)(i).  Clearly, the challenged actions taken by T.J. Earle were consistent with what he reasonably perceived to be in the best interests of PRT. Indeed, the possibility that Laura was misappropriating investor funds might "explain the endless delays and excuses that Laura had given [T.J. Earle] as to why Pristec America had not provided [PRT] with the required support and materials." Moreover, during this same time, several investors, suspicious of Laura's actions, contacted T.J. Earle for an update on the status of the technology and expressed anger over Laura having lied to them to get them to invest.

Even Earle's execution of the March 23, 2017 LOI and subsequent Settlement Agreement with PAG to form a new joint venture to commercialize the Pristec Technology are understandable given the totality of the circumstances.  As explained by T.J. Earle, PAG's acquisition of PAI and ICT (via the SAA) "had complicated the organizational structure and ownership of the licenses and sublicenses."  As perceived by T.J. Earle, following the conversion of Pristec America shareholders to PAG shareholders "in an effort to clean up the mess Laura and Sichenzio had created by overselling interests in Pristec America," a "NewCo" — formed by two members owning 96%

of the two joint ventures (PNE and PRT) — would have
restructured those entities by combining them into a single
company.

These actions challenged by Respondents as breaches of
Claimants' fiduciary duties involve neither a misappropriation
of PRT's funds nor a usurpation of corporate opportunities by
the Earle entities.  On the contrary, they can objectively be
viewed as an effort to immunize the businesses from any possible
wrongdoing by Laura and/or Sichenzio, or at the very least, from
any stain or taint occasioned by the SEC's inquiry into same.
As credibly stated by T.J. Earle:

> My actions were at all times guided by my
> business judgment as to what I determined
> was in the best interests of the companies
> and the parties with the information I had
> available at the time.

> \*     \*     \*

> I concluded that Mr. Laura and Mr.
> Sichenzio, by reason of the credible
> allegations that they defrauded investors
> for years, had become toxic to the Refinery
> Joint Venture.  Even if the technology
> worked, the business still needed to raise
> millions in investor funds.  As the subjects
> of an investigation (and later civil
> enforcement action) by the SEC, Mr. Laura
> and Mr. Sichenzio rendered the enterprise
> unable to raise funds, and thus non-viable.

According to Earle, he did what he had to do to save the
business of PRT.  Such conduct, undertaken in the reasonable
belief that it is necessary to accomplish a legitimate end, is

neither wrongful nor actionable.  Indeed, even actions taken to
protect a **party's own** rightful business interests do not give
rise to a cognizable legal claim.  *Macdougall v. Weichert*, 144
N.J. 380, 385 (1996).

Even if Claimants' challenged conduct may somehow be viewed
as breaching a duty of care or loyalty as defined in PRT's
Operating Agreement, it cannot be said to be the proximate cause
of whatever injury Respondents claim to have suffered.  The
weight of the credible evidence points to Nuerk as the prime
initiator and mover in the attempt to distance and ultimately
sever PAI from the joint venture's business, and that would have
inevitably happened even absent whatever assistance Claimants
may have lent to the effort.

More significant, Respondents have only themselves to
blame.  Whatever the outcome of the pending SEC complaint, it
was Laura's and Sichenzio's own actions that sparked
governmental scrutiny of PAI's operations in the first instance
and placed at serious risk the continued viability of the
parties' business.  Having come to this litigation with "unclean
hands," Respondents cannot now be heard to complain of another's
wrongdoing.  "In simple parlance, [the unclean hands doctrine]
merely gives expression to the equitable principle that a court
should not grant relief to one who is a wrongdoer with respect
to the subject matter in suit,." *Faustin v. Lewis*, 85 N.J. 507,

511 (1981).  A court will not reward a party who has acted in a manner contrary to the principles of equity.  *Rolnick v. Rolnick*, 262 N.J. Super. 343, 361-64 (App. Div. 1993).

