# EXHIBIT B

AMERICAN ARBITRATION ASSOCIATION

| | |
|---|---|
| PRISTEC REFINING TECHNOLOGIES USA, LLC, EARLE REFINING LLC, EARLE OIL INVESTMENTS, LLC, and EARLE INVESTMENTS, LLC, | Case No. 01-22-0000-7497 |
| Claimants/Counter-Respondents, | **CERTIFICATION OF WILLIAM R. TELLADO, ESQ. IN SUPPORT OF CLAIMANT'S MOTION TO AMEND DEMAND, COMPEL DISCOVERY, AND FOR RELATED RELIEF** |
| v. | |
| PRISTEC AMERICA, INC., (NEVADA), PRISTEC AMERICA, INC. (NEW JERSEY), INNOVATIVE CRUDE TECHNOLOGIES, INC., ANTHONY SICHENZIO, AND JOSEPH LAURA, | |
| Respondents/Counterclaimants. | |

WILLIAM R. TELLADO, being of full age, hereby certifies as follows:

1.      I am an attorney at law of the State of New Jersey and a Member of the firm Sills Cummis & Gross P.C., attorneys for Claimants, Pristec Refining Technologies USA, LLC, Earle Refining LLC, Earle Oil Investments, LLC, and Earle Investments, LLC. ("Claimants") in the above-captioned arbitration proceeding. I respectfully submit this Certification, and the exhibits attached hereto, in support of Claimant's Motion to Amend Demand, to Compel Discovery and for Related Relief.

### Procedural History of the New Jersey Superior Court Actions

2.      Claimants commenced the first of the two consolidated actions that comprise this proceeding on October 23, 2017 in New Jersey Superior Court, Monmouth County, Chancery Division (the "2017 Action"), asserting claims against Pristec AG, Pristec America, Inc., Laura,

and Sichenzio for breach of contract, fraud and various other torts.[1]  A true and correct copy of

Claimants' complaint in the 2017 Action is attached hereto as Exhibit A.

3.    On or about February 27, 2018, Pristec America (at the time controlled by Pristec

AG) commenced a related action, seeking various injunctive relief, against Laura and Sichenzio,

in Monmouth County Superior Court, Chancery Division, entitled Pristec America, Inc. v. Laura,

et al., Docket No. MON-C-24-18.  Laura and Sichenzio asserted counterclaims seeking to

rescind a February 8, 2017 Share Acquisition Agreement ("SAA") between Laura, Sichenzio,

and Pristec AG.  The matter was referred to arbitration.

4.    In May 2018, Laura and Sichenzio commenced an arbitration (the "ICDR

Arbitration") against Pristec AG seeking rescission of the SAA.  Pursuant to the SAA, Laura and

Sichenzio had agreed to, among other things, transfer their interests in Pristec America to Pristec

AG.  None of the Claimants to this arbitration proceeding were parties to the ICDR Arbitration

or the SAA (which contained the arbitration agreement).

5.    A final award was issued in the ICDR Arbitration on June 10, 2019 (the "Final

Award").  A true and correct copy of the Final Award is attached hereto as Exhibit B.

6.    A true and correct copy of a Transcript of Decision by the Hon. Katie A.

Gummer, P.J.Ch., dated March 12, 2020, denying Respondents' motion to disqualify Sills

Cummis. And in which Judge Gummer, inter alia, discusses Respondents' repeated

mischaracterization of the Final Award, is attached hereto as Exhibit C.

---

[1] Pristec America, Inc. (NEVADA) and Pristec America, Inc. (NEW JERSEY) are referred to
collectively as "Pristec America."  Respondents Pristec America, Innovative Crude
Technologies, Inc. ("ICT"), Joseph Laura ("Laura"), and Anthony Sichenzio ("Sichenzio") are
referred to collectively as "Respondents."

7.      Following issuance of the Final Award, Earle Refining and Pristec AG entered into a Patent Purchase Agreement dated July 3, 2019.  A true and correct copy of the Patent Purchase Agreement is attached hereto as <u>Exhibit D</u>.

8.      Earle is the owner of United States Patent No. 10,053,635 entitled "Method for the treatment of a liquid, in particular a mineral oil," which duly and legally issued on August 21, 2018 ("the '635 Patent").  True and correct copies of the '635 Patent, and the Patent Office record of assignment to Earle, are attached hereto as <u>Exhibits E</u> and <u>F</u>, respectively.

9.      At the direction of the Hon. Joseph P. Quinn, P.J.Cv., following the issuance of the Final Award in the ICDR Arbitration, Claimants commenced a second action, Docket No., MON-C-98-19, on July 31, 2019 (the "2019 Action").  A true and correct copy of Claimants' First Amended Complaint, filed in 2019 Action on September 5, 2019, is attached hereto as <u>Exhibit G</u>.

10.     On October 29, 2019, Respondents filed their Answer and Counterclaims in the 2019 Action, asserting counterclaims against Claimants, a true and correct copy of which is attached hereto as <u>Exhibit H</u>.

11.     By Order dated May 29, 2020, Judge Gummer consolidated the 2017 Action with the 2019 Action for all purposes.

12.     On June 30, 2021, the parties to this proceeding entered into an Arbitration Agreement, a true and correct copy of which is attached hereto as <u>Exhibit I</u>.

<u>**The Intellectual Property Dispute**</u>

13.     On October 9, 2020, certain of Pristec AG's creditors commenced an involuntary bankruptcy proceeding against Pristec AG in Austria Commercial Court, Vienna, Index No. AZ 38 S 64/20v.

14.     The Austrian bankruptcy administrator eventually auctioned off Pristec AG's assets, including all of its intellectual property and legal claims.  The bid of an affiliate of RedMax GmbH & Co KG ("RedMax"), an Austria corporation, was accepted at the auction. Subsequently, RedMax and the Austrian bankruptcy administrator entered into a purchase agreement dated July 26, 2021 pursuant to which RedMax acquired all of Pristec AG's assets, including its legal claims.

15.     Following RedMax's purchase of Pristec AG's assets, RedMax and Earle Refining entered into a Cooperation Agreement dated October 7, 2021.   A true and correct copy of the Cooperation Agreement is attached hereto as Exhibit J.

16.     Attached hereto as Exhibit K is a true and correct copy of a press release, dated August 26, 2021, in which CMG Holdings Group, Inc. ("CMG") disclosed an investment in "new technology related to the crude oil refining business, specifically….a multi-patent procedure for restructuring oil through magnetic vacuum upgrading…."

17.     Attached hereto as Exhibit L is a true and correct copy of a press release, dated November 30, 2021, in which CMG disclosed a joint venture with New Jersey Petroleum Partners ("NJPP") with regard to magnetic vacuum upgrading technology for reining crude oil.

18.     Prior to the November 30, 2021 press release, on February 18, 2020, New Vacuum Technologies USA, LLC ("NVT"), an entity allegedly owned and/or controlled by Laura, filed United States Patent Application No. 16/793,273 entitled "System and method for cold cracking under a condition of modified density of physical vacuum," which was published as US20200325402A1 on October 15, 2020 (hereinafter "the '402 Publication").  A true and correct copy of the '402 Publication is attached hereto as Exhibit M.

4

19.     Claimants and their counsel were provided with the August 26, 2021 press release and the November 30, 2021 press release in April 2022.  While Claimants were aware of the existence of NVT prior to receiving the press releases (because the Securities and Exchange Commission had tried to subpoena NVT in an civil enforcement action commenced against Laura and Sichenzio still pending in the United States District Court for the Eastern District of New York, but that subpoena was quashed), Claimants were not aware of the theft of trade secrets, the involvement of one of Pristec AG's former Chief Technology Officer, Jose Miguel Delgado Castillo ("Delgado") with NVT and the '402 Publication, or that NVT was constructing equipment using the infringing patent application and misappropriated trade secrets.

20.     A true and correct copy of a letter, dated May 13, 2022, from Claimants' counsel to NVT detailing the alleged patent infringement, and Exhibit D to the letter -- a claim chart comparing the NVT patent application to independent claims 1 and 6 of the '635 Patent—are collectively attached hereto as Exhibit N.

**The Discovery Dispute**

21.     A true and correct copy of the Court's July 2, 2020 Amended Case Management Order is attached hereto as Exhibit O.

22.     While discovery in the 2017 Action and the 2019 Action was open, Claimants sought discovery concerning Laura and Sichenzio's current efforts to conduct business with the oil-refining technology at issue in this action (the "Technology").

23.     A true and correct copy of Claimant's First Request for the Production of Documents to Defendant Joseph Laura is attached hereto as Exhibit P.

24.     Claimants requested that Laura produce all documents (a) concerning or relating to the construction, manufacturing, or design of any equipment, system, module, component,

designs, or specification for the Pristec Technology from January 1, 2016 to present; (b) relating to or reflecting the commercial or market readiness of the Technology from January 1, 2015 to present; and (c) concerning the patent(s) for the Technology from January 1, 2015 to present. (Exhibit P, Request Nos. 20-25, 28, 29, 52).

25.     Respondents did not produce any documents relating to NVT's efforts to file a patent application or construct and test a module.

26.     Claimants' counsel also requested information about Respondents' current efforts to conduct business with the Technology during the depositions of Laura and Sichenzio.

27.     Relevant excerpts of Sichenzio's deposition, taken on February 18, 2020, are attached hereto as Exhibit Q.

28.     Relevant excerpts of Laura's first deposition, taken on February 18, 2020, are attached hereto as Exhibit R.

29.     Laura's refusal to answer certain questions at his deposition prompted Claimants to file a motion to compel.  That motion was granted by Order dated August 7, 2020.  A copy of the August 7, 2020 Order is attached hereto as Exhibit S.

30.     Relevant excerpts of Laura's second deposition, taken on August 24, 2020, are attached hereto as Exhibit T.

31.     On July 28, 2020, Claimants served Respondents with Supplemental Requests for the Production of Documents (the "Supplemental Requests").  A true and correct copy of the Supplemental Requests served on Respondents are collectively attached hereto as Exhibit U.

32.     On September 1, 2020, Respondents served their responses to the Supplemental Requests by objecting to the requests and refusing to produce the requested documents, particularly Respondents' tax returns.

33.     On or about September 16, 2020, Claimants' counsel served Respondents' counsel with a deficiency letter pursuant to R. 1:6-2(c).  A true and correct copy of the deficiency letter is attached hereto as Exhibit V.  Respondents failed to respond to the letter.

34.     On October 26, 2020, Claimants filed a motion to compel.  That motion was pending when the parties agreed to arbitrate their disputes.

35.     Claimants and Respondents each produced two expert reports – one on damages and one on Austrian law in connection with the validity of the sale of the '635 Patent to Earle Refining.

36.     The Arbitration Agreement provides in Paragraph 7 that any expert depositions shall be performed within thirty (30) days of the effective date of the Agreement, or by July 30, 2020.  (Exhibit I, ¶ 7).

37.     Claimant's counsel repeatedly requested dates for the depositions of Respondents' experts, including by email on July 12, and July 20, 2021.  Copies of my email exchanges with Respondents' counsel are attached hereto as Exhibit W.

38.     In response, Respondents' counsel advised that Laura was out of the country, but once he returned he would provide dates.

39.     No dates were ever provided and Respondents' counsel is refusing to produce Respondents' experts for deposition on the ground that the deadline in the Arbitration Agreement has passed.

40.     On February 18, 2022, after the parties were unable to agree on an arbitrator, Claimants filed a demand for arbitration with the AAA.  A copy of the demand, without Claimants' First Amended Complaint, filed in 2019 Action (which is attached as Exhibit G), is attached hereto as Exhibit X.

41.     Relevant excerpts of the deposition of Walter Gil de Rubio, taken on April 1,

2021, are attached hereto as Exhibit Y.

I certify that the foregoing statements made by me are true.  I am aware that if any of the

foregoing statements are willfully false, I am subject to punishment.

Dated: July 11, 2022

_____ /s/ William R. Tellado_____
WILLIAM R. TELLADO

8

# EXHIBIT D

## PATENT PURCHASE AGREEMENT

This PATENT PURCHASE AGREEMENT ("**Agreement**") is entered into on July _3_, 2019 ("**Effective Date**") by and between Earle Refining LLC, a New Jersey limited liability company with its principal place of business at 1800 Route 34, Wall, New Jersey 07719 ("**Earle**" or "**Buyer**") and Pristec AG, a joint stock company organized under the laws of the Republic of Austria, having a principal place of business in Vienna, Austria ("**PAG**" or "**Seller**"). Earle and PAG may be referred to herein individually as a "Party" and collectively as the "Parties."