To be sure, the "unclean hands" doctrine is an equitable remedy and **not** an available defense for claims of monetary relief, as in this matter.  *Springer v. Trout*, 375 N.J. Super. 120, 136 (App. Div. 2005).  However, its underlying rationale is not without some relevance here.  Claimants' alleged misconduct in trying to oust Laura and Sichenzio from their positions of influence and control in PAG, PAI and PRT is intrinsically related to Laura's and Sichenzio's comparatively more egregious wrongful conduct in mismanaging and placing in perilous risk the business of these very same entities.  And even assuming **both** parties come to this Arbitration with so-called "unclean hands," their mutual misconduct may be said to neutralize each other's wrongdoing.  *Graziano v. Grant*, 326 N.J. Super. 328, 342 (App. Div. 1999) ("Equity regards as done that which ought to be done.").

Even assuming a breach of fiduciary duty and proximate causation, Respondents' counter and third party claims must fail for want of any resultant damages.  Although Respondents allege tens of millions of dollars ($30 - $40 million) in lost profits, they offer no credible proof in support thereof.

On the contrary, PAI-NV's license was reinstated shortly after being notified of its termination.  The ICDR Arbitrator rescinded the SAA; ruled that PAI's license remains in full force and effect; voided the purported Settlement Agreement between PAG and the Earle entities; returned the PAI-PAG relationship to the status quo ante; permanently enjoined PAG from taking any actions to jeopardize PAI's license; and awarded PAI hundreds of thousands of dollars in damages, including attorneys' fees and costs.

By Claimants' own admission, the effect of the ICDR Award was to invalidate Earle's attempt to strip PAI-NV of its membership in PRT.  Indeed, as early as August 11, 2017, PRT's Board voted not to "disassociate" PAI as a member of PRT.

Furthermore, the Pristec USA deal was never consummated[10] and PRT still exists to date with all its rights fully intact. Laura is presently the Chairman and CEO of PAI and ICT; ICT is

---

[10] In July 2018, Earle Refining, PAG and PAI (at the time owned by PAG) entered into a settlement agreement resolving Claimants' claims against PAG and PAI in the First Monmouth County action, wherein the parties agreed to form a new company – Pristec USA, LLC – to commercialize the Pristec Technology in the United States.  The new company was formed on August 15, 2018. Although Earle took some preliminary steps toward starting the business – opening a bank account, paying consulting fees to Hays and Pesch, obtaining a valuation of its license based on projections and purchasing activators from PAG – "PUSA"  never got off the ground because the ICDR Arbitrator rescinded the settlement agreement and enjoined PAG from operating the newly formed company.  In other words, the deal was unwound before any real consequence ensued.

the owner of PAI; and Laura is an owner of ICT.  PAI remains the majority member of PRT and the licensee of the U.S. Patent for the Pristec Technology pursuant to the October 1, 2013 License Agreement between PAI-NV and PAG.  The latter was acknowledged by T.J. Earle himself, whose company, Earle Refining, was assigned PAG's rights and obligations as licensor under PAI's license in the United States only.  In fact, the October 7, 2021 Cooperation Agreement between RedMax and Earle Refining acknowledged that PAI-NV continues to hold a license for the Pristec Technology.

As evidence the partnership continued, sometime after September 2020, PRT solicited PAI's assistance in testing a module built by Polaris and Bayou Pumps & Products, Inc. ("Bayou") in Louisiana.  Interestingly enough, Laura is currently working with Delgado – one of the original inventors of the Pristec Technology supposedly in exclusive possession of the "secret sauce" – on projects related to the oil refining technology and has actually applied for a new patent with Delgado and Chernikov listed on the application.

Not only has PAI's status not changed, there is no credible proof of any monetary consequences suffered by Respondents.  As with Claimants' request for relief, Respondents' expert's calculation of economic damages, including lost profits, is

based on certain assumptions and projections simply not borne out by the record in this case.