WHEREAS, Seller owns Austrian Patent Nos. AT509680 B1 2012-04-15 granted April 15, 2012 and AT510227 B1 2013-01-15 granted January 15, 2013 ("**Austrian Patents**"), as well as United States patent applications and issued patents that claim priority to the Austrian Patents, including US Patent No. 10,053,635 and U.S. Patent Application Nos. 16/017,651 and 16/017,725 ("**United States Patents**").

WHEREAS, Seller wishes to sell to Buyer its entire right, title and interest in the United States Patents, the causes of action to sue for infringement thereof, and any other legal rights entitled by the original owner of the United States Patents under the law; and

WHEREAS, Buyer wishes to purchase the United States Patents.

NOW, THEREFORE, for good and valuable consideration, the receipt, sufficiency, and adequacy of which are hereby acknowledged, the Parties agree as set forth herein.

1.   **TRANSFER OF PATENTS**

1.1   <u>Patent Assignment.</u>  Seller hereby assigns, transfers and conveys to Buyer all right, title and interest it has in and to the United States Patents, including without limitation, any and all legal rights of Seller to sue for past, present and future infringement, to collect royalties under such United States Patents, to prosecute all existing United States Patents, to apply for additional patent grants claiming priority to the United States Patents worldwide and to have additional patent grants claiming priority to the United States Patents issue in the name of the Buyer.

1.2   <u>Assignment of Causes of Action.</u>  Seller hereby assigns, transfers and conveys to Buyer all right, title and interest it has in and to all causes of action and enforcement rights it has, whether known, unknown, currently pending, filed, or otherwise, for the United States Patents, including without limitation all its rights to pursue damages, injunctive relief and other remedies for past, current and future infringement of the United States Patents.

1.3   <u>Assignment of License Agreement.</u>  Seller hereby assigns, transfers and conveys to Buyer all right, title and interest it has in, and Buyer hereby assumes all rights and obligations of Seller under, that certain Patent, Technology and Know-How Licenses Agreement dated as of October 1, 2013, as amended, by and between Seller and Pristec America, Inc., a Nevada corporation (the "<u>PAI License</u>") for only that portion of the Primary Territory (as defined in the PAI License) which is the United States of America. For purposes of clarification, Seller retains the rights and obligations under the PAI License for all other areas covered under the Primary Territory. The

6063634 v6

                                                          CONFIDENTIAL

Seller shall provide the Buyer with all support necessary, including providing the Buyer with know-how, for the Buyer to fulfill its obligations under the License Agreement referenced herein.

1.4     <u>Sellers Knowledge</u>.   The Seller shall provide the Buyer with all support necessary, including providing the Buyer with know-how, for the Buyer to make use of the technology covered by the United States Patents.

## 2.     CONSIDERATION TO SELLER

2.1     <u>Payment.</u>   In consideration for the assignment of such rights, title and interest in the United States Patents and the other obligations of Seller as set forth in this Agreement, Buyer shall pay Seller the total sum of Five Hundred Thousand (US$500,000). Buyer shall make such payment in immediately available funds by wire transfer as follows: Three Hundred Thousand (US$300,000) immediately upon receipt of both this Agreement and Assignment of the United States Patents signed by Seller and Two Hundred Thousand Dollars (US$200,000) within two (2) business days of the date that Seller provides to Buyer all of Seller's records and documents (in whatever medium those records are kept) related to the United States Patents and the know-how necessary to make use of the technology covered by the United States Patents.

2.2     <u>Cooperation After Effective Date.</u>   Seller further covenants and agrees that it will upon request, execute and deliver to Buyer any other reasonably requested documents and materials that Buyer reasonably believes are necessary for Buyer to perfect its title in the United States Patents.

2.3     <u>Execution of Assignment Agreement</u>.   Seller and Buyer shall execute contemporaneously herewith the Assignment attached hereto as **Exhibit A** suitable for filing with the United States Patent and Trademark Office.   Buyer shall also promptly send all files and original documents owned or controlled by Seller or its agents or attorneys regarding the United States Patents including, without limitation, any assignments for the United States Patents, documents and materials evidencing dates of invention, prosecution history files, and an electronic copy of an updated Docket current as of the Effective Date.

## 3.     RESERVED

## 4.     REPRESENTATIONS AND WARRANTIES

4.1     Seller hereby represents and warrants to Buyer that:

4.1.1   <u>Authority.</u> Seller has obtained all necessary approvals from its governing bodies and has the right and authority to enter into this Agreement and to carry out its obligations hereunder and requires no third party consent, approval, and/or other authorization to enter into this Agreement and to carry out its obligations hereunder, including, without limitation, the assignment of the United States Patents to Buyer.

4.1.2   <u>Title and Contest.</u>   Seller has good and marketable title to the United States Patents, including without limitation all rights, title, and interest in the United States Patents and the right to sue for past, present and future infringement thereof. Seller has obtained and properly recorded

6063634 v6



**CONFIDENTIAL**

previously executed assignments for the United States Patents as necessary to fully perfect Seller's rights and title therein in accordance with governing law and regulations in each respective jurisdiction. The United States Patents are free and clear of all liens, mortgages, security interests or other encumbrances and restrictions on transfer. There are no actions, suits, investigations, communications, correspondence, claims or proceedings threatened, pending or in progress relating in any way to the United States Patents. Without limiting the foregoing, there are no outstanding payments or other consideration due or owing with respect to the United States Patents.

4.1.3   Fees. All maintenance fees, annuities, and the like due on the United States Patents have been timely paid.

4.1.4   Validity and Enforceability. The United States Patents have never been found invalid or unenforceable for any reason in any administrative, arbitration, judicial or other proceeding.

4.2   Buyer hereby represents and warrants to Seller that:

4.2.1   Buyer has the right and authority to enter into this Agreement and to carry out its obligations hereunder, including, without limitation, making the Payment under Section 2.1.

5.   **CONFIDENTIALITY**

5.1   Restrictions on Disclosure. The terms and conditions of this Agreement, but not the existence of this Agreement, are confidential and may not be disclosed to anyone other than the Parties without the prior written consent of both Parties; provided, however, that the terms and conditions of this Agreement may be disclosed to the extent such disclosure (a) is necessary to enforce or interpret this Agreement, (b) is necessary for the rendering of professional services by attorneys, accountants, or financial advisors, provided that such attorneys, accountants, or financial advisors agree to maintain the confidentiality of any information acquired pursuant to any such disclosure, (c) is necessary to complete any tax return or tax reporting requirement, (d) is necessary to respond to or comply with a subpoena, provided that each non-subpoenaed Party is given reasonable notice of the subpoena and the opportunity to resist disclosure or to impose confidentiality thereon; (e) is made under a protective order entered by a court in a judicial proceeding limiting disclosure to the litigating parties' outside counsel; or (f) is necessary to comply with a court order or to otherwise comply with applicable law (disclosure pursuant to this section (f) is not currently anticipated by either Party); or (g) is necessary for Buyer to manufacture, develop and otherwise use the technology covered by the United States Patents.

5.2   Exceptions. Notwithstanding the provisions of Section 5.1 of this Agreement, the Assignment once executed may be publicly disclosed, and the Parties intend that once executed the Assignment, attached hereto as Exhibit A, along with its Schedule 1, will be publicly recorded with the United States Patent and Trademark Office.

5.3   No Press Releases. The Parties agree that no Party shall issue any press releases regarding this Agreement.

6063634 v6

   CONFIDENTIAL

## 6.    CHOICE OF LAW/VENUE

6.1    This Agreement shall be construed, applied, and enforced in accordance with the laws of the State of New Jersey, except for its conflicts of laws provisions.   All Parties submit to personal jurisdiction in the State of New Jersey for any action to enforce any obligation of any Party under this Agreement. The State and federal courts of the State of New Jersey shall have co-exclusive jurisdiction over all disputes hereunder.

## 7.    SEVERABILITY

7.1    If any provision of this Agreement, or the application of such provision to any person or circumstance, is held by a court of competent jurisdiction to be invalid, then the remainder of this Agreement, or the application of such provision to other persons or circumstances, shall not be affected thereby. In any such event, the Parties shall negotiate in good faith a valid and enforceable substitute provision for any invalid, void, or unenforceable provision that most nearly achieves the intent of such provision.

## 8.    ENTIRE AGREEMENT

8.1    This Agreement, together with **Exhibit A** attached hereto, constitutes the entire, complete, and final agreement and understanding of the Parties with respect to the subject matter hereof, and supersedes all previous negotiations, agreements, understandings, and commitments between the Parties regarding the subject matter of this Agreement. This Agreement, and the Parties' rights and obligations hereunder, shall not be released, discharged, changed, waived, or modified, except by instruments in writing signed by duly authorized officers or representatives of all Parties.

## 9.    COUNTERPARTS

9.1    This Agreement may be executed in one or more counterparts, including facsimile or email counterparts, and all so executed shall constitute one agreement, binding on the Parties, even though all Parties are not signatories to the original or the same counterpart. Any counterpart of this Agreement that has attached to it separate signature pages, which altogether contain the signatures of all Parties hereto, shall for all purposes be deemed a fully executed instrument. The Parties agree to exchange facsimile or emailed .pdf copies of the signed Agreement and to thereafter exchange signed originals of this Agreement for their respective records.

## 10.    SUCCESSORS AND ASSIGNS

10.1    This Agreement shall be binding upon and inure to the benefit of the Parties and their respective heirs, successors and permitted assigns.

## 11.    INTERPRETATION

11.1    Each Party acknowledges that it and its legal counsel have reviewed and participated in settling the terms of this Agreement, and the Parties hereby agree that any rule of construction to

6063634 v6



    CONFIDENTIAL

the effect that any ambiguity is to be resolved against the drafting Party shall not be applicable in the interpretation of this Agreement.

## 12.   NO CHALLENGE

12.1   To the extent legally enforceable, Seller hereby agrees, so long as this Agreement is in effect, not to file any action, assert any affirmative defense, or institute any proceeding in any court or governmental agency that challenges the validity, enforceability, or patentability of any United States Patents.

## 13.   RIGHT OF FIRST OFFER

13.1   Buyer shall first offer to sell the United States Patents to Seller before offering the United States Patents for sale to any other party.  Buyer shall deliver notice of such offer in writing and such offer shall include the price and all other material terms.  Seller shall have ten (10) days to accept the offer in writing (with Seller's failure to respond in writing being deemed a rejection of the offer).  If Seller does not accept the offer Buyer shall be free to sell the United States Patents to any other party on terms and conditions no more favorable than those offered to Seller.  The provisions contained in this Section 13 shall expire twelve (12) months after the date of this Agreement, at which time Seller shall have no further right of first offer.

[signature page follows]

6063634 v6



                                        CONFIDENTIAL

Earle Refining LLC

Signature

Thomas J. Earle
Printed Name

Manager
Title

7-3-19
Date

Pristec AG

Signature

RUEDIGER NJERV
Printed Name

Chairman & CEO
Title

July 3rd 2019
Date

6063634 v6

CONFIDENTIAL

# EXHIBIT A

## FORM OF PATENT ASSIGNMENT

**See attached**

6063634 v6

CONFIDENTIAL

## UNITED STATES PATENT ASSIGNMENT

This PATENT ASSIGNMENT (this "Assignment") is made by and between Pristec AG, a joint stock company organized under the laws of the Republic of Austria ("Assignor"), and Earle Refining LLC, a New Jersey limited liability company ("Assignee"), and is being entered into pursuant and subject to the PATENT PURCHASE AGREEMENT executed and effective as of July 5d 2019 (the "Agreement").

WHEREAS, Assignor has acquired ownership of all of the right, title, and interest in and to U.S. Patent No. 10,053,635 and U.S. Patent Application Nos. 16/017,651 and 16/017,725, together with reissuances, continuations, continuations-in-part, revisions, extensions and reexaminations thereof (collectively, "**United States Patents**; and

WHEREAS, it has been and is the intention of Assignor and Assignee, that Assignee own all of Assignor's right, title and interest in and to all of Assignor's United States Patents, including all rights to claim, sue, and collect for all alleged infringement, including for any and all past damages, and be applicant for all United States Patents, wherever so permitted by law;

NOW, THEREFORE, for good and valuable consideration, the receipt, sufficiency, and adequacy of which are hereby acknowledged:

1.      Assignor hereby sells, assigns, conveys, transfers, and sets over to Assignee and Assignee's successors and assigns, and Assignee acknowledges and receives from Assignor, all of Assignor's rights, title, and interest, and all of the rights, title, and interest of any of Assignor's affiliates, in and to the United States Patents on and as of the Effective Date, including United States patent applications, utility models and design registrations, and all rights to claim priority thereto, including priority under the Paris Convention, the Patent Cooperation Treaty and any and all applicable treaties and conventions of like purpose, and including all United States provisional, non-provisional, continuation, divisional, reissue, national phase and extension applications and patents thereof in the United States, along with any and all rights of renewal, maintenance, abandonment, disposition and enforcement with respect thereto, and the right to sue and/or recover for past, present, and future infringement thereof in the United States, and any and all causes of action related thereto. Assignee, its successors and assigns, or any entity it may properly designate, may apply for and receive patents therefor in its own name in the United States.. Assignor represents and warrants to Assignee, and to Assignee's successors and assigns, that Assignor has not and will not execute any writing or do any act that conflicts with this Assignment.