Instead, the proofs clearly demonstrate that despite many years in development and millions of dollars raised in investment, the Pristec Technology is not at a point where PRT or the Earle entities could bring it to market.  To date, no revenue has been generated by the Pristec Technology **anywhere** in the world.  And the longest the system ever operated in the field was eleven days, during the Tillen demonstration.  Recent testing was unsuccessful in producing a significant level of conversion and the current module constructed for Earle Refining has yet to work properly.[11]  Although T.J. Earle believes the Pristec Technology can be successfully commercialized, such a belief alone is simply too slender a reed on which to base a valuation.  Absent more, there can be no credible calculation or

---

[11] In connection with the Patent Sale, PAG provided Earle Refining with the engineering designs for the activators, but not the module.  Based thereon, and in conjunction with Bayou and Polaris, Earle Refining eventually completed construction of the "Earle System" in September 2020.  Subsequent testing, however, proved unsuccessful although when the System was later reconfigured, two of the tests showed a drop in sulfur content by 15%.  Yet without the operating parameters needed to calibrate the system, which Earle was never provided, Earle could not "stabilize" the system and get it to work on a continuous basis.  As noted, it appears Delgado may be the only one who holds the "secret sauce" that by his own admission, has not been disclosed to anyone, including Laura.  (J499 at ¶ 47).

quantification of economic damages suffered by either party to this arbitration.[12]

   For all these reasons, Respondents' counterclaims against Claimants and third -party claims against Third Party Defendants, including Walter Gil de Rubio, sounding in fraud, breach of fiduciary duty, conspiracy and aiding and abetting, are **DENIED**.

  For these very same reasons, Respondents' cause of action for tortious interference with contract against Claimants and Third-Party Defendants is **DENIED** as lacking preponderant proof of any interference with a contractual relationship or prospective economic right that was intentional, malicious or without legal justification, or that any damages resulted therefrom.   *See Nostrame v. Santiago*, 213 N.J. 109 (2013); *Printing Mart-Morristown*, 116 N.J. at 751-752.

  Respondents' claim of a violation of New Jersey's Uniform Securities Law, *N.J.S.A.* 49:3-52, is also **DENIED** because Claimants did not "offer, sell or purchase" any securities.

---

[12] ICT claims it has "upstream patent" rights to an invention it owns independent of the U.S. patents that have been rendered "worthless" by the Patent Sale.  This allegation is without any support in the record as there is no proof that the value of the ICT patent is at all dependent on PAG's continued ownership of the U.S. patents.

**VII**

**RESPONDENTS' CLAIM FOR ATTORNEYS' FEES BASED ON
CLAIMANTS' WITHDRAWL OF ITS 2017 COMPLAINT**

In Count 6 of their 2017 Counterclaim and Third Party
Complaint, Respondents seek attorneys' fees under the fee
shifting provisions of PRT's Operating Agreement for
successfully defending against Claimants' so-called "frivolous"
claim of "dissociation" in their 2017 Complaint.  Respondents'
claim is without merit and accordingly is **DENIED**.

To be sure, the 2017 Complaint alleged that PAI had been
"dissociated" from PRT.  However, Claimants asserted no cause of
action relating to the dissociation.  On the contrary,
Claimants' 2017 Complaint sought specific performance,
compelling its joint venturer, PAI, to perform under PRT's
Operating Agreement.  In any event, even if the 2017 Complaint
did not allege dissociation, PAI would still have had to defend
against Claimants' claims in the 2019 action that mirrored those
in the 2017 lawsuit.

Moreover, Respondents cannot be considered the "prevailing
party" for purposes of the fee shifting provision of PRT's
Operating Agreement.  Claimants' voluntary dismissal of the new
complaint in the First Monmouth County action is not an
adjudication on the merits, *Czepas v. Schenk*, 362 N.J. Super.
216, 228 (App. Div. 2003), and, as already noted, Claimants'

2019 Complaint – the subject matter of the instant arbitration – asserts claims against Respondents to be adjudicated herein identical to those in their 2017 Complaint.  Simply put, Respondents' so-called defense of "dissociation" in the 2017 Complaint is not of the nature or character to justify shifting counsel fees and accordingly their claim for same is **DENIED**.