2.      Assignor does not retain, whether expressly, by implication, estoppel or otherwise, any right, title, or interest in and to the United States Patents. For the avoidance of doubt, as of the Effective Date, Assignee shall solely and exclusively have the right and be entitled, in its sole discretion, in and/or under the laws of any country and jurisdiction, to initiate and/or continue any action, suit, litigation, arbitration or other proceeding of any kind, and seek, enforce, and benefit from any right, remedy and/or award, for any infringement or violation of the United States Patents. Assignee does not and shall not have any obligation to account for,

6082374 v2

                                                   CONFIDENTIAL

report, or share any such remedy or award to Assignee with Assignor, or make any other payment for the United States Patents.

3.      Upon Assignee's request, Assignor shall provide any assistance, including, without limitation, providing any information and documents, executing any documents and affidavits, providing any testimony, and/or rendering any other assistance, as is reasonably requested for Assignee to secure, perfect, and record sole and exclusive ownership of, and obtain registrations in the name of Assignee or a third party designated by Assignee, for the United States Patents and/or any part thereof, and to otherwise fully effect and implement the provisions in this Assignment. Assignor represents and warrants to Assignee that Assignor will promptly record transfers of all of the United States Patents to Assignor, and Assignor will promptly deliver to Assignee copies of all such recordings.

4.      Should any section, or portion thereof, of this Assignment be held invalid by reason of any law existing now or in the future in any jurisdiction by any court of competent authority or by a legally enforceable directive of any governmental body, such section or portion thereof shall be validly reformed so as to approximate the intent of Assignor and Assignee as set forth herein as nearly as possible and, if unreformable, shall be deemed divisible and deleted with respect to such jurisdiction; this Assignment shall not otherwise be affected. This Assignment shall be binding upon Assignor and all of Assignor's successors and assigns, and shall be binding upon and inure to the benefit of Assignee and its successors and assigns.

5.      Assignor authorizes the United States Patent and Trademark Office to issue any and all patents resulting from the United States Patents, to Assignee according to this Assignment. The right, title and interest is to be held and enjoyed by Assignee and Assignee's successors and assigns as fully and exclusively as it would have been held and enjoyed by Assignor had this assignment not been made.

6.      This Assignment, but not the Agreement or any part thereof, may be publicly disclosed, and will be publicly recorded in various countries.



6082374 v2

Assignor, and Assignee, have executed this Assignment, each through its authorized representative, to be effective as of the Effective Date.

Assignor:

Pristec AG

Name: _RUEDIGER NUERK_

Title: _CHAIRMAN & CEO_

Date: _July 3rd. 2019_

Assignee:

Earle Refining LLC

Name: _Thomas I. Earle_

Title: _Manager_

Date: _7-3-19_

6082374 v2

          CONFIDENTIAL

# EXHIBIT J

EXECUTION VERSION

### DISSOLUTION AGREEMENT

This dissolution agreement is made on the date below between

**Drott Holding GmbH**, Josef Strebl-Gasse 3, 2345 Brunn am Gebirge

and

**Earle Investments LLC**, 1800 State Route 34, Bldg. 2 Ste. 205, Wall, NJ 07719

As follows:

(1) The agreement of 23 July 2021 between Drott Holding GmbH and Earle Investments LLC based on the offer made by attorney Dr. Andreas Frauenberger, Landstraßer Haupstraße 1/1/10, 1030 Wien on behalf of Earle Investments LLC is mutually and fully dissolved and all rights and obligations of the parties are rescinded in their entirety. Both parties expressly and irrevocably waive any existing or future rights or claims resulting out of or in connection with the agreement of 23 July 2021.

(2) In addition, the parties agree that the payment envisioned in the agreement of 23 July 2021 by Stephen M. Harnik, Esq, Harnik Law Firm, Chrysler East Building, 666 Third Avenue, 10th Floor, New York, 10017, USA, as trustee, to Drott Holding GmbH shall not occur and that the trustee is fully discharged from his obligations in that connection.

(3) Austrian law, excluding its choice-of-law provisions and the CISG, shall exclusively apply to this dissolution agreement. The parties agree to the exclusive jurisdiction of the competent court in the first district of Vienna for any disputes resulting from or in connection with this agreement.

(4) This dissolution agreement is enforceable upon execution by both parties.

_____
Place, Date

DROTT Holding GmbH
_____
Drott Holding GmbH

_____
Place, Date

_____
Earle Investments LLC

**EXECUTION VERSION**

---

**Cooperation Agreement**

---

between

**RedMax GmbH & Co KG**
Previously: **Landstraße 130 GmbH & Co KG**
(RedMax)

and

**Earle Refining LLC**
(Earle)



EXECUTION VERSION

This cooperation agreement (hereinafter "**Agreement**") is made as of the date below between

1.  **RedMax GmbH & Co KG** (previously: **Landstraße 130 GmbH & Co KG**), with its seat in Brunn am Gebirge and its business address at Josef Strebl-Gasse 3, 2345 Brunn am Gebirge, registered in the commercial register of the Landesgericht Wiener Neustadt no FN 502927z (hereinafter "**RedMax**")

on the one hand, and on the other hand:

2.  **Earle Refining LLC**, Business ID 0600434818, P.O. Box 556, Farmingdale, NJ 07727 (hereinafter "**Earle**")

(RedMax und Earle hereinafter also referred to as "**party**" or together "**parties**") as follows:

**PREAMBLE**

A.  RedMax has acquired the fixed assets and working capital of Pristec AG lock, stock and barrel in the insolvency proceedings Index No. AZ 38 S 64/20v at the Commercial Court Vienna over the assets of Pristec AG after acceptance of its bid at the auction. The notarized purchase agreement executed between RedMax and the insolvency administrator dated 26 July 2021 has been fully disclosed to Earle.

B.  Among the acquired assets are, inter alia, patents with the patent no. AT509680 B1 2012-04-15 as well as patent no. AT510227 B1 2013-01-15 which were registered with the Austrian Patent Office on 15 April 2012 and 15 January 2013, respectively, regarding certain processes/technologies for the treatment of (inter alia) mineral oil (the so-called cold-cracking process) (hereinafter, together, the "**Base Patents**"). On the basis of the Base Patents additional patents have been registered in numerous states world-wide.

C.  Earle bought United States patent applications and issued patents that claim priority to the Austrian patents, including U.S. Patent No. 10,053,635 and U.S. Patent Application Nos. 16/017,651 and 16/017,725 (hereinafter, together, the **"U.S. Patents"**) which were registered by Pristec AG based on the Base Patents prior to the commencement of the insolvency proceedings against Pristec AG. The insolvency administrator has contested the sale and assigned all of its rights in, and to contest the sale of, the U.S. Patents to RedMax (hereinafter the **"U.S. Patent Rights"**).

D.  Earle has access to a facility in the U.S. (State of Louisiana) to utilize the technology that is based on the U.S. Patents and has meanwhile developed its own know-how with respect to the use of the technology. RedMax has acquired the technical documentation of Pristec AG as provided by the insolvency administrator. Earle is prepared to grant RedMax access to the facility and its equipment for the purpose of testing the technology based on the Base Patents.

E.  The parties intend to cooperate, under the terms of this Agreement in light of a potential further development of the technology based on the Base Patents, by exchanging existing and future know-how in order to render the technology marketable.

F.  It is understood that RedMax waives all rights in, and shall hereby assign, the U.S. Patent Rights to Earle thereby confirming Earle has the exclusive rights in the technology in the U.S. and

8330263 v1                                    2/22

**EXECUTION VERSION**

RedMax shall have exclusive rights worldwide (except in the U.S.) to comprehensively protect and utilize the know-how and the technology (including that of the respective other party) in the fields of application of the Base Patents (as defined below).

**NOW, THEREFORE,** the parties agree as follows:

1.  **Utilization of the existing Equipment for testing purposes**

1.1.  Earle has access to a Polaris Engineering facility located at 1139 Patton Street, Sulphur, LA 70665 (hereinafter "**Facility**"). Earle will enable RedMax, during the term of this Agreement, to access the Facility and Earle's equipment located there and referenced in the Piping and Instrumentation Diagram showing the engineering, drawing and schematics and photographs attached hereto as Appendix A (hereinafter "**Equipment**") for testing purposes, particularly with respect to the technologies and procedures which rely on the Base Patents.

1.2.  Earle shall cooperate with RedMax to perform test runs using the technology at the Facility which shall include in particular the right of RedMax to participate in, monitor and comprehensively document such test runs performed by Earle. In particular, Earle will provide the following for testing purposes:

    1.2.1.  The Equipment with all components that are necessary for the operation and performance of the test runs;

    1.2.2.  The apparatus necessary for the operation of the Equipment and all accessories;

    1.2.3.  The usual necessary raw material (oil raw material etc.) to conduct the tests;

    1.2.4.  Electric power and all necessary resources necessary to operate the Equipment; and

    1.2.5.  Personnel to operate the Equipment and perform the test runs.

1.3.  Furthermore, the parties shall endeavor to have all material samples that are obtained before and after a test run examined by a suitable lab to insure compliance with provided methods and parameters. Basic results of such examinations shall be delivered as soon as reasonably possible from taking the sample.

1.4.  RedMax shall not be responsible for any hardware (including the costs thereof) that is used to maintain, improve, develop or optimize the Equipment, nor for its regular or further developed operation unless such hardware is specifically needed by RedMax for the conduct of test runs which are requested by RedMax for its own purposes. In that case, RedMax shall be advised in advance of, and shall be responsible for, the costs and approval thereof must be given by RedMax in writing.

1.5.  Earle shall share with RedMax all documents, calculations and other economic data pertinent to the cost of production, construction, operation and rentability and marketing of the technology.

1.6.  RedMax will participate (without assuming any obligations in that regard) in the further development of the Equipment, in particular by providing know-how and personnel, to achieve the operational readiness of the Equipment and commercial utilization of the technology together with Earle. To the extent that this participation adds value, the parties shall in good faith discuss fair cost sharing. RedMax shall be under no obligation to participate in any test runs or any other efforts in regard of the development of the technology and may abandon the development thereof at any time without any liability to Earle.

1.7.   It is the basic intent of the parties to plan and perform the test runs jointly and that the costs of test runs, which are agreed and conducted for their mutual benefit, shall be shared equally. If a party intends to perform a test run, it shall inform the other party accordingly in a timely manner and the parties shall agree on such test run and the test program in advance. If the parties do not agree on a joint test run proposed by a party, the other party shall not be obliged to participate in the costs of such test run. RedMax shall have the right to request the performance of test runs by Earle in accordance with the specification provided therefor, conditioned upon Earle being satisfied that the requested test runs can be performed safely. Such test runs shall be conducted at RedMax's sole cost.

1.8.   The above joint costs shall include the parties' reciprocal right to have the transferable and sub-licensable right to use the know-how acquired as a result of the joint test runs, in particular all generated data, (test-)results, parameters, technological progress and all other information of whatsoever nature and all technical documentation in their respective fields of application without any restrictions or time limits. If either party does not join in the test run of the other party, then the results of such singly conducted test run shall not be shared with the non-participating party and shall not be deemed Know-How to be disclosed under this Agreement.

1.9.   RedMax and all RedMax Affiliated Enterprises shall have the right to reference the Facility and the Equipment in all of their business- and marketing materials and media (*e.g.* website presentation videos etc.) and to publish all relevant information and, in particular, photos or videos of the Facility and the Equipment. The parties may not use the other party's name or trademarks or that of any of the other party's business enterprise involved in the cold cracking technology without the other party's prior written consent. **"Affiliated Enterprises"** in this Agreement means any individual or entity that directly or indirectly controls a party or is controlled by a party. "Control" means in that connection (i) ownership of a majority interest or vote (ii) power to appoint more than half of the management of (iii) the right to manage the company. With respect to Earle, only Earle Investments LLC and Earle Oil Investments LLC and any other entity of the Earle group that is now or in the future operating or doing business related to the fields of application of the Base Patents shall be deemed to be **Earle Affiliated Enterprises**.