To the extent that Count 6 of Respondents' 2017 Counterclaims seeks broader relief based on Earle Refining's actions post-Patent Sale, in particular its construction of a module, suffice it to say there is no basis in the record to find this activity actionable.

### VIII

### RESPONDENTS' REQUEST FOR A DECLARATORY JUDGMENT VOIDING THE PATENT SALE

Count I of Respondents' counterclaim requests declaratory relief pursuant to *N.J.S.A.* 2A:16-51 *et seq.* declaring the July 3, 2019 Patent Purchase Agreement and Assignment ("Patent Sale") null and void because it violates the ICDR Arbitrator's permanent injunction as well as Austrian law.  For reasons that follow, such relief is **DENIED**.

Briefly to recap the relevant facts, following issuance of the ICDR Final Award, on July 3, 2019, Earle Refining purchased the U.S. Patent for the Pristec Technology (No. 10,053,635) from PAG for $500,000.  In connection with the Patent Sale, PAG

assigned to Earle Refining all of its rights and obligations as Licensor under PAI-NV's license in the United States only.

Following the Patent Sale, in October 2020, PAG's creditors commenced insolvency proceedings against PAG in Austria.  The insolvency administrator auctioned off all of PAG's assets, including its intellectual property, fixed assets and legal claims.  The bid of RedMax, an Austrian corporation, was accepted and RedMax entered into a purchase agreement with the insolvency administrator, dated July 26, 2021.  As part of the sale to RedMax, the insolvency administrator also assigned all of the bankruptcy estate's rights in the Patent Sale to RedMax. Thereafter, RedMax entered into a Cooperation Agreement with Earle Refining, wherein RedMax waived all rights in, and assigned the U.S. Patent rights to Earle Refining, "thereby confirming Earle has the exclusive rights in the technology in the U.S. and RedMax shall have exclusive rights worldwide (except in the U.S.) to comprehensively protect and utilize the know-how and the [Pristec Technology]."

Respondents PAI and ICT now seek to have the Patent Sale declared void as violative of both the ICDR injunction and Austrian law.  Claimant Earle Refining counters that not only is there nothing prohibiting the Patent Sale, but that Respondents lack standing to challenge because the Patent Sale itself neither terminated nor interfered with PAI-NV's license, and

that in any event, because the insolvency administrator, and then RedMax, terminated PAI's license, PAI no longer has any interest in the ownership of the U.S. Patent.

As a threshold matter, Earle Refining's procedural arguments are rejected.  In the first place, Earle Refining is judicially estopped from arguing PAI's license has been terminated since it affirmatively represented at trial and elsewhere that it remains the licensee pursuant to the October 1, 2013 License Agreement.  Furthermore, Earle Refining has not shown that either the insolvency administrator's or RedMax's letter of termination is of any legal force and effect. Consequently, as "licensee," PAI has a sufficient enough interest in the ownership of the U.S. Patent to challenge the validity of the sale, as it purports to have given PAI a "new licensor," Earle Refining, who has already claimed entitlement to an accounting from PAI of all revenue ever earned since 2013 from the PAI-NV License and to "indemnity."

Having the requisite interest to challenge the Patent Sale, Respondents' substantive attacks nevertheless fail.  The ICDR injunction permanently enjoined PAG from "taking any other actions . . . of any kind that would impact the operations, ownership or rights of ICT [or PAI-NV], including rights in the cold cracking Pristec Technology . . .."  Assuming, without

deciding, the prohibition extended to Earle Refining,[13] the Patent Sale, as just noted, neither interfered with nor terminated PAI-NV's license rights, which remained in full force and effect in its aftermath.  Consequently, the Patent Sale is not in violation of the ICDR injunction.

Nor have Respondents shown that the Patent Sale violated Austrian law, assuming its applicability here.