1.10.  RedMax and RedMax Affiliated Enterprises shall be permitted to visit the Facility and the Equipment at all times upon reasonable notice. RedMax guests in that regard shall be subject to Earle prior approval and appropriate NDAs if applicable which approval shall not be unreasonably withheld.

1.11.  Each party shall make all reasonable efforts to ensure that the respective other party (i) has the right, subject only to the execution of customary non-disclosure agreements, to access any facilities of customers or other contracting partners (*e.g.* refineries etc.), where the technology based on the Base Patents is installed and/or in operational use, in order to inspect the operation of the technology or to present the same to its guests and (ii) has the right to reference such facilities in its business and marketing materials and media and publish information to the same extent as provided under Subsection 1.9. Notwithstanding the foregoing, neither party assumes any liability whatsoever if a third party should for whatever reason deny access to a facility (or any testing facility) to the other party. If, at any time during the term of this Agreement, Polaris should no longer permit Earle use of the Facility, then Earle shall, at its own cost, move the Equipment to a different suitable site, where test runs can be performed in accordance with this Agreement. Barring any circumstances beyond Earle's control, during the term of this Agreement, RedMax shall have access to the Equipment as set forth above.

<strong>EXECUTION VERSION</strong>

1.12. For the duration of this Agreement, Earle shall maintain general liability and property insurance in form and amount not less than its existing insurance, a copy of which is annexed to this Agreement and made a part hereof as Appendix B.

**2.    Acquisition and Disclosure of Know-How**

2.1.   To clarify, for purposes of this Agreement, **"fields of application of the Base Patents"** comprise the facilitation of the cold-cracking method as well as acoustic/electromagnetic-cracking for treatment and quality improvement of mineral oil and its derivates (see the exemplary parameters shown in Appendix C).

2.2.   The parties agree that within an appropriate time of execution of this Agreement they shall in good faith and free of cost share in suitable form the extent of their existing know-how in respect of the fields of application of the Base Patents and the Equipment and provide to the other party all known technical knowledge and experience in the fields of application of the Base Patents, regardless of form (together "**Know-How**"). Know-How also comprises the relevant knowledge and experience of Earle Affiliated Enterprises and RedMax Affiliated Enterprises.

2.3.   Subject to Subsections 1.8 and 2.5., the parties assure each other that, for the term of this Agreement, they will provide each other with all future modifications, improvements and/or extension of the existing Know-How in the fields of application of the Base Patents as well as the individually or jointly developed new Know-How in the fields of application of the Base Patents without cost (except where such Know-How is developed by testing for which the parties shall jointly share the cost). This comprises in particular the future Know-How in the fields of application of the Base Patents arising in connection with testing, validation as well as installation, adaptation and use of the technology (*e.g.* hardware, software, controls, systems and processes, etc.) in any future facilities of either party or their (end-)customers. The parties will endeavor to acquire the consent of (end-)customers in future agreements to disclose the respective Know-How to the other party and shall only be obliged to disclose such Know-How to the extent legally permissible.

2.4.   To clarify, it is noted that Section 5 (*Intellectual Property and Rights of Protection*) and Section 6 (*Confidentiality*) of this Agreement apply to the disclosed Know-How under this Section 2.

2.5.   With respect to relevant Know-How which Jose Miguel Delgado ("**Delgado**") has, the parties agree to coordinate their efforts to obtain the same. The sharing of any costs of any legal actions by the parties shall be subject to a separate agreement. Whatever information is garnered from Delgado shall be shared. However, information garnered by way of litigation shall not be shared and shall not be deemed Know-How to be disclosed under this Agreement if the respective other party did not share in the cost of obtaining such know how. Furthermore, if the other party does not agree to share in the costs of pursuing Delgado, then it shall, nevertheless, be obligated to assign its claims to the party that does pursue Delgado at no cost.

2.6.   The parties are aware that New Vacuum Technologies, LLC (Delaware) applied for patents or property rights in various countries based on the Know-How in the fields of application of the Base Patents. In addition, Innovative Crude Technologies, Inc (New Jersey) owns an application patent based on the Base Patents. The parties will coordinate efforts to achieve a transfer of the registered and existing patents or patent application by New Vacuum Technologies, LLC und the

6/22

Innovative Crude Technologies, Inc to the parties. It is agreed that in case of a successful transfer, RedMax shall have all patents and patent applications worldwide (except U.S.) and Earle shall have all U.S. patents and patent applications.

2.7.  Regarding Subsections 2.5 and 2.6, to wit, in the absence of an additional agreement, neither party is required based on this Agreement to pursue particular legal measures or to participate in such measures taken by the other party, whether by action or by sharing costs.

## 3.  Reciprocal waiver of claims

3.1.  The parties agree, that the above referenced U.S. Patents and the U.S. Patent Rights, which Earle acquired by agreement of 3 July 2019 (*Patent Purchase Agreement*) are owned by Earle. RedMax hereby assigns all rights or claims it obtained from the bankrupt estate in the U.S. Patent Rights to Earle and it shall not assert any claims, including but not limited to claims acquired from the bankrupt estate of Pristec AG against Earle or any Earle Affiliated Enterprises, in particular, with respect to the acquired U.S. Patents and U.S. Patent Rights and waives any and all claims of whatsoever nature in that regard. The obligations under this Subsection 3.1 shall survive the expiration, rescission or termination of this Agreement - irrespective of the underlying basis and remain applicable indefinitely.

3.2.  RedMax hereby assigns to Earle any and all claims of Pristec AG, which RedMax acquired from the bankrupt estate and which are in existence, against Joseph M. Laura, Antonio Sichenzo, Pristec America, Inc. and Innovative Crude Technologies, Inc (New Jersey) in the U.S. Absent a separate agreement, claims which only inure to the benefit of RedMax for money or with a monetary value are excluded from the aforementioned assignment.

3.3.  Except for the rights referred to in this Agreement, in particular Subsections 3.1 and 3.2, Earle shall have no additional claims or rights with respect to the bankruptcy assets acquired by RedMax. RedMax is not required to participate in any legal action regarding the assigned claims under Subsection 3.2 by Earle nor to share the cost associated with such action or enforcement.

3.4.  Intentionally Omitted.

3.5.  In consideration for the rights under Subsections 3.1 and 3.2, Earle shall pay the *net* sum of EUR 90,000 which is payable in full with no deductions upon execution of this Agreement by wire transfer to RedMax's account IBAN AT79 4715 0115 5025 0000 und BIC VBOEATWWN0M. This transaction is not subject to Austrian tax (*Umsatzsteuer*). It is agreed that the payment of this sum will be made by Earle's representative, Stephen M. Harnik, Esq, Harnik Law Firm, Chrysler East Building, 666 Third Avenue, 10th Floor, New York, 10017, USA.

3.6.  The parties are aware that Pristec AG's rights to all patents have been challenged by court action. RedMax makes no representations and gives no warranties with respect to the rights or other assets acquired from the bankrupt estate, in particular for the current existence, extent, or legal properties, the assumption of a particular legal position, the effective acquisition of particular rights or claims or a successful legal defense. The parties agree that RedMax shall have no liability in that regard on any legal basis whatsoever. In particular, RedMax does not assume any warranty or liability with respect to the U.S. Patents and U.S. Patent Rights. Earle confirms that it has full knowledge of the arbitral award issued against Pristec AG on 10 June 2019 in the arbitration

**EXECUTION VERSION**

proceeding administered by the International Center for Dispute Resolution under case No. 01-18-0001-9729.

3.7.   The parties are aware that RedMax has acquired the assets from the bankrupt estate, but has not assumed any obligations or liabilities. Therefore, Earle irrevocably warrants that it and Earle Affiliated Enterprises will not assert any claims against RedMax or RedMax Affiliated Enterprises in connection with any claims they may have against Pristec AG or against persons or companies which held an interest in Pristec AG or in which Pristec AG held an interest. This waiver shall not apply to any RedMax Affiliated Enterprise in the U.S.

3.8.   It is understood by and between the parties, that because of the insolvency proceedings against Pristec AG all contractual agreements and obligations between Pristec AG on the one hand and Earle and Earle Affiliated Enterprises and third parties on the other hand, in particular all agreements regarding licenses or rights of use are expired or will be terminated and that no agreements will be transferred to RedMax unless RedMax expressly assumes them. In addition, RedMax will, in its own discretion, handle any contest or termination rights (except the U.S. Patents). Earle acknowledges the validity of all such contests, terminations and dissolutions of existing agreements in full. Earle irrevocably represents for itself and for the Earle Affiliated Enterprises that it will not assert any rights or claims against RedMax or the RedMax Affiliated Enterprises resulting from any contractual agreements of Pristec AG (including any license agreements concluded in the past) or the dissolution of such agreements. This waiver shall not apply to any RedMax Affiliated Enterprise in the U.S.

3.9.   The parties mutually agree to indemnify, defend and hold the other, its directors, officers, employees, agents, representatives, successors and assigns harmless from and against any and all liability, claim, demand, loss, out-of-pocket cost, actual damage, expense or cause of action (including without limitation, reasonable attorneys' fees and expenses) incurred by reason of any gross negligence or willful misconduct by the indemnifying party or its respective agents, Affiliated Enterprises or employees in the performance of its obligations hereunder.

**4.    Existing Ownership Structures**

4.1.   Within a reasonable time of execution of  this Agreement, Earle shall endeavor to provide RedMax with copies of pertinent current contractual agreements and relevant information regarding the legal and commercial status pertaining to those entities in which RedMax, as a result of its acquisitions from the bankruptcy estate, and Earle or Earle Affiliated Enterprises jointly hold a direct or (in regard to RedMax) indirect ownership interest (hereinafter the "**Shared Entities**") at no cost, subject to confidentiality or other covenants binding on Earle with respect to those agreements. This obligation expressly includes existing agreements concerning the entities (*e.g.* articles of organization, syndicate agreements, joint venture agreements, operating agreements, etc.)

4.2.   RedMax may request in a writing to Earle the dissolution and liquidation of individual or all Shared Entities within twelve (12) months as of the effective date of this Agreement which request, subject to Earle's or Earle Affiliate Enterprises' obligations under any relevant agreements, shall not be unreasonably withheld.

4.3.   If RedMax and Earle mutually agree to dissolution under Subsection 4.2, both parties commit to (i) each take all necessary action, in particular calling the necessary shareholder meetings and

**EXECUTION VERSION**

exercising voting and other corporate rights, and making all declarations (if necessary also repeatedly and in the required form), which are necessary to bring about the complete dissolution of the Shared Entities, as well as (ii) to bring about the necessary actions described in (i) - insofar as necessary - through the entities and individuals related therewith.

4.4.    Upon request by RedMax, Earle shall discontinue the use of the name or name component "Pristec".

4.5.    The cost incurred in connection with the dissolution and liquidation of the entities shall be apportioned between the parties based on their ownership interest in the entities and, in case of doubt, in equal shares, provided that the corporate documents do not provide otherwise. Each party shall be responsible for its own legal fees. Earle shall not have any further claims against RedMax or the RedMax Affiliated Enterprises in connection with exercising the right under 4.2.

4.6.    Both parties commit to provide the best possible and broad support as the other party may reasonably request in connection with the dissolution and liquidation of all entities in the United States in which RedMax acquired a direct ownership interest from Pristec AG's bankruptcy estate.

4.7.    The parties shall provide all information and all necessary cooperation as may be required to contest or procure the termination of the Patent, Technology and Know-How License Agreement no. 20130904-1655, dated October 1, 2013, between Pristec AG and Pristec America, Inc. (Nevada) and to defend all claims brought by Pristec America, Inc. or third parties under that agreement against both parties or either party.

**5.    Intellectual Property and Rights of Protection**

5.1.    Insofar as no separate written agreements concerning intellectual property rights, property rights and exploitation rights are entered into by the parties in connection with the reciprocal access to Know-How pursuant to Section 2, the following provisions shall govern.

5.2.    The parties shall retain ownership over their Know-How in the fields of application of the Base Patents as well as their other business and trade secrets (irrespective of whether they currently are registered or may be eligible for registration). For the sake of clarity, the Know-How of RedMax shall include the entire Know-How acquired from the bankruptcy estate as well as the Know-How previously financed and developed by Pristec AG. All rights to modifications, improvements or advancements of Know-How of one party in the fields of application of the Base Patents shall be owned exclusively by the party who developed them.

5.3.    If, after the effective date of this Agreement, the parties jointly develop Know-How or technological advancements within the fields of application of the Base Patents (e.g. in connection with test runs, etc.), all ownership rights to such Know-How shall be shared equally by the parties. Know-How or technological advances are considered as having been developed jointly if both parties contribute to technology optimization or enhancement.