Dr. Michael Prager, Respondents' expert, opined that the Patent Sale violated Austrian Law for three reasons:

1.   PAG was insolvent at the time of the Patent Sale in July 2019;

2.   The U.S. Patent for the Pristec Technology was sold for less than fair market value in violation of Section 156 of the Austrian Penal Code; and

3.   Nuerk, whose term as Executive Director of PAG had lapsed, was not authorized to act on behalf of PAG.

At the time of the Patent Sale, there was no formal bankruptcy proceeding instituted against PAG and Dr. Prager offers no proof of PAG's actual financial condition cotemporaneous with the challenged transaction.  The expert

---

[13] It should be noted that none of the Claimants was a party to the ICDR Arbitration and there was never an opportunity in that prior proceeding to litigate any issue relative to the Patent Sale, which had not yet occurred, including rights to the Pristec Technology.

simply relies on a notice of a judicial auction of PAG's movable property in January 2019 but otherwise fails to establish its equivalency to an "insolvency" to trigger application of Austria's criminal laws.  Accordingly, Dr. Prager's conclusionary determination of a violation thereof is a "net opinion," lacking any foundation in either fact or law and therefore must be disregarded.

Similarly, in opining that a patent sale for less than fair market value is violative of Austria's penal code, Dr. Prager, who is not an expert in patent appraisals, formed no independent professional opinion as to the value of the Pristec Technology. Instead, he relied on two valuations commissioned by persons with a vested interest therein and on whose selective disclosures the appraisers formed their respective opinions – one appraising the business between $143 million and $676 million; the other at $520 million.  For reasons already explained, those valuations are flawed.  Indeed, PAG's bankrupt estate, including all its worldwide patents (save the U.S. Patent) for the Pristec Technology, sold for a mere € 270,000 (Euros).  And, according to T.J. Earle, the technology has yet to be commercialized after over 16 years in existence, with no immediate prospect in sight as of the close of the record in this case.  Furthermore, the bare conclusion that a sale for less than fair market value violates Austria's penal code,

without sufficiently identifying the requisite elements of the specific criminal violation, constitutes yet another net opinion wholly inadequate to render the Patent Sale null and void.[14]

Lastly, Dr. Prager posits that Nuerk was not authorized to act on behalf of PAG as its Executive Director because his appointment had lapsed as of the time of the Patent Sale. However according to Section 73(4) of the Austrian Federal Law Gazette No. 98/1965, as amended ("AKtG"):

> If a person is registered or notified as member of the management board, a defect in his/her appointment is only binding against a third party if such party was aware of the defect.

Thus, a third party may rely on a manager's authority to bind the company if that person is either registered in the commercial register or if the third party was so notified otherwise, unless the third party knew that that person was not effectively appointed as a manager.  Section 73(4) AKtG.

According to Claimants' expert, Christian Votava, Esq., the Austrian commercial register, as of the date of the Patent Sale, listed Nuerk as manager with the capacity to act alone – a fact undisputed in this record.  Moreover, there is no credible proof that T.J. Earle or any of the Earle entities had knowledge of

---

[14] Dr. Prager also opined that the Patent Sale violated Section 158 of the Austrian Penal Code because PAG did not use the proceeds to benefit all creditors equally.  However, the record is devoid of any evidence to this effect.

any defects in Nuerk's authority to act on behalf of PAG at time
of the Patent Sale.  In fact, Dr. Prager offers no finding that
T.J. Earle had either actual or constructive knowledge of any
infirmity in Nuerk's reappointment.[15]  On the contrary, the
record demonstrates that Earle reasonably relied on Nuerk's
apparent authority to bind PAG, as he had historically dealt
with Nuerk as PAG's manager; and Nuerk, as well as the
commercial register, continued to hold him out as such.  Under
the circumstances it cannot be said that the Patent Sale was
null and void as to an innocent third party (Earle Refining)
because Nuerk was not legally reinstated as PAG's Executive
Director at time of the transaction.