5.4.    Each party commits to transfer to the other party all rights and Know-How as well as other business and trade secrets to which the other party is entirely or partially entitled pursuant to the foregoing provisions and to make all declarations (in the requisite form) and take all steps as may be necessary for that purpose. Additionally, both parties will take such measures (particularly the entering into contractual agreements) as may be necessary to obtain all rights to the Know-How

**EXECUTION VERSION**

in the fields of application of the Base Patents that were developed by the parties' respective employees, consultants or other third parties involved in the development of Know-How.

5.5. The parties grant each other on a mutual and irrevocable basis a cost-free, exclusive, transferable, sublicensable right of unrestricted substance and duration for the use and exploitation of Know-How disclosed pursuant to this Agreement – in particular under Section 2 – provided that, in the case of Earle, said right is geographically limited to the United States of America, and, in the case of RedMax, to the entire world (with the exception of the Unites States of America). The aforementioned rights include the right to revise the Know-How and to the commercial use of technologies based on such Know-How (e.g. hardware, equipment, systems, software and processed, etc.) for the party's own account (e.g. the manufacture, sale, leasing or licensing to retail customers). The use of Know-How by RedMax in the United States is further restricted to the purpose of facilitating test runs, further developing of the Know-How and technology based thereupon as well as showing the Facility and Equipment to third parties in accordance with this Agreement.

5.6. At the same time, the parties grant each other the mutual right to register in their own name any and all patents and trademarks in the fields of application of the Base Patents pertaining to the Know-How to be disclosed under this Agreement, and to exercise all rights and claims resulting therefrom, provided that, in the case of Earle, said right is geographically limited to the United States of America, and, in the case of RedMax, to the entire world (with the exception of the Unites States of America). Should a party intend to register a patent or trademark regarding Know-How in the fields of application of the Base Patents, it shall give advance notice of such registration to the other party, so that the other party may timely register corresponding patents and trademarks in its respective territory. The parties shall conduct the registration of all patents in the fields of application of the Base Patent in such manner as to allow RedMax to use the PCT process for purposes of its patent application. The parties shall mutually support each other insofar as necessary and feasible when registering corresponding patents and trademarks.

5.7. RedMax commits with regard to the United States of America and Earle commits with regard to the entire world (with exception of the United States) (i) not to register, either directly or indirectly through third parties, patents or other protective rights in the fields of application of the Base Patents and the Know-How disclosed by the other party or jointly developed, as well as the technology in the fields of application of the Base Patents, and (ii) not to exploit or commercially use the Know-How and the technology in the fields of application of the Base Patents, or to grant third parties any such rights. The obligations under this Subsection 5.7 extend to all Affiliated Enterprises of the parties. The parties are, however, permitted to use the same manufacturer, vendor or other contract partner in connection with the production and distribution of the technology in the fields of application of the of the Base Patents. The parties are also permitted - albeit without restricting the other provisions of this Agreement concerning their respective exclusive rights - to have the technology in the fields of application of the Base Patents manufactured on a worldwide basis.

5.8. The grant of rights under the preceding paragraphs shall only be effective to the extent it does not conflict with the rights of third parties. With the exception of the rights expressly regulated by this Agreement, the parties do not grant each other any other rights of use or exploitation in whatever form to their respective Know-How, intellectual property rights, or business and trade secrets. A separate written agreement shall be prerequisite to any grants of additional licenses or

**EXECUTION VERSION**

rights in regard of the parties' Know-How, intellectual property rights, or business and trade secrets.

5.9.  Neither party is obligated to exercise its rights of use and exploitation or to apply for or maintain any protective rights (in particular patents or patent applications). Neither party may assert any claims against the other party based on failure to obtain or for a cancelled or otherwise lost registration (or application) of patents or other protective rights. The parties are obligated for themselves and for their affiliates not to contest any patents or protective rights of the other party which have been applied for in accordance with this Agreement and not to support any such attacks by third parties. Neither party is required to pursue its rights against infringements by third parties.

5.10.  The parties do not make any warranties and do not assume any liabilities whatsoever with regard to the existence of specific Know-How as well as with regard to the characteristics of the Know-How or other intellectual property made available to the other party, in particular with regard to a specific trait, suitability or applicability for a particular purpose or success of Know-How made available, as well as the existence of specific rights or the freedom from rights of third parties. Each party uses the Know-How made available by the other party at their own risk. The parties' liability in that regard is fully excluded.

5.11.  In the event of an assignment or sub-licensing of rights pursuant to Subsections 5.5 and 5.6 the parties are obligated to grant any rights – also with regard to patents and trademarks based on Know-How – to third parties only to the extent that the rights of use and exploitation of the other party are not affected. Accordingly, Earle shall not grant licenses for the use and exploitation of Know-How and the technology based thereupon in the fields of application of the Base Patents and the corresponding patents and trademarks to third parties outside the United States, and RedMax shall not grant such licenses within the United States. The grant of sub-licenses or authorizations of use to third parties shall not create any entitlement to royalties or other compensation for the respective other party.

5.12.  Each party has the right to assign its entire Know-How (including the know-how disclosed by the other party) and all of its rights thereon to a third party in part or in full (*e.g.* in connection with an asset deal). Such party is obligated, however, to bind such third party to the obligations concerning Know-How of this Agreement as necessary to fulfil the terms of this Agreement. This obligation does not depend on whether there is any consideration for the transfer. These provisions apply analogously to a transfer or sub-licensing of either party's license under this Agreement.

5.13.  The rights and obligations under this Section 5 (in particular rights of use and exploitation) survive any expiration, termination or dissolution of this Agreement. The same is true for the rights under Subsections 1.8, 1.9 and 3.1.

**6.  Confidentiality**

6.1.  In accordance with the following provisions, the parties shall keep confidential and adequately protect all non-public written and oral information or information in any other format whatsoever, in particular all business secrets within the meaning of § 26c UWG [Austrian Law against Unfair Competition] (hereinafter **"Confidential Information"**), disclosed by either party pursuant to this Agreement. Confidential Information includes, in particular Know-How (including modifications, improvements and advancements) of the respective other party, as well as any and

**EXECUTION VERSION**

all information concerning business activities, products, technologies, techniques and practices, technological, scientific, financial and other information, specifications, drafts, conceptions, drawings, reports, models, samples of any form, software, data, documents, research and development findings, employee information, inventions, ideas, formulas, protocols and concepts of the respective other party and confidential information of third parties in written, oral, visual, electromagnetic or any other physical or non-physical form.

6.2.   Unless otherwise provided in this Agreement, each party shall

6.2.1. treat Confidential Information confidentially and neither disclose it to third parties or disseminate or publicize it;

6.2.2. protect Confidential Information against unauthorized exploitation, dissemination, or publication, subject to the same (but at the very last least reasonable) standard of care as with regard to its own confidential information, and take all reasonable measures to keep it confidential; and

6.2.3. only use Confidential Information as necessary pursuant to this Agreement.

6.3.   Information shall no longer be considered Confidential Information if:

6.3.1. it is made or become available to the public without violation of this Agreement;

6.3.2. the other party had already been in lawful possession of the information prior to its disclosure by a party;

6.3.3. it was made available to a party lawfully and without obligation for confidential treatment by a third party;

6.3.4. it was developed or discovered independently and without access to Confidential Information; or

6.3.5. its disclosure was ordered by a court of competent jurisdiction or by an administrative or governmental agency, provided that the disclosing party immediately notifies the other party in writing of such order.

6.4.   Either party may share Confidential Information with (i) employees, suppliers, manufacturers, sellers and other contractual partners, as well as (ii) accountants, auditors, attorneys and other external consultants, provided that they are subject to statutory or contractual confidentiality obligations that are not less strict than the terms of this Agreement. The parties may also disclose Confidential Information to customers, insofar as that is prerequisite for their use of the technology in the fields of application of the Base Patents.

6.5.   Either party may disclose Confidential Information to its Affiliated Enterprises. The parties warrant that its Affiliated Enterprises will comply with the confidentiality obligations of this Agreement. The parties shall indemnify each other with respect to any violation of the confidentiality obligations by their Affiliated Enterprises and will take all necessary measures to correct any such violation and to prevent similar violations going forward.

**EXECUTION VERSION**

6.6.   Either party shall continue to treat Confidential Information confidentially after expiration or in the event of rescission or termination of the Agreement - irrespective of the underlying basis.

6.7.   It is understood that the confidentiality obligations hereunder do not apply insofar as the parties act in furtherance of the contractual rights or obligations under this Agreement. To the extent appropriate or necessary to exercise the rights of use and exploitation (in particular for the further development and commercial use of the technology in the fields of application of the Base Patents; sub-licenses to customers etc.) or the prosecution of claims, the parties shall be exempt from the requirement to treat confidentially the Confidential Information.

6.8.   Either party is further permitted to disclose Confidential Information to potential buyers of its company or of ownership interest in its company, and their consultants, for purposes of due diligence review or comparable audits, or in the event of a (permissible) assignment of this Agreement, provided that such disclosure is subject to an non-disclosure agreement which is no less restrictive than this Agreement and provided that the particular disclosure is actually necessary in each case.

**7.   Access to information and data protection**

7.1.   RedMax – in accordance with the confidentiality and data protection provisions in this Agreement and subject to its own confidentiality obligations – shall provide access to all acquired documents and information of Pristec AG provided by the insolvency administrator in the data room to Earle which are potentially relevant to the U.S. market. In the event that there is legitimate privileged information in the acquired documents, RedMax shall provide Earle with a detailed privilege log.

7.2.   Unless such information is Know-How, Earle shall use such disclosed information and documents solely for the purpose of identifying the assets acquired by RedMax, in particular to determine and pursue Earle's rights as per Subsection 3.2 and to coordinate the cooperation in the US with RedMax.

7.3.   All disclosed information shall be considered Confidential Information. In addition, Earle shall be bound by any confidentiality obligations of RedMax vis-a-vis third parties in connection with the disclosed information. Upon request by RedMax, Earle will promptly delete or destroy such information and confirm destruction/deletion to RedMax in writing unless such information is Know-How in the fields of application of the Base Patents under this Agreement.

7.4.   Earle shall use and process all personal data of natural persons, to which Earle is granted access by RedMax, in compliance with all applicable data protection laws, in particular the General Data Protection Regulation (GDPR) and - insofar as applicable - the Austrian data protection laws. Upon request, Earle will enter into a processing contract within the meaning of GDPR § 28 with RedMax containing customary contractual clauses, in so far as reasonably deemed legally necessary by RedMax.

7.5.   The obligations under this Section 7 shall survive the expiration, rescission or termination of this Agreement - irrespective of the underlying basis and remain applicable indefinitely. Earle shall indemnify RedMax with regard to any violation of the obligation under this Section 7.

**EXECUTION VERSION**

**8.     Term and Termination**

8.1.   This Agreement shall become effective if the following conditions are met:

     8.1.1. Signing of this Agreement by both parties; and

     8.1.2. Execution of the agreement per Appendix D by Drott Holding GmbH and Earle Investments LLC.

If these conditions are not met by October 7, 2021 then this Agreement shall be deemed not concluded.

8.2.   The term of this Agreement shall be limited to three (3) years as of the date of this Agreement. There shall be no termination without cause; provided, however, parties' exclusivity for use of the technology and Know-How as stipulated under this Agreement shall survive indefinitely.

8.3.   Termination for cause is not affected. Cause means circumstances that render it unacceptable for a party to remain bound by the Agreement. In particular, one party has cause to terminate if the other party

     8.3.1. is in material breach of its obligations under this Agreement and remains in breach or does not fully cure such breach despite written notice to cure within four (4) weeks from its receipt of such written notice;

     8.3.2. becomes insolvent or subject of insolvency (or similar) proceedings or if such proceedings are not commenced for lack of assets;

     8.3.3. breaches applicable laws or authoritative regulations repeatedly or in an egregious manner;

     8.3.4. does not adhere to a final decision by a court or arbitrator.

8.4.   A party entitled to termination for cause shall provide the other party with a written termination notice, and such termination for cause shall be effective upon receipt of the written termination notice by the other party.

8.5.   Except as provided otherwise in this Agreement, upon expiration or termination of this Agreement all rights and obligations shall lapse. This shall not apply to any claims either party may have against the other at the time of the termination, in particular (without limitation) in respect of a breach of this Agreement.