In any event, Earle Refining's purchase of the U.S. Patent
was confirmed and ratified in the Cooperation Agreement,
pursuant to which RedMax, the Austrian purchaser of PAG's assets
(including its legal claims), waived all rights to challenge the
Patent Sale and confirmed that Earle Refining has "the exclusive
rights in the technology in the U.S. . . .."  Earlier, as part

---

[15] In fact, less than one month prior to the Patent Sale, PAG's
counsel, Mr. Bauer, wrote to Earle assuring him that the actions
taken at PAG's February 2018 shareholders' meeting removing
Laura and Sichenzio from PAG's Supervisory Board (that Laura and
Sichenzio successfully challenged in the lower court) would be
upheld on appeal.  Two weeks later, on June 24, 2019, Bauer
reiterated his prior opinion that under Austrian law, an
agreement signed by Nuerk, who he represented was still PAG's
executive managing director, would be binding upon PAG.

of the sale of PAG's assets to RedMax, the insolvency
administrator assigned all of the bankruptcy estate's rights in,
and right to contest the Patent Sale, to RedMax.

For all these reasons, Respondent's request for declaratory
relief adjudging the Patent Sale null and void is **DENIED.**

## IX

## RESPONDENTS' REQUEST FOR DISSOLUTION

In Count VI of its counterclaims in the 2017 Action and
Count VII of its counterclaims in the 2019 Action, Respondent
PAI seeks dissolution of PRT, alleging that "there is no way
PAI-NV could continue with the Earles in PRT," given their past
history.

The Delaware LLC Act provides in pertinent part:

> On application by or for a member or
> manager, the court of chancery may decree
> dissolution of a limited liability company
> whenever it is not reasonably practicable to
> carry on the business in conformity with a
> [LLC] agreement

Courts, however, are wary of interfering with the internal
affairs of a company. *Muellenberg v. Bikon Corp.*, 143 N.J. 168
(1995). Indeed, the Delaware LLC Act itself is grounded on
principles of freedom of contract. Consequently, when the
company's operating agreement provides a reasonable exit
mechanism, it is assumed that the LLC may still proceed to

operate practically under its contractual charter because the charter itself provides an equitable way out.

Moreover, a court's authority to order dissolution is discretionary. *Haley v. Talcott*, 86 A.3d 86, 97 (Del. Ch. 2004); *In re Arthur Treacher's Fish & Chips, Inc.*, 386 A.2d at 1167; *Brenner v. Berkowitz*, 134 N.J. 488, 514 (1993). Even if there are no facts under which the LLC could carry on business in conformity with its operating agreement, the judicial remedy of dissolution remains discretionary. *Haley*, 86 A.3d at 93-94.

Here, there is an explicit exit mechanism built into PRT's Operating Agreement. Section 12, entitled "Voluntary Transfers of Economic Interests and Membership Interests," describes in detail the procedure for disposing, assigning or otherwise transferring a member's interest, either economic or voting, in PRT. Also, Section 19, entitled "Dissolution," provides for dissolution of the company following "unanimous written consent" of the voting members or the sale of all of the company assets; and Section 20 lays out the procedure for winding up company affairs and liquidating its assets.

Rather than invoking these contractual mechanisms, Respondent PAI-NV seeks dissolution by way of arbitral fiat. However, the facts simply don't justify recourse to this equitable relief. PAI-NV has not convincingly demonstrated that PRT cannot continue to function in accordance with its charter;

or that an unbreakable impasse renders future operation of its business impracticable; or, for that matter, that the parties ever formally attempted to reach an agreement or resolve any stalemate before coming to court.  Significantly, this is not a situation where the operating agreement provides for the company to be governed by its members and there are only two members who are at permanent and irreconcilable odds.  To the contrary, PRT's Operating Agreement vests practically exclusive managerial authority in a Manager who "shall conduct, direct and exercise full control over all activities of the Company consistent with the Business Plan and the Budget . . ." and shall have the power to bind or take any action on behalf of the Company . . .." Section 5(f).

Moreover, Respondent has offered no proof of any inertial status quo with regard to PRT, which still exists and enjoys all the rights it ever did.  In fact, in 2020, well after the ICDR's Final Award rendering PAI-NV's disassociation from PRT null and void, T.J. Earle reached out to Laura for assistance in testing the system then recently constructed by Polaris.  The fact that Laura chose not to respond should not now inure to his benefit.