**9.     Notice**

9.1.   Unless otherwise provided, all declarations and notifications in connection with this Agreement shall be in writing via registered letter or email to the recipient at the following address (or to a different address as may be subsequently specified by the respective party):

     <u>RedMax:</u>

     **RedMax GmbH & Co KG**

8330263 v1

14/22

EXECUTION VERSION

Attn. Dr. Martin Mayrhofer
Josef Strebl-Gasse 3
2345 Brunn am Gebirge
Austria
Email: m.mayrhofer@acorda.cc

with copy to

Dr. Wolfgang Schwackhöfer and Dr. Alexander Lotz, attorneys-at-law
Dr. Karl Lueger-Platz 5
1010 Vienna
Austria
wolfgang.schwackhoefer@herbstkinsky.at / alexander.lotz@herbstkinsky.at

Earle:

**Earle Refining LLC**
Attn. TJ Earle
P.O. Box 556 ,
Farmingdale, NJ 07727
tearle@earleco.com

with copy to

Robert E. Schiappacasse, Esq.
One Riverfront Plaza,
Newark, NJ 07102
rschiappacasse@sillscummis.com

9.2.   The parties consent to service of process of all judicial documents to the addresses provided under this Section 9.

**10.   Miscellaneous**

10.1.   This Agreement shall not entail the creation of a private corporation or other entity, or any joint venture or any obligations going beyond the cooperation or the rights and obligations expressly set forth in the terms of this Agreement. No party grants the other any power-of-attorney or other representative rights.

10.2.   This Agreement constitutes the sole and entire agreement of the parties with respect to the subject matter of this Agreement, and supersedes all prior agreements, meetings, correspondence or understandings of any form whatsoever. There are no concurrent oral agreements. The application of the parties' general terms and conditions or forms of contract is expressly excluded.

10.3.   Amendments of or additions to this Agreement must be in writing. This also applies to complete or partial amendments or revocation of the written notice requirement.

**EXECUTION VERSION**

10.4. This Agreement and the resulting rights and obligations may only be assigned to third parties upon consent of the respective other party. However, the right under Subsection 5.12 is not affected by this. Notwithstanding the foregoing, each party has the right assign this Agreement to an affiliate company without the other party's consent, provided that performance of this Agreement is not materially affected. Moreover, each party has the right to assign this Agreement without the other party's consent to the acquiring entity in case of a merger, split or conversion. In that case, it has to be ensured, that the rights and obligations herein are transferred back if the assignee ceases to be an affiliate company.

10.5. Each party shall bear its own costs, fees and taxes in connection with the conclusion and the performance of this Agreement.

10.6. Any and all provisions in this Agreement shall only be binding if in accordance with applicable law. If any provisions in this Agreement are or become invalid in part or in full, the remaining provisions shall not be affected. The parties shall agree on an alternative provision by way of interpretation, re-interpretation or amendment to achieve the same economic result, or to come as close to it as possible in accordance with the law. The parties are obligated to each other to amend the invalid provision with a valid provisions for the future.

**11.   Dispute Resolution**

11.1. This Agreement shall be exclusively governed by Austrian law without regard to conflict of law rules under Austrian law and under CISG.

11.2. The parties shall resolve any dispute, controversy, or claim arising out of or relating to this Agreement, or the breach, termination, interpretation or invalidity hereof (each, a **"Dispute"**), under the provisions of this Section 11. The procedures set herein shall be the exclusive mechanism for resolving any Dispute that may arise from time to time and Subsections 11.3 through 11.5 are express conditions precedent to litigation of the Dispute.

11.3. A party shall send written notice to the other party of any Dispute (**"Dispute Notice"**). The parties shall first attempt in good faith to resolve any Dispute set forth in the Dispute Notice by negotiation and consultation between themselves. In the event that such Dispute is not resolved on an informal basis within 10 business days after one party delivers the Dispute Notice to the other party, (the last day of such time period, the **"Escalation to Mediation Date"**), either party may initiate mediation under Subsection 11.4.

11.4. Subject to Subsection 11.3, the parties may, at any time after the Escalation to Mediation Date, submit the Dispute to any mutually agreed mediation service for mediation by providing to the mediation service a joint, written request for mediation, setting forth the subject of the dispute and the relief requested. The parties shall cooperate with one another in selecting a mediation service, and shall cooperate with the mediation service and with one another in selecting a neutral mediator and in scheduling the mediation proceedings. The parties covenant that they will use commercially reasonable efforts in participating in the mediation. The parties agree that the mediator's fees and expenses and the costs incidental to the mediation will be shared equally between the parties. The parties further agree that all offers, promises, conduct, and statements, whether oral or written, made in the course of the mediation by any of the parties, their agents, employees, experts, and attorneys, and by the mediator and any employees of the mediation service, are confidential, privileged, and inadmissible for any purpose, including impeachment, in any litigation, arbitration or other proceeding involving the parties, provided that evidence that

EXECUTION VERSION

is otherwise admissible or discoverable shall not be rendered inadmissible or non-discoverable as a result of its use in the mediation.

11.5. If the parties cannot resolve any Dispute for any reason, including, but not limited to, the failure of either party to agree to enter into mediation or agree to any settlement proposed by the mediator, within 30 days after the Escalation to Mediation Date, either party may file suit in a court of competent jurisdiction in accordance with the provisions of Subsection 11.6.

11.6. Subject to Subsections 11.2 through 11.5, any legal suit, action, or proceeding arising out of or based upon or relating to this Agreement or the transactions contemplated hereby shall be instituted as follows: (a) if initiated by RedMax, in any United States federal court or state court located in the state of New Jersey in the City of Newark and County of Essex, and (b) if initiated by Earle, in the courts of Vienna, Republic of Austria. Each party irrevocably submits to the exclusive jurisdiction of such courts in any such suit, action, or proceeding. The parties irrevocably and unconditionally waive any objection to the laying of venue of any suit, action, or proceeding in such courts and irrevocably waive and agree not to plead or claim in any such court that any such suit, action, or proceeding brought in any such court has been brought in an inconvenient forum.

## 12. Preamble a Part of this Agreement

The Preamble recitals are true and correct and are incorporated herein as if repeated at length.

| Appendix A | Piping and Instrumentation Diagram |
| Appendix B | Earle Insurance Policy |
| Appendix C | Parameters |
| Appendix D | Dissolution Agreement |

*****

[*Signatures on the next page*]

EXECUTION VERSION

*[Signature page]*

The individuals signing this Agreement confirm and represent with their signature that they are sufficiently authorized by their respective entities.

W̲e̲n̲, 21/10/07

**Place, Date**

**RedMax GmbH & Co KG**
(previously: Landstraße 199 GmbH & Co KG )
(represented by Dr. Martin Mayrhofer)

N̲S̲, 10/7/2021

**Place, Date**

**Earle Refining LLC**
(represented by N Earle)

**EXECUTION VERSION**

**Appendix A** Piping and Instrumentation Diagram

EXECUTION VERSION

**Appendix B** Earle Insurance Policy

EXECUTION VERSION

Appendix D

## DISSOLUTION AGREEMENT

This dissolution agreement is made on the date below between

**Drott Holding GmbH**, Josef Strebl-Gasse 3, 2345 Brunn am Gebirge

and

**Earle Investments LLC**, 1800 State Route 34, Bldg. 2 Ste. 205, Wall, NJ 07719

As follows:

(1)   The agreement of 23 July 2021 between Drott Holding GmbH and Earle Investments LLC based on the offer made by attorney Dr. Andreas Frauenberger, Landstraßer Hauptstraße 1/1/10, 1030 Wien on behalf of Earle Investments LLC is mutually and fully dissolved and all rights and obligations of the parties are rescinded in their entirety. Both parties expressly and irrevocably waive any existing or future rights or claims resulting out of or in connection with the agreement of 23 July 2021.

(2)   In addition, the parties agree that the payment envisioned in the agreement of 23 July 2021 by Stephen M. Harnik, Esq, Harnik Law Firm, Chrysler East Building, 666 Third Avenue, 10th Floor, New York, 10017, USA, as trustee, to Drott Holding GmbH shall not occur and that the trustee is fully discharged from his obligations in that connection.

(3)   Austrian law, excluding its choice-of-law provisions and the CISG, shall exclusively apply to this dissolution agreement. The parties agree to the exclusive jurisdiction of the competent court in the first district of Vienna for any disputes resulting from or in connection with this agreement.

(4)   This dissolution agreement is enforceable upon execution by both parties.

_____, _____
**Place, Date**

_____
**Drott Holding GmbH**

_____, _____
**Place, Date**

_____
**Earle Investments LLC**

21/22

EXECUTION VERSION

**Appendix C** Parameters

8330263 v1

**EXECUTION VERSION**

**Appendix C** Parameters

8330263 v1



**intertek**

**Total Quality. Assured.**

Hafenstrasse 92  CH-4127 Birsfelden         Fon: +41-61 311 67 55  -  Fax: +41-61 311 69 6

**Intertek (Schweiz) AG**

www.intertek.ch
www.intertek.com
info.birsfelden@intertek.com

---

**Test Report No:**   **117156/07#01**                                                        Page 1 of 2

**Final report**

**Client:**                                          **Pristec AG**
                                                     **Lobgrundstrasse 3**
                                                     **A1220 Vienna**

| | |
|---|---|
| **Test object:** | **HVR untreated** |
| **Date of receipt:** | **2017-06-14** |
| **Container:** | **1 x 5L Metal can** |
| **Origin:** | **Öl Hafen Lobau Wien** |
| **Sample name:** | **India M0.16** |
| **Date of Sampling:** | **2017-05-19** |
| **Compiler:** | **Miguel Delgado** |

| Property | Unit | Result | Test Method | |
|---|---|---|---|---|
| Ash | % (m/m) | <0.001 | EN ISO 6245 | |
| Dichte bei 100 °C | kg/m³ | 974.0 | ASTM D 7042 mod. | (4) |
| Säureaufschluss (HNO3/HF) | | HNO3 / HF komplexiert | Interne Methode | (4) |
| CCAI | | 843 | Calc. | |
| Total Acid Number | mg KOH/g | 1.18 | ASTM D 664 | |
| Strong Acid Number (SAN) | mg KOH/g | <0.05 | ASTM D 664 | |
| Flash point | °C | >150 | EN ISO 2719 | |
| Hydrogen sulphide (H2S) | mg/kg | <0.10 | IP 570 | |
| Pourpoint | °C | 33 | ISO 3016 | |
| Carbon residue | % (m/m) | 22.20 | EN ISO 10370 | |
| Existent total sediment | % (m/m) | – | ISO 10307-1 | |
| Accelerated total sediment | % (m/m) | – | ISO 10307-2b | |
| Potential total sediment | % (m/m) | – | ISO 10307-2a | |
| Viskosität bei 100°C | mm²/s | 2253 | ASTM D 7042 mod. | (4) |
| Water | % (m/m) | <0.1 | ISO 3733 | |
| Sulfur | % (m/m) | 3.73 | ISO 8754 | |
| Heavy Oil Stability | | | ASTM D 7060 | (1) |
| Po | | 77 | | |
| Frmax | | 33 | | |
| SARA | | | ASTM D 2007 | (1) |
| Saturate content | % (m/m) | 9.7 | | |
| Aromatic content | % (m/m) | 39.7 | | |
| Polar content | % (m/m) | 49.1 | | |
| Bromine number | g Br/100g | – | ASTM D 1159 | (1) |

---

**Remark:**   The test results are only valid for the analysed sample. The utilisation of the report for advertising purpo ses, or reference to it in publications, requires the permission of (Schweiz) AG. Details of the analysis (norms, SOPs), as well as limits of detection and standard deviations can be obtained from Intertek (Schweiz) AG. Files, including reports, are retained for ten years at Intertek (Schweiz) AG. The raw data is held at (Schweiz) AG for ten years. The sample is held at Intertek (Schweiz) AG for at least one month after the report has been completed.

(1) Subcontractor, (2) Method not accredited, (4) Analysis at Intertek Schlieren.