After all, dissolution is an equitable remedy and, as previously mentioned, the doctrine of "unclean hands" operates to deny such relief to one whose inequitable conduct contributed, and is intrinsically related to the very conflict

in issue.  So, whatever reasonable expectations Laura may have harbored in having control or influence in the operation of the business and formulation of plans for its future development may be considered, at worst, to have been forfeited by his own actions and, at best, must be balanced against PRT's ability to exercise its business judgment and run its business effectively and efficiently.

Suffice it to say, the circumstances here simply do not warrant the exercise of arbitral authority to dissolve PRT. Accordingly, Respondent PAI-NV's request for dissolution is **DENIED**.

**X**

**AWARD SUMMARY**

I, the UNDERSIGNED ARBITRATOR, having been duly designated and sworn, and having heard the proofs and allegations of the parties during the six-day hearing, and having considered the post-hearing submissions of all parties do hereby Rule and AWARD as follows:

1. Claimants' First Amended Complaint:

Count I (Breaching PRT Operating Agreement and License Agreement;

Count IV (Breach of Implied Covenant of Good Faith and Fair Dealing);

            Count V (Conversion/Theft);

            Count VI (Fraudulent Inducement); and

            Count VII (Breach of Fiduciary Duty)

are **DENIED.**

    2.   Claimants' First Amended Complaint:

            Count III (Breach of Contract – Failure to Refund) is

**GRANTED** (see Interim Award);

    3.   Claimants' First Amended Complaint:

            Count II (Breach of License Performance Guarantee v.

PAG) is **DISMISSED.**

    4.   Respondents' Answer and Counterclaim in MON-C-98-19:

            Count I (Declaratory Judgment seeking to declare

Patent Sale Void);

            Count II (Fraud and Aiding and Abetting);

            Count III (Conspiracy to Commit Fraud);

            Count IV (Breach of Fiduciary Duty and Aiding and

Abetting);

            Count V (Tortious Interference with Contract);

            Count VI (Fraud in the Inducement); and

            Count VII (Dissolution)

are **DENIED.**

    5.   Respondents' Revised First Amended Answer,

Counterclaims and Third Party Complaint in MON-C-175-17:

            Count I (Fraud and Aiding and Abetting);

Count II (Conspiracy to Commit Fraud);

Count III (Breach of Fiduciary Duty and Aiding and Abetting);

Count IV (Tortious Interference with Contract);

Count V (Violation of N.J. Uniform Securities Laws); and

Count VI (Declaratory Judgment)

are **DENIED.**

6.    Respondents Laura, PAI-NV, PAI-NJ and ICT's Third-Party Complaint Against the Earle Entities, Earle Brothers and Walter Gil de Rubio filed in MON-C-175-17.

Count I (Fraud and Aiding and Abetting);

Count II (Conspiracy to Commit Fraud);

Count III (Breach of Fiduciary Duty and Aiding and Abetting);

Count IV (Tortious Interference with Contract);

Count V (Violation of N.J. Uniform Securities Law); and

Count VI (Declaratory Judgment);

are **DENIED.**

7.    Respondent PAI-NV's Third Party Complaint Against T.J. Earle filed in MON-C-98-19:

Count I (Aiding and Abetting Fraud);

Count II (Conspiracy to Commit Fraud);

Count III (Aiding and Abetting Breach of Fiduciary
Duty); and

Count IV (Tortious Interference with Contract);
are **DENIED.**

8.    The parties shall each pay their own counsel and
professional fees.

9.    The fees of the American Arbitration Association
and Arbitrator compensation shall borne as incurred.

10.   This Award is in full settlement of all claims and
counterclaims submitted to this Arbitration.   All claims not
expressly granted herein are hereby denied.


Dated:   April _2/_ , 2023              Anthony J. Parrillo


I Anthony J. Parrillo, an attorney-at-law and judge
(retired) arbitrator, do hereby affirm on my oath as Arbitrator
that I am the individual described in and who executed this
instrument which is my Award.