00023556-170505-ADB



**Total Quality. Assured.**

Hafenstrasse 92  CH-4127 Birsfelden          Fon: +41-61 311 67 55  -  Fax: +41-61 311 69 6

**Intertek (Schweiz) AG**
www.intertek.ch
www.intertek.com
info.birsfelden@intertek.com

| Test Report No: | 117156/07#01 | | Page 2 of 2 |
|---|---|---|---|
| | **Final report** | | |

| Property | Unit | Result | Test Method |
|---|---|---|---|
| **SIMDIS** | | | ASTM D 7169     (1) |
| Initial boiling point | °C | 217.0 | |
| 5 mass.% distilled at | °C | 505.0 | |
| 10 mass.% distilled at | °C | 533.5 | |
| 20 mass.% distilled at | °C | 567.0 | |
| 30 mass.% distilled at | °C | 592.0 | |
| 40 mass.% distilled at | °C | 614.5 | |
| 50 mass.% distilled at | °C | 638.0 | |
| 60 mass.% distilled at | °C | 664.0 | |
| 70 mass.% distilled at | °C | 697.0 | |
| 80 mass.% distilled at | °C | >720.0 | |
| 90 mass.% distilled at | °C | >720.0 | |
| 95 mass.% distilled at | °C | >720.0 | |
| End point | °C | >720.0 | |
| **Trace Elements** | | | ICP-OES     (4) |
| Al Aluminum | mg/kg | 37 | |
| Ca Calcium | mg/kg | 72 | |
| Cu Copper | mg/kg | 5 | |
| Fe Iron | mg/kg | 56 | |
| Na Sodium | mg/kg | 280 | |
| P  Phosphorus | mg/kg | <1 | |
| Si Silicon | mg/kg | <100 | |
| V  Vanadium | mg/kg | 257 | |
| Zn Zinc | mg/kg | 11 | |

* Please note: CCAI was calculated with iterated density at 15°C acc. to DIN 51757. Density and Viscosity have been measured with mod. method acc. to ASTM D 7042. TSE, TSA and TSP could not be measured because of to heavy consistence of the product. Bromine number could not be measured with this product. SimDis have been measured with ASTM D 7169 method.

Birsfelden, 01.08.2017
Project Leader:

Arnaud Baumann

**Remark:**   The test results are only valid for the analysed sample. The utilisation of the report for advertising purposes, or reference to it in publications, requires the permission of (Schweiz) AG. Details of the analyses (norms, SOPs), as well as limits of detection and standard deviations can be obtained from Intertek (Schweiz) AG. Files, including reports, are retained for ten years at Intertek (Schweiz) AG. The raw data is held at (Schweiz) AG for ten years. The sample is held at Intertek (Schweiz) AG for at least one month after the report has been completed.   .

(1) Subcontractor, (2) Method not accredited, (4) Analysis at Intertek Schlieren                                    200023966-170505-AOB

**EXECUTION VERSION**

**Appendix A**

19/22









EXECUTION VERSION

Appendix B

20/22



THANK YOU FOR BEING OUR POLICYHOLDER



The Buck's Got Your Back®

**LEARN MORE.**

The Hartford's deep specialization can help create customized solutions that better protect you from the complex risks you face.

TheHartford.com/globalspecialty



**THE HARTFORD**

**Business Insurance**
**Employee Benefits**
**Auto**
**Home**

**Policyholder Notice**

### CLAIM REPORTING PROCEDURES

Conditions of the policy require that in the event of a claim, you notify us as soon as practicable All claim notifications are to be reported to the Danbury Office by electronic mail to newloss@thehartford.com.

In the alternative, claim notices may also be:

* Mailed to the Danbury Office at:

    Navigators Management Co., Inc.
    Claims Division
    83 Wooster Heights Road
    Danbury, CT 06810s

* Or faxed to 847-285-9003

* Or telephone 855-444-4796

All claims notifications must be accompanied by an ACORD loss form and should contain current contact information for the insured and claimant(s) as well as a detailed description of the loss.

If the insured files a claim with the agent, it is the agent's responsibility to forward the claim to the Danbury Office.

© 2020 by The Hartford. Classification: Non-Confidential. No part of this document may be reproduced, published or used without the permission of The Hartford.

Page 1 of 2

## COMMERCIAL INLAND MARINE - DECLARATIONS
## RENEWAL CERTIFICATE

**POLICY NUMBER:**      NY21ILMZ0660301

### AMWINS BROKERAGE OF NEW JERSEY
### AMWI0009

Insurance is provided by the Company Designated Below:

**Navigators Insurance Company**
**One Penn Plaza**
**New York, NY 10119**

## NAMED INSURED & MAILING ADDRESS

**EARLE REFINING LLC**
**PO BOX 556**
**FARMINGDALE, NJ  07727**

Policy Period 12:01 a.m. Standard Time:  From  **06/11/2020**  To  **06/11/2021**

Payment of the premium renews this policy for the policy period stated above at Your Mailing Address shown above.

Coverage Parts That
Apply To This Policy                                     Coverage Part Premium

| Commercial Inland Marine Coverage Part: | $20.963 | |
|---|---|---|
| Minimum Premium: | $20.963 | +$375.78 Fees |
| Minimum Earned Factor: | 25% | |

[ X ]  Accepted TRIA            [ ] Declined TRIA

See Attached Revised Schedule of Coverages and Endorsements:

**Page 2 of 2**

- IM 7005 01 12 – Schedule of Coverages – Contractors Equipment
- Addendum A – Equipment Schedule
- IM 7870 01 12 – Split Deductible
- IM 7020 04 04 – Replacement Cost
- IM 7860 11 12 – Earth Mvmt, Flood and Sewer Backup Exclusions
- CL 0605 01 15 – Certified Terrorism Loss Disclosure of Premium
- NAV-PHN-200 04 17 – Claim Reporting Procedures
- G-3418-0-NAVG 09 19 - Producer Compensation Notice

Date:_____08/3/2021_____          BY: _Douglas Elliot_____
       (date Cert was prepped)



**Policy Number
NY21ILMZ06603-01**

### SCHEDULE OF TAXES, SURCHARGES OR FEES

## NAVIGATORS INSURANCE COMPANY

Named Insured    EARLE REFINING, LLC

Effective Date: 08-20-2021
12:01 A.M., Standard Time

Agent Name    AMWINS BROKERAGE

Agent No.    AMWI0009

CO-DEC  (cont.)

SURPLUS LINES TAXES/FEES DETAILED BREAKDOWN:

STATE TAX                                    $       125.78

TOTAL SURPLUS LINES TAXES/FEES               $       125.78

**TAX-FORM (01/97)**

AAIS
IM 7005 01 12
Page 1 of 2

POLICY NUMBER
NY21ILMZ06603-01

# SCHEDULE OF COVERAGES
## CONTRACTORS' EQUIPMENT

(The entries required to complete this schedule
will be shown below or on the "schedule of coverages".)

**PROPERTY COVERED**

(check one)

[X]  Scheduled Equipment (Refer to Addendum A - Equipment Schedule)

[ ]  Schedule On File

"Limit"

Catastrophe Limit -- The most "we" pay
for loss in any one occurrence is:                    $2,000,000

**COVERAGE EXTENSIONS**

Additional Debris Removal Expenses              $_____

**SUPPLEMENTAL COVERAGES**

Employee Tools                                             $_____

Equipment Leased or Rented From Others      $_____

Newly Purchased Equipment  (check one)

    [X]  Percentage of Catastrophe Limit            _____30_____ %

    [ ]  Dollar Limit                                     $_____

Pollutant Cleanup and Removal                     $_____

Rental Reimbursement

    -- Reimbursement Limit                          $_____

    -- Waiting Period                                    _____

Spare Parts and Fuel                                     $_____

Copyright, American Association of Insurance Services, Inc., 2012

**AAIS**
**IM 7005 01 12**
**Page 2 of 2**

**COINSURANCE**  (check one)

[X] 80%        [ ] 90%        [ ] 100%        [ ] Other _____%

**REPORTING CONDITIONS**    (check if applicable)

[ ]  **Equipment Leased or Rented From Others**

-- Reporting Rate                    $_____

-- Deposit Premium                   $_____

-- Minimum Premium                   $_____

**VALUATION**    (check if applicable)

[X]  Actual Cash Value for Contractors Equipment

[X]  Replacement Cost as per IM 7020 04 04

[X]  Indicated on Equipment Schedule - Agreed Amount as per IM 7026 01 07

**DEDUCTIBLE**  (check one)

[X]  Flat Deductible Amount              $25,000 except; 2% ($25,000
                                         min) for Wind/Hail

[ ]  Percentage Deductible               _____ %

    Maximum Deductible Amount            $_____

    Minimum Deductible Amount            $_____

**ADDITIONAL INFORMATION**

Physical Location – 1139 Patton Street, Sulphur, LA 70665

_____

_____

_____

_____

---

**IM 7005 01 12**

Copyright, American Association of Insurance Services, Inc., 2012

DocuSign Envelope ID: F9730748-3288-4971-A098-9072D13D9203

| SCHEDULED EQUIPMENT | % COINSURANCE | | | AGENCY CUSTOMER ID: | 00017706 | | |
|---|---|---|---|---|---|---|---|
| **#** | **TYPE** | **DESCRIPTION** | | **ID # / SERIAL NO.** | | **NEW / USED** | **DATE PURCHASED** |
| **1** | | Acoustical Oil Cracking Module incl | | 000013 | | New | |
| | **MANUFACTURER** | | **MODEL** | | **MODEL YEAR** 2020 | **CAPACITY** | **AMOUNT OF INSURANCE** $ 2,000,000 |
| **#** | **TYPE** | **DESCRIPTION** | | **ID # / SERIAL NO.** | | **NEW / USED** | **DATE PURCHASED** |
| | **MANUFACTURER** | | **MODEL** | | **MODEL YEAR** | **CAPACITY** | **AMOUNT OF INSURANCE** $ |
| **#** | **TYPE** | **DESCRIPTION** | | **ID # / SERIAL NO.** | | **NEW / USED** | **DATE PURCHASED** |
| | **MANUFACTURER** | | **MODEL** | | **MODEL YEAR** | **CAPACITY** | **AMOUNT OF INSURANCE** $ |
| **#** | **TYPE** | **DESCRIPTION** | | **ID # / SERIAL NO.** | | **NEW / USED** | **DATE PURCHASED** |
| | **MANUFACTURER** | | **MODEL** | | **MODEL YEAR** | **CAPACITY** | **AMOUNT OF INSURANCE** $ |
| **#** | **TYPE** | **DESCRIPTION** | | **ID # / SERIAL NO.** | | **NEW / USED** | **DATE PURCHASED** |
| | **MANUFACTURER** | | **MODEL** | | **MODEL YEAR** | **CAPACITY** | **AMOUNT OF INSURANCE** $ |
| **#** | **TYPE** | **DESCRIPTION** | | **ID # / SERIAL NO.** | | **NEW / USED** | **DATE PURCHASED** |
| | **MANUFACTURER** | | **MODEL** | | **MODEL YEAR** | **CAPACITY** | **AMOUNT OF INSURANCE** $ |
| **#** | **TYPE** | **DESCRIPTION** | | **ID # / SERIAL NO.** | | **NEW / USED** | **DATE PURCHASED** |
| | **MANUFACTURER** | | **MODEL** | | **MODEL YEAR** | **CAPACITY** | **AMOUNT OF INSURANCE** $ |
| **#** | **TYPE** | **DESCRIPTION** | | **ID # / SERIAL NO.** | | **NEW / USED** | **DATE PURCHASED** |
| | **MANUFACTURER** | | **MODEL** | | **MODEL YEAR** | **CAPACITY** | **AMOUNT OF INSURANCE** $ |
| **#** | **TYPE** | **DESCRIPTION** | | **ID # / SERIAL NO.** | | **NEW / USED** | **DATE PURCHASED** |
| | **MANUFACTURER** | | **MODEL** | | **MODEL YEAR** | **CAPACITY** | **AMOUNT OF INSURANCE** $ |
| **#** | **TYPE** | **DESCRIPTION** | | **ID # / SERIAL NO.** | | **NEW / USED** | **DATE PURCHASED** |
| | **MANUFACTURER** | | **MODEL** | | **MODEL YEAR** | **CAPACITY** | **AMOUNT OF INSURANCE** $ |
| **#** | **TYPE** | **DESCRIPTION** | | **ID # / SERIAL NO.** | | **NEW / USED** | **DATE PURCHASED** |
| | **MANUFACTURER** | | **MODEL** | | **MODEL YEAR** | **CAPACITY** | **AMOUNT OF INSURANCE** $ |
| **#** | **TYPE** | **DESCRIPTION** | | **ID # / SERIAL NO.** | | **NEW / USED** | **DATE PURCHASED** |
| | **MANUFACTURER** | | **MODEL** | | **MODEL YEAR** | **CAPACITY** | **AMOUNT OF INSURANCE** $ |
| **#** | **TYPE** | **DESCRIPTION** | | **ID # / SERIAL NO.** | | **NEW / USED** | **DATE PURCHASED** |
| | **MANUFACTURER** | | **MODEL** | | **MODEL YEAR** | **CAPACITY** | **AMOUNT OF INSURANCE** $ |
| **#** | **TYPE** | **DESCRIPTION** | | **ID # / SERIAL NO.** | | **NEW / USED** | **DATE PURCHASED** |
| | **MANUFACTURER** | | **MODEL** | | **MODEL YEAR** | **CAPACITY** | **AMOUNT OF INSURANCE** $ |
| **#** | **TYPE** | **DESCRIPTION** | | **ID # / SERIAL NO.** | | **NEW / USED** | **DATE PURCHASED** |
| | **MANUFACTURER** | | **MODEL** | | **MODEL YEAR** | **CAPACITY** | **AMOUNT OF INSURANCE** $ |

| AAIS<br>IM 7870 01 12<br>Page 1 of 1 | This endorsement changes the<br>Inland Marine Coverage<br>-- PLEASE READ THIS CAREFULLY -- | POLICY NUMBER<br>NY21ILMZ06603-01 |
|---|---|---|

## SPLIT DEDUCTIBLE ENDORSEMENT

(The entries required to complete this endorsement
will be shown below or on the "schedule of coverages".)

### DEDUCTIBLE SCHEDULE

1. Covered Peril(s) ___Wind/Hail_____

   Deductible Amount 2% ($25,000 min)_____

2. Covered Peril(s) _____

   Deductible Amount _____

3. Covered Peril(s) _____

   Deductible Amount $_____

4. All Other Covered Perils Not Described Above

   Deductible Amount $25,000_____

### HOW MUCH WE PAY

The deductible provision under How Much We Pay is replaced by the following:

**Split Deductible** -- When a loss is caused by the described covered peril, "we"
pay only that part of "your" loss that is over the deductible amount indicated on
the Deductible Schedule. When a loss is caused by any other covered peril, "we"
pay only that part of "your" loss that is over the deductible amount indicated on
the Deductible Schedule for all other covered perils.

IM 7870 01 12

Copyright, American Association of Insurance Services, Inc., 2012

AAIS
IM 7860 11 12
Page 1 of 3

This endorsement changes
the Inland Marine Coverage
-- PLEASE READ THIS CAREFULLY --

POLICY NUMBER
NY21ILMZ06603-01

# EARTH MOVEMENT, FLOOD, AND SEWER BACKUP EXCLUSIONS

(The entries required to complete this endorsement
will be shown below or on the "schedule of coverages".)

## SCHEDULE

Indicate if applicable:

[X]  Earth Movement Exclusion

[X]  Flood Exclusion

[X]  Sewer, Septic Tank, Sump, Or Drain Backup And
Water Below The Surface Exclusion

## DEFINITIONS

1.  The following definitions are added to the
Inland Marine Coverage Part to which this
endorsement is attached.

a.  "Earth movement" means:

1)  The movement of the ground, soil,
sediments, substrates, or strata
whether the movement is caused by
an act of nature or is manmade,
including but not limited to:

a)  earthquake including
aftershocks, liquefaction, or
ground displacement associated
with earthquake;

b)  eruption, explosion, or effusion
of a volcano;

c)  shaking or ground rupture
before, during or after a volcanic
eruption;

d)  landslide;

e)  mine subsidence whether or not
the manmade mine is currently
in use; or

f)  any other ground movement,
including sinking (other than
"sinkhole collapse"), shifting,
contraction, or rising of the
ground including, but not limited
to:

(1)  erosion, expansion,
shrinking;

(2)  freezing or thawing;

(3)  soil compaction; and

(4)  movement caused by water
under the surface of the
ground

that cause cracking, settling,
tilting, leaning, or shifting of
covered property.

2)  The movement of the ground, soil,
sediments, substrates, or strata
resulting from any act, error or
omission including but not limited to:

a)  construction or excavation
activities, regardless of whether
or not occurring under covered
property and regardless of
whether the construction or
excavation was being performed
at "your" request or for "your"
benefit;

Copyright, American Association of Insurance Services, Inc., 2012

AAIS
IM 7860 11 12
Page 2 of 3

b) blasting or vibration from any source;
c) any process for removing gas; oil; minerals; water; steam; or any other natural resource, substance, or material from below the surface of the ground including, but not limited to, hydraulic fracturing (fracking), mining, drilling, or geothermal energy extraction;
d) water injection below the surface of the ground, whether wastewater from hydraulic fracturing or any other source or water injected into underground rock for the purpose of creating geothermal energy; or
e) carbon sequestration, biosequestration or any other process for removing carbon dioxide or other forms of carbon from the atmosphere and placed it in an underground reservoir, underground geologic formations or any underground storage technique.

b. "Flood" means an overflowing or inundation by water of an area that was previously and normally dry or not covered by water, whether caused artificially or naturally, by human or animal forces or by an act of nature. "Flood" includes, but is not limited to:

1) overflow of inland or tidal waters, waves, tidal waves, or tsunamis, or spray that results from any of these, all whether driven by wind or not, including but not limited to storm surge;
2) unusual and rapid accumulation or runoff of surface waters from any source; or
3) mudslides or mudflows if caused by:

a) unusual and rapid accumulation or runoff of surface waters or waves; or
b) currents of water exceeding anticipated cyclical levels.

2. Unless otherwise defined, the following definition is added to the Inland Marine Coverage Part to which this endorsement is attached.

"Volcanic action" means airborne volcanic blast or airborne shock waves; ash, dust, or particulate matter; or lava flow.

"Volcanic action" does not include the cost to remove ash, dust, or particulate matter that does not cause direct physical loss or damage to the covered property.

## ADDITIONAL PERILS EXCLUDED

If indicated on the schedule above or on the "schedule of coverages", "we" do not pay for loss or damage caused directly or indirectly by, or consisting of, one or more of the following excluded causes, events, or conditions. Such loss or damage is excluded regardless of other causes, events, or conditions that contribute in any sequence to or aggravate the loss, whether such causes, events, or conditions act to produce the loss before, at the same time as, or after the excluded causes, events, or conditions.

1. **Earth Movement** — Any "earth movement" whether natural or manmade and regardless of cause and regardless of whether or not the cause of the "earth movement":

   a. originated at the covered property; or

   b. was being performed at "your" request or for "your" benefit.

   However, if eruption, explosion, or effusion of a volcano results in "volcanic action", "we" will pay for the loss or damage caused by that "volcanic action".

   If "earth movement" results in fire, "we" will pay for the loss or damage caused by that fire. If "earth movement" (other than eruption, explosion, or effusion of a volcano) results in explosion, "we" will pay for the loss or damage caused by that explosion.

Copyright, American Association of Insurance Services, Inc., 2012

**AAIS**
**IM 7860 11 12**
**Page 3 of 3**

This exclusion does not apply to covered property while in transit if property in transit is covered under this Inland Marine Coverage Part.

2. **Flood** – "Flood".

   "We" also do not cover waterborne material carried or otherwise moved by "flood", whether or not driven by wind, including storm surge, or material carried or otherwise moved by mudslide or mudflow.

   However, if "flood" results in fire, explosion, or sprinkler leakage, "we" will pay for the loss or damage caused by that fire, explosion, or sprinkler leakage.

   This exclusion does not apply to covered property while in transit if property in transit is covered under this Inland Marine Coverage Part.

3. **Sewer, Septic Tank, Sump, Or Drain Backup And Water Below The Surface --**

   a. Water or waterborne material that backs up, overflows or is otherwise discharged through a sewer or drain, sump or septic tank, eaves trough or downspout; or

   b. water or waterborne material below the surface of the ground, whether naturally or artificially occurring, including but not limited to water or waterborne material that exerts pressure on or flows, seeps, or leaks through or into a covered building or structure, sidewalk, driveway, foundation, swimming pool, or other structure.

   But if sewer, drain, sump, septic tank, eaves trough, or downspout backup and water or waterborne material below the surface results in fire, explosion, or sprinkler leakage, "we" cover the loss or damage caused by that fire, explosion, or sprinkler leakage.

   This exclusion does not apply to covered property while in transit if property in transit is covered under this Inland Marine Coverage Part.

**IM 7860 11 12**

Copyright, American Association of Insurance Services, Inc., 2012

**AAIS**
**CL 0605 01 15**
**Page 1 of 1**

This endorsement changes
the policy
-- PLEASE READ THIS CAREFULLY --

**POLICY NUMBER**
**NY21ILMZ06603-01**

## CERTIFIED TERRORISM LOSS DISCLOSURE OF
## PREMIUM AND FEDERAL SHARE OF INSURED LOSSES

(The entries required to complete this endorsement will be shown
below, on the "declarations", or on the "schedule of coverages".)

### SCHEDULE

Certified Terrorism Loss Premium   $ ___611___

Additional information, if any, concerning terrorism premium:

1. The portion of "your" premium that is attributed to coverage for "certified terrorism loss" is shown in the Schedule above.

2. Coverage for "certified terrorism loss", to the extent that such coverage is provided by this policy or Coverage Part, will be partially reimbursed by the United States Government, Department of Treasury under a federal program. Under that program, the United States pays the following percentage of insured losses for "certified terrorism loss" that exceeds the statutorily established deductible that "we" retain:

   a. 85%, for insured losses occurring before January 1, 2016;

   b. 84%, for insured losses occurring during the 2016 calendar year;

   c. 83%, for insured losses occurring during the 2017 calendar year;

   d. 82%, for insured losses occurring during the 2018 calendar year;

   e. 81%, for insured losses occurring during the 2019 calendar year; and

   f. 80%, for insured losses occurring on or after January 1, 2020.

   However, if aggregate insured losses attributable to terrorist acts certified under the Terrorism Risk Insurance Act, as amended, exceed one hundred billion dollars in a calendar year (January 1 through December 31), the Treasury will not make payment for any portion of the amount of such losses that exceeds one hundred billion dollars.

   If the Secretary of the Treasury determines that the aggregate amount of "certified terrorism loss" has exceeded one hundred billion dollars in a calendar year (January 1 through December 31), and "we" have met "our" insurer deductible under the Terrorism Risk Insurance Act, as amended, "we" will not pay for any portion of "certified terrorism loss" that exceeds one hundred billion dollars. If the "certified terrorism loss" exceeds one hundred billion dollars in a calendar year (January 1 through December 31), losses up to one hundred billion dollars are subject to pro rata allocation in accordance with procedures established by the Secretary of the Treasury under the Terrorism Risk Insurance Act, as amended.

CL 0605 01 15

Copyright, American Association of Insurance Services, Inc., 2015



A BRAND OF THE HARTFORD

**PRODUCER COMPENSATION NOTICE**

You can review and obtain information on The Hartford's producer compensation practices at www.TheHartford.com or at 1-800-592-5717.

**MANU IM 07 07**

**Endorsement No.:**   1
**Insured:**            **Earle Refining LLC**
**Policy No.:**         **NY21ILMZ0660301**
**Effective Date:**     **8/20/2021**


This endorsement changes the Inland Marine Coverages
——-**PLEASE READ THIS CAREFULLY**——

It is hereby understood and agreed the Renewal Certificate is amended to read the following:

Policy Period 12:01 a.m. Standard Time: From **08/20/2021**   To **08/20/2022**

**All other terms and conditions remain unchanged.**

Page 1 of 2

## COMMERCIAL INLAND MARINE - DECLARATIONS
## RENEWAL CERTIFICATE

**POLICY NUMBER:**          **NY21ILMZ0660301**

### AMWINS BROKERAGE OF NEW JERSEY
### AMWI0009

Insurance is provided by the Company Designated Below:

**Navigators Insurance Company**
**One Penn Plaza**
**New York, NY 10119**

## NAMED INSURED & MAILING ADDRESS

### EARLE REFINING LLC
### PO BOX 556
### FARMINGDALE, NJ  07727

Policy Period 12:01 a.m. Standard Time:  From  **08/20/2021**  To  **08/20/2022**

Payment of the premium renews this policy for the policy period stated above at Your Mailing Address shown above.

Coverage Parts That
Apply To This Policy                                    Coverage Part Premium

| | |
|---|---|
| Commercial Inland Marine Coverage Part: | $20,963 |
| Minimum Premium: | $20,963 |
| Minimum Earned Factor: | 25% |

[ X ]   Accepted TRIA            [ ] Declined TRIA

**Page 2 of 2**

**See Attached Revised Schedule of Coverages and Endorsements:**
- IM 7005 01 12 – Schedule of Coverages – Contractors Equipment
- Addendum A – Equipment Schedule
- IM 7870 01 12 – Split Deductible
- IM 7020 04 04 – Replacement Cost
- IM 7860 11 12 – Earth Mvmt, Flood and Sewer Backup Exclusions
- CL 0605 01 15 – Certified Terrorism Loss Disclosure of Premium
- NAV-PHN-200 04 17 – Claim Reporting Procedures
- G-3418-0-NAVG 09 19 - Producer Compensation Notice

Date: ___08/3/2021___          BY: _Douglas Elliot_____
    (date Cert was prepped